IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. RDB 08-056 |
| | * | |
| PATRICK ALBERT BYERS, ET AL. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Defendants Patrick A. Byers, Jr., and Frank K. Goodman have been charged in a nine-count federal indictment, which includes the charge of murder-for-hire of Government witness Carl Stanley Lackl in violation of 18 U.S.C. § 1958(a).

On January 13, 2009, this Court conducted a telephone conference with all parties to address jury selection procedures in anticipation of trial. During the conference call, this Court indicated that it was going to grant the Government's request that the names and addresses of jurors be under seal and be anonymous to the parties and the public. All co-defendants objected to this ruling on the record. By Letter Order dated February 2, 2009, this Court reiterated its mandate for juror anonymity having "determined by a preponderance of the evidence that releasing this information may jeopardize the jurors' safety." (Paper No. 178.) In the pending Motion for Relief from Anonymous Jury Order (Paper No. 182), Defendant Byers seeks reconsideration. For the reasons set forth below, that motion is DENIED and the names and addresses of the jurors in this case will be placed under seal and remain anonymous to the parties and the public.

## BACKGROUND

As an initial matter, it is important to clarify the extent to which the jury will be "anonymous." This Court has ordered that the jurors' names, addresses, and places of employment be under seal. In addition, during individualized *voir dire* of every prospective juror, each potential juror has been cautioned not to divulge any information that would potentially disclose his or her identity. Otherwise, all other information concerning the jurors is open and discoverable,[1] and the lawyers have been permitted to question the jurors concerning their responses to an exhaustive juror questionnaire.

Byers argues that the empanelment of an anonymous jury is an extreme measure that is unwarranted under the circumstances. He claims that the concealment of jurors' names and addresses has infringed his rights to due process and the presumption of innocence under the Fifth Amendment and his rights to an impartial jury and a public trial under the Sixth Amendment. In addition, he cites a statutory right to obtain a venire list due to the disclosure requirements for capital cases contained in 18 U.S.C. § 3432. He states that his defense will be prejudiced because counsel are barred from searching available public data on the jurors and their criminal histories.[2]

The United States Court of Appeals for the Fourth Circuit has not addressed the issue of juror anonymity in a capital case. The only precedent that bears any tangential relevance is the Fourth Circuit's decision in *In re Baltimore Sun Co.*, 841 F.2d 74 (4th Cir. 1988). Prior to the commencement of a high-profile criminal prosecution of savings and loan executives, the

---

[1] Some courts refer to such a jury as "innominate," rather than "anonymous," "because, after a thorough *voir dire*, the parties [know] everything about the jurors except their names." *United States v. Bowman*, 302 F.3d 1228, 1236 n.1 (11th Cir. 2002) (citing *United States v. Carpa*, 271 F.3d 962, 963 n.1 (11th Cir. 2001)).

[2] In his motion, Byers states that the Government will have the ability to conduct a search of the information on the jurors and will thereby enjoy a tactical advantage. (Def.'s Mot. at 3-4.) However, Byers overlooks the fact that the jurors' identities will be concealed from both defendants and the Government, thus eliminating the potential for any one-sided advantage. *See United States v. Barnes*, 604 F.2d 121, 142 (2d Cir. 1979) (noting that "both the prosecutor and defense were equally in the dark as to names and addresses of the prospective panelists").

Baltimore Sun newspaper intervened to obtain access to the jury venire list. This Court denied

that request. In response to an application for writ of mandamus, the Fourth Circuit recognized a

common law right of access to the names and addresses of jurors and alternates. The court found

that this right is triggered when the jury is chosen, at which point the information becomes a part

of the public record. *Id.* at 75. While acknowledging the pressures placed upon jurors in highly

publicized trials, the court stated that "the risk of loss of confidence of the public in the judicial

process is too great to permit a criminal defendant to be tried by a jury whose members may

maintain anonymity." *Id.* at 76.

The reasoning in *Baltimore Sun* is closely moored to the case's unique factual

circumstances. In its opinion, the court only addressed the right of access of the press, as all

parties in the case sought to preserve the confidentiality of the jurors' identities. For this reason,

the court relied upon the United States Supreme Court's First Amendment precedents in *Press-*

*Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501 (1984) and *Press-Enterprise Co. v.*

*Superior Court of Cal.*, 478 U.S. 1 (1986), which concerned the public's and press' right of

access to criminal trials. *Id.* at 76. Despite its application of First Amendment principles, the

court emphasized the limited significance of its decision by stating that it was not based upon the

First Amendment,[3] or specifically on the defendants' Sixth Amendment right to a public trial.

*Id.* at 76 & 76 n.4. Finally, and most importantly, the court stated: "[w]e emphasize that we do

not deal here with a situation in which there existed realistic threats of violence or jury

corruption." *Id.* at 76 n.5. Thus, it is clear that the holding and decision in *Baltimore Sun* are

inapplicable to the present matter concerning a challenge to juror anonymity in a capital trial for

---

[3] The court stated: "[w]e see no need to and do not base our decision on the First Amendment." *In re Baltimore Sun Co.*, 841 F.2d 74, 76 n.4 (4th Cir. 1988).

the murder of a government witness.  As a result, this Court analyzes the propriety of juror

anonymity in this case as an issue of first impression.

## ANALYSIS

### I.        Applicable Standards

A district court is permitted, under 28 U.S.C. § 1863(b)(7), to empanel an anonymous

jury when "the interests of justice so require."  Thus, it is well established that a trial judge has

broad discretion in conducting *voir dire*, subject only to the "essential demands of fairness."

*Aldridge v. United State*s, 283 U.S. 308, 310 (1931); *United States v. Rucker*, 557 F.2d 1046,

1049 (4th Cir. 1977).  However, this Court is mindful that empanelling an anonymous jury is an

"extreme measure" that is only warranted in exceptional circumstances.  *United States v.*

*Mansoori*, 304 F.3d 635, 650 (7th Cir. 2002).  This stems from the recognition that "'an

anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors

must be protected, thereby implicating the defendant's constitutional right to a presumption of

innocence.'"  *United States v. Edmund*, 52 F.3d 1080, 1090 (D.C. Cir. 1995) (quoting *United*

*States v. Ross*, 33 F.3d 1507, 1519 (11th Cir. 1994)).  In addition, some courts have found that

"juror anonymity denies a defendant information that might be helpful in the exercise of his or

her right to utilize peremptory challenges during *voir dire*." *Edmund*, 52 F.3d at 1090; *see also*

*United States v. Barnes*, 604 F.2d 121, 142 (2d Cir. 1979) ("There must be sufficient information

elicited on *voir dire* to permit a defendant to intelligently exercise . . . his peremptory

challenges.").

In deciding whether to empanel an anonymous jury, a court must "balance the

defendant's interest in conducting meaningful *voir dire* and in maintaining the presumption of

innocence, against the jury member's interest in remaining free from real or threatened violence

and the public interest in having the jury render a fair and impartial verdict." *United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994).  When conducting this balancing inquiry, many of the circuit courts of appeal have adopted the Second Circuit's directive that a court should not empanel an anonymous jury without first "a) concluding that there is a strong reason to believe the jury needs protection, and b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991); *see, e.g., United States v. Shryock*, 342 F.3d 948, 971 (9th Cir. 2003); *United States v. Talley*, 164 F.3d 989, 1001 (6th Cir. 1999); *United States v. DeLuca*, 137 F.3d 24, 31 (1st Cir. 1998); *United States v. Darden*, 70 F.3d 1507, 1532 (8th Cir. 1995).

When considering the first issue of jury protection, courts have prescribed five factors to inform a district court's discretion, namely: "(1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment." *Ross*, 33 F.3d at 1520; *see, e.g., Shyrock*, 342 F.3d at 971; *Mansoori*, 304 F.3d at 649; *Darden*, 70 F.3d at 1532.  These five factors are intended to provide guidance and "are neither exclusive nor dispositive, and the district court should make its decision based on the totality of the circumstances." *Shryock*, 342 F.3d at 971.

In capital cases, the question of juror anonymity is also influenced by a supplemental authority in 18 U.S.C. § 3432, which provides:

> A person charged with treason or other capital offense shall at least three entire
> days before commencement of trial be furnished with a copy of the indictment

and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each veniremen and witness, except that such list of the veniremen and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.

18 U.S.C. § 3432. Accordingly, in order to conceal juror information, a district court in a capital case must determine, "by a preponderance of the evidence," that disclosure of the contested information "may jeopardize the life or safety of any person." *Id.* This requires, in turn, an analysis into the dangerousness of the defendant and his willingness and ability to interfere in the judicial process—an inquiry that is informed by the five-factor test expounded above. *United States v. Honken*, 378 F. Supp. 2d 880, 905-06 (N.D. Iowa 2004); *United States v. Edelin*, 128 F. Supp. 2d 23, 43 (D. D.C. 2001).

## II.   Legal Analysis

### A)  Issue of the Need for Jury Protection

This Court reviews the entire record, including the Superseding Indictment and testimony from prior evidentiary hearings,[4] in determining whether an anonymous jury is necessary "to protect the life and safety of any person." *See* 18 U.S.C. § 3432; *see Edelin*, 128 F. Supp. 2d at 43-44 (relying upon indictment and government proffers in reaching its decision on the need for jury anonymity). Byers contends that, under 18 U.S.C. § 3432, an evidentiary hearing must be held before any findings may be made on the issue of juror safety. However, no court has held that such an evidentiary hearing is mandated under the statute. *United States v. Price*, No. 05-CR-492, 2008 U.S. Dist. LEXIS 84441, at *10-11 (E.D.N.Y. Oct. 21, 2008). In light of the nature of the charges in this case and the evidence already presented in four pretrial evidentiary hearings, there is no need to conduct an additional hearing on this isolated matter. *See United*

---

[4] This includes the pretrial evidentiary hearings held on September 12 and 16, 2008, February 27, 2009, and March 18, 2009.

6

*States v. Henderson*, 461 F. Supp. 2d 140, 141 (S.D.N.Y. 2006) (making Section 3432 finding without conducting a hearing on basis of the indictment and government submissions); *Edelin*, 128 F. Supp. 2d at 43-44 (reaching Section 3432 decision without conducting a hearing); *United States v. Nguyen*, 928 F. Supp. 1525, 1551 n.29 (D. Kan. 1996) (conducting *in camera* review of government's evidence).

The Superseding Indictment charges Defendants with extremely violent crimes, including conspiracy and murder-for-fire of a government witness and possession of a firearm in the furtherance of a drug trafficking crime. *See, e.g., Amuso*, 21 F.3d at 1264-65 (indictment charged defendant for crimes of extreme violence including murders of government witnesses). On March 4, 2006, an individual named Larry Haynes was murdered by gunfire in front of 2401 North Jefferson Street in the City of Baltimore. That same day, eyewitness Carl Stanley Lackl made a positive photo-array identification of Byers as the individual he saw running from the murder scene in possession of a firearm. Soon thereafter, Byers was charged with the murder of Larry Haynes and his trial was scheduled to begin in the Circuit Court for Baltimore City on July 10, 2007. While incarcerated in the Baltimore City Detention Center, Byers allegedly came into possession of a subpoena issued by his prior counsel for information and records relating to Lackl, who was identified in the subpoena by name and address. The Superseding Indictment charges that Byers conspired with several individuals, including co-defendant Goodman, to have Lackl murdered in order to prevent his testimony. A monetary award of $2,500 was allegedly promised and granted in return for the murder of Lackl, who was fatally shot in front of his home on July 2, 2007, just eight days prior to the commencement of the state trial. It is alleged that several of the co-conspirators were members of the "Bloods" street gang. To coordinate the

planning and commission of the murder, the co-conspirators allegedly used cell phones and Byers allegedly used a contraband cell phone to make calls from his jail cell.

In addition, the record reveals that Byers has a prior history of violence. Byers is alleged to have been a drug dealer in the vicinity of the intersection of North Montford Avenue and Jefferson Street in the east side of Baltimore City. In order to assert his control over his drug turf, Byers exhibited a willingness to use violent means, as evidenced by his alleged shooting of Carlile Coleman on May 24, 2004. Coleman testified before this Court on February 27, 2009, and specifically identified Byers as the individual who shot him at the entrance to his residence at 506 N. Montford Avenue. Coleman specifically testified that Byers shot him multiple times with a .45 semiautomatic gun, causing severe and permanent injuries. This shooting occurred less than a block away from where Haynes was shot and directly across the street from the alley where Lackl saw Byers discard his gun.

Initially this Court analyzes the first three factors in the five-factor test enunciated by the Eleventh Circuit in the need for juror protection. *See Ross*, 33 F.3d at 1520. Having heard testimony at four pretrial evidentiary hearings, including the specific testimony of Coleman, this Court finds, by a preponderance of the evidence, that Byers has utilized violent means to protect and further his interests.[5] Defendants have demonstrated a willingness and ability to interfere in the judicial process as evidenced by the alleged conspiracy to murder Lakl in order to prevent his imminent testimony at Byers' trial for the Haynes murder. *See Edmund*, 52 F.3d at 1092 (noting that information "indicating a general willingness to obstruct justice on the part of a defendant or

---

[5] Byers contends that an anonymous jury is not warranted because Defendants were "never alleged to have been involved in any type of *juror tampering*." (Def.'s Mot. at 6 (emphasis in original).) This Court is not persuaded by this restrictive view. The Defendants in this case are alleged to have obstructed justice through the commission of a conspiracy to kill a government witness. It is elementary that such conduct "is more than adequate to support a real possibility that a defendant will threaten or otherwise tamper with jurors." *United States v. Edmund*, 52 F.3d 1080, 1092 (D.C. Cir. 1995); *see United States v. Gotti*, No. S8-02-CR-743, 2004 U.S. Dist. LEXIS 20270, at *8 (S.D.N.Y. Oct. 7, 2004) ("It is no great leap from the intimidation and murder of potential informants to jury tampering").

his associates, is more than adequate to suggest a real possibility that a defendant will threaten or otherwise tamper with jurors"). Moreover, to carry out the conspiracy to murder, Byers and co-Defendants are alleged to have worked with members of the Bloods gang. *See United States v. Salvatore*, 110 F.3d 1131, 1143-44 (5th Cir. 1997) (noting the fact that defendants were "closely connected with organized crime" as an indicia supporting juror anonymity). Because of their ties to this criminal organization in the Baltimore area, Defendants have an enhanced ability to interfere with the administration of this judicial proceeding.[6] *See Darden*, 70 F.3d at 1532-33 (noting defendant's ties to criminal enterprise that "had many members and associates who remained at large throughout the trial"); *Shryock*, 342 F.3d at 972 (observing that defendants "were involved with the Mexican Mafia, an extraordinarily violent organized crime enterprise," and that "there were hundreds of Mexican Mafia members and associates still at large").

In addition, the need to protect the jurors through anonymity is further supported by the fact that Byers is facing the potentiality of the death penalty and his co-defendant Goodman is facing a term of life imprisonment. *See Honken*, 378 F. Supp. 2d at 911 ("[A]t least where there is other evidence showing that the defendant has the capacity to harm jurors, and has in the past been willing to exercise that capacity . . . the defendant's potential death sentence is also a factor weighing in favor of an anonymous jury.") (emphasis omitted). In *United States v. DeLuca*, the

---

[6] A continuation of a hearing on a suppression motion in this case was scheduled for March 12, 2009. On that date, the witness Joseph Parham advised government counsel that that he did not want to be involved in this matter and would assert his Fifth Amendment privilege against self-incrimination. The Government filed a motion to compel that witness's testimony pursuant to 18 U.S.C. § 6001 *et seq.*, and this Court issued an Order compelling Parham's testimony. At a hearing on March 18, 2009, Parham recanted, for the first time, his previous statements given to government agents regarding what he witnessed at the scene of the Haynes murder. This Court makes no finding as to Parham's credibility and the determination of the facts lies within the province of the jury at trial. However, this Court cannot ignore the fact that nine days after the commencement of individualized *voir dire* in this case, and five days before opening statements scheduled for March 23, 2009, a witness has suddenly changed his testimony.
     On the morning of March 23, 2009, just prior to opening statements for trial, this Court was informed that a contraband cell phone was seized from Byers' bed in his cell at the Maryland Correctional Adjustment Center "Supermax" facility on March 17, 2009. The Government proffers that information from the "recent calls" feature of the cell phone reveals a recent call between Byers and Parham on March 13, 2009—five days prior to the March 18, 2009 identification hearing when Parham recanted his identification of Byers as the person he saw shoot Haynes.

court noted that defendants "were confronting *mandatory lifetime sentences* upon conviction, which surely provided a strong inducement to resort to extreme measures in any effort to influence the outcome of their trial." 137 F.3d 24, 32 (1st Cir. 1998) (emphasis in original). In this case, such an inducement is especially powerful for Byers, who is facing the potentiality of a death penalty sentence if he is convicted. *See Edelin*, 128 F. Supp. 2d at 31 (remarking that the fourth factor is "clearly present" when one defendant faces the death penalty and co-defendants face life imprisonment since "[o]bviously the defendants would have an incentive to influence jurors").

Finally, the last factor of the five-factor test concerning publicity also weighs in favor of juror anonymity, as the publicity attendant to this trial "could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment." *Ross*, 33 F.3d at 1520. During the past two years significant media attention has surrounded the Lackl murder and its relationship to the earlier Haynes trial and such recognition has grown since the initiation of the federal government's case against Byers.[7] Although the publicity factor is often attributed less weight in the total analysis, this Court finds that it reinforces the need for juror anonymity. *See Price*, 2008 U.S. Dist. LEXIS 84441, at *8 (noting that the likelihood of publicity is "not as decisive" as the other factors but that "it lends some support . . . for an anonymous jury").

After weighing the totality of the circumstances, this Court finds by a preponderance of the evidence that there is "a strong reason to believe the jury needs protection" and jury anonymity will therefore be preserved. *Paccione*, 949 F.2d at 1192.

**B) Precautions to Minimize Prejudice to the Defendants**

_____

[7] On March 12, 2009, a hearing was conducted on the record to address the letter request of WBAL-TV and WMAR-TV challenging this Court's decision to close the individualized *voir dire* proceedings to members of the press and public. At the hearing, this Court reaffirmed its decision to keep the proceedings closed.

Having concluded that an anonymous jury is necessary "to protect the life and safety" of the jurors, 18 U.S.C. § 3432, this Court has taken extensive precautions to minimize any prejudicial effects upon Defendants and ensure that their fundamental rights are protected. Indeed, during the individualized *voir dire* process this Court has advised each juror of the Defendants' presumption of innocence. However, while the rights to a presumption of innocence, an impartial jury obtained through effective *voir dire*, and the proper exercise of peremptory challenges are fundamental, they are not absolute, for "each, at times, must yield to the legitimate demands of trial administration and courtroom security so long as steps are taken to ensure that the defendant receives a fair trial." *Edmund*, 52 F.3d at 1090.

**i)   Right to a Presumption of Innocence under the Fifth Amendment**

There is some authority holding that a defendant's Fifth Amendment right to a presumption of innocence may be imperiled when a jury infers from the mere fact of its anonymity "that the defendant is a dangerous person from whom the jurors must be protected." *Mansoori*, 304 F.3d at 650. Courts are encouraged to emphasize that defendants are presumed innocent until proven guilty and that "the reasons for the use of such a jury . . . [have] nothing to do with the [defendants'] guilt or innocence." *Shryock*, 342 F.3d at 972-73. *See also United States v. Edwards*, 303 F.3d 606, 615 (5th Cir. 2002) (approving district court's instruction that "defendants were presumed innocent until proven guilty" and that it was "using these procedures to protect juror privacy and ensure a fair trial for both sides").

Accordingly, during individualized *voir dire*, the jurors have been reminded of the presumption of innocence. Furthermore, they have been advised and will continue to be advised that anonymity is aimed at shielding them from media contact and that their role is to decide the case solely on the basis of the evidence presented in court. *See, e.g., United States v. Collazo-*

*Aponte*, 216 F.3d 163, 182 (1st Cir. 2000); *DeLuca*, 137 F.3d at 32.  No mention will be made as

to whether or not anonymity is related to juror safety.  *See United States v. Marrero-Ortiz*, 160

F.3d 768, 776 (1st Cir. 1998) (approving trial judge's instruction that "did not mention any threat

to juror safety, but, rather informed the jurors that they would remain anonymous during the trial

because of publicity concerns . . . and instructed the jury on the presumption of innocence, and

periodically repeated that instruction as the trial progressed").

### ii)  Right to An Impartial Jury under the Sixth Amendment

A defendant's right to an impartial jury is secured through the administration of a

thorough *voir dire* process.  Perhaps the most critical consideration in this endeavor is the need

to uncover any biases against the issues or any of the defendants involved.  For this reason,

measures have been taken to ensure that an especially extensive *voir dire* process is conducted

and available safeguards are employed.  A lengthy, 36-page questionnaire, crafted through the

participation and consent of all parties, was distributed to approximately 500 prospective jurors.

The questionnaire was specifically tailored to elicit a great deal of information about each juror,

especially concerning issues of bias.  The only information that has been concealed is the actual

name and address of each juror, and his or her employer's name.[8]  After the completed

questionnaires were returned, the parties convened on March 4, 2009 for a hearing, conducted on

the record, in which the pool of jurors was narrowed by filtering out those responses that clearly

evidenced bias or an inability to sit through the trial.  Individualized *voir dire* has been

conducted since the first day of the trial on March 9, 2009, during which time approximately 30

jurors per day have been separately questioned by the parties.  At the request of the Defendants

and the Government, the individualized *voir dire* has been conducted as an *in camera*

---

[8] Nonetheless, each juror's form of employment and the community of residence are expressed in general terms.

proceeding, to ensure that the jurors are forthcoming in response to questioning on critical issues such as racial bias and the death penalty.

The *voir dire* process has been both extensive and carefully choreographed to "uncover any bias as to the issues or the defendants." *United States v. Aulicino*, 44 F.3d 1102, 1116 (2d Cir. 1995).  As a result, Defendants will have had sufficient opportunity to gather information in order to intelligently exercise their peremptory challenges.  *See Paccione*, 949 F.2d at 1192 ("[A] defendant's fundamental right to an unbiased jury is adequately protected by the court's conduct of a *voir dire* designed to uncover bias as to the issues in the cases and as to the defendant himself.") (internal quotations omitted).

## CONCLUSION

Accordingly, Byers' Motion for Relief from Anonymous Jury Order (Paper No. 182) is DENIED.

A separate Order follows.

Dated: March 24, 2009.

/s/ _____

Richard D. Bennett
United States District Judge