1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION

3    UNITED STATES OF AMERICA

4                                    CRIMINAL NO.

5     v.                            08-056

6

7    PATRICK A. BYERS, JR, ET AL        March 26, 2009

8                  Defendants

9    _____/

10                  DAY ELEVEN
                TRANSCRIPT OF PROCEEDINGS

11          BEFORE THE HONORABLE RICHARD D. BENNETT,

12            UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   On behalf of the United States:

15   John F. Purcell, AUSA
     Bryan Giblin, AUSA

16   On behalf of the Defendant Byers:

17   William Purpura, Esquire
     A. Eduardo Balarezo, Esquire

18

19   On behalf of Defendant Goodman:

20   Christopher Davis, Esquire
     Mary Davis, Esquire

21   Reported By:

22   Jacqueline Sovich, RPR, CMR, FOCRR

23   Official Court Reporter

24

25

1          (PROCEEDINGS)

2          THE COURT:  I have a few preliminary matters to go

3     through.

4          Good morning, Mr. Byers, Mr. Goodman.

5          Good morning, Mr. Purcell, good morning, Mr. Giblin

6     and Detective Ruby, good morning.  Counsel, I have one matter

7     quickly and another matter at the bench here before we bring

8     the jury in.

9          As a general matter for counsel, juror number 1 has

10    had an employment issue in that he had mentioned during

11    individualized voir dire he knew his employer would pay for

12    four weeks, perhaps not five or six.  He asked through the

13    criminal clerk if I contact his employer and urge citizenship

14    upon he, the employer, and I've done so, just so you know that.

15         I'll be letting the juror know at break I've spoken

16    with his employer.  They're going get back to me.  They've

17    confirmed he'll be paid for four weeks and look into paying him

18    for the remainder of the trial.

19         And then there are two matters that the defense

20    counsel has submitted, one under seal and one having to do with

21    payment vouchers.

22         A letter I received from you, Mr. Purpura, with

23    respect to allocation of your budget.

24         MR. PURPURA:  Yes.

25         THE COURT:  And in light of certain justification in

1    terms of trial strategy, I think this is an important ex parte
2    communication on the record here at the bench on that and on
3    another motion to seal a matter.
4          So I'll defense counsel will come to the bench and
5    I'll talk to you about this.
6          (At the bench)
7          THE COURT:  As to your request for relocation of
8    funds, I have approved this today.  I've given you a copy, so
9    it's approved.  This is your copy.  You can keep that, okay.
10         And then the motion to seal, you had filed a motion
11   to seal with respect to and a writ of habeas corpus to produce
12   a prisoner Darryl Cortez Briggs.
13         MR. PURPURA:  Yes.
14         THE COURT:  Ordinarily, I'm more than receptive to
15   motions to seal from defense counsel with respect to calling of
16   a witness because of defense strategy, and as you may know,
17   there's a case I've handled, a Rule 17(c) where the issue's
18   come up between the U.S. Attorney's office and the Public
19   Defender's office.
20         My concern on this, Mr. Purpura, I don't know what
21   security considerations are attended to that prisoner Darryl
22   Cortez Briggs.  I don't know because of the nature of this case
23   and cooperating witnesses and so forth, witnesses having to be
24   kept separate.  I'm reluctant to have a production of a
25   prisoner unknown to the government because there may or may not

1    be security considerations.

2          Do you want to reconsider this?  I haven't signed

3    this yet.  I know that you've indicated you want to call him as

4    a defense witness.  I'm sensitive to that.  We have too many

5    security considerations.

6          MR. PURPURA:  In consideration of the Court's

7    comments, we can unseal that motion.  I'm more concerned to

8    have him present.

9          THE COURT:  Do you have any problem if I note I'm

10   going to sign that you're going resubmit a matter for me for

11   the witness, and I'll then issue a writ for him but it's not

12   going to be under seal?

13         MR. PURPURA:  Can I just redact on that, is it

14   possible?  I guess I could resubmit.  I'm concerned about time

15   considerations for the government.

16         THE COURT:  I'll do it right away.  The point is the

17   government needs to know.  --

18         (Open court)

19         THE COURT:  Counsel come up to the bench, including

20   government counsel, please, on this.

21         (At the bench)

22         THE COURT:  Good morning, Mrs. Davis and Mr. Davis,

23   and you can hear me?  Mr. Byers, can you hear me down there

24   with your headset?

25         Where's his headset?  Mr. Byers needs his headset on,

1    okay.  Make sure that you --

2          Can you hear me now okay?  Mr. Byers is indicating he

3    can hear me.  I had just two matters that I -- yes.  Mr.

4    Purpura approached bence and asked allocation of funds from the

5    court with respect to court-appointed counsel, and I've

6    approved reallocation of funds, but you don't need to go into

7    the details.

8          The second matter I raised was Mr. Purpura had

9    submitted an ex-party motion for a writ of habeas corpus under

10   seal with respect to the production of a particular prisoner

11   Darryl Cortez Briggs.

12         I indicated to Mr. Purpura that I was not inclined to

13   sign any subpoena under seal because of security considerations

14   with respect to witnesses, be they cooperating witnesses or not

15   cooperating witnesses.

16         Mr. Purpura understands the Court's position and is

17   going to withdraw request for it to be under seal.  So, then

18   accordingly, I will sign a writ.

19         If you want to resubmit this or something, Mr.

20   Purpura, we can strike -- under seal portioning I'll issue an

21   order with respect to the prisoner Darryl Cortez Briggs being

22   called, being under subpoena and being writted over as a

23   defense witness.

24         It will be a while before he testifies, obviously.

25   I'll go ahead and sign that for the record.  The reason I did

1    not permit it under seal, I don't know what the security issues

2    are, and the government may or may not have security issues

3    they need to alert the U.S. Marshal on with respect to a

4    witness.  So that's how that will be handled.

5            Okay.  Anything further on that?

6            MR. PURPURA:  Nothing further.  I have no objection

7    to not having the portion of the sealed being redacted for the

8    motion.

9            THE COURT:  That's fine.  I'll go ahead and sign

10   this, and we're ready to go with the next witness.

11           MR. PURCELL:  I'm not finished with Miss Graham yet.

12           THE COURT:  That's right.  All right.  We're ready to

13   go.

14           MR. PURCELL:  I'll be finished with her in a minute.

15           THE COURT: Okay.  Fine.

16           (Open court)

17           (Jury present)

18           THE COURT:  Good morning, everyone.  Nice to see you.

19   If we're ready to continue with Miss Graham's testimony, and if

20   we'll bring Miss Graham back in, please, you all may be seated.

21   Thank you.

22           Good morning, Miss Graham.  If you'll come back to

23   the witness stand, please.  Miss Graham, you are still under

24   oath.  You will continue with your direct examination by the

25   government.

1           Mr. Purcell?

2           MR. PURCELL:  We're just about finished.

3                CONTINUED DIRECT EXAMINATION

4    BY MR. PURCELL:

5    Q.  Good morning, Miss Graham.  Thank you for coming back

6    today.

7    A.  Good morning.

8    Q.  All settled in?

9    A.  Yes.

10   Q.  Miss Graham, just to conclude my examination that we began

11   yesterday.  After you entered into an agreement with the

12   government to cooperate with the assistance of your attorney,

13   did there come a time where you were shown some pictures of

14   some of the people that you described as being involved or you

15   having seen on July second, 2007 who you might otherwise know

16   from the Normal Avenue area?

17   A.  Yes.

18   Q.  Okay.  May I approach the witness, Your Honor?

19           THE COURT:  Yes.

20           MR. PURCELL:  Exhibit 231.  Thank you.

21   Q.  I don't know, I'm showing you the very first picture of

22   exhibit number 231, do you recognize the photograph?

23   A.  Yes.

24   Q.  Did you have an occasion to see this at another time and

25   initial it?

1   A.  Yes.

2   Q.  Who is the person depicted in that photograph, if you know?

3   A.  Lump.

4   Q.  Okay.  And how do you know Lump?

5   A.  I know him from Pound.

6   Q.  From where?

7   A.  Pound.

8   Q.  Where would you used to see him?

9   A.  On Normal Avenue.

10  Q.  Okay.  Was he a Blood?

11  A.  No, I don't think so.

12  Q.  Okay.  In fact, were any other guys you knew on Normal

13  Avenue other than Pound Bloods?

14  A.  No, not that I know of.

15  Q.  I'm showing you what's been marked government's exhibit

16  number, actually, second page of the same exhibit, 231, and the

17  photograph is marked number 3 at the top left-hand corner, were

18  you shown this photograph?

19  A.  Yes.

20  Q.  And did you indicate that you recognize the individual who

21  was shown?

22  A.  Yes.

23  Q.  And who is that?

24  A.  P.

25  Q.  Is that person in the courtroom today?

1    A.   Yes.

2    Q.   Can you point to him please so we know?

3         THE COURT:   Record will indicate the witness has

4    identified the defendant Patrick Byers.

5    Q.   Thank you.   So at one time Mr. Byers had what looked like

6    braids?

7    A.   Yes.

8    Q.   And a photograph that is part of the same exhibit and is

9    marked number 6 on the top, did you identify that person or

10   make a comment as to that particular person?

11   A.   Yes.

12   Q.   And who did you think that to be?

13   A.   Brazy.

14   Q.   Brazy?

15   A.   Yes.

16   Q.   And who's Brazy?

17   A.   The one on the front passenger out of the green car.

18   Q.   Is that one of the people you went cross town to pick up

19   and took back afterwards?

20   A.   Yes.

21   Q.   And finally, maybe not finally because the picture that is

22   marked number 7 of this exhibit, did you have occasion to see

23   that person and can you tell us who it is?

24   A.   Frank.

25   Q.   And is Frank in the courtroom today?

1    A.  Yes.

2    Q.  And where do you see him, please?

3    A.  He right there.

4          THE COURT:  The record will reflect the witness has

5    identified the defendant Frank Goodman.

6    Q.  Okay.  Is that the individual you know to have the black

7    T-Bird --

8    A.  Yes.

9    Q.  -- that you met on the way back from Philadelphia Road?

10   A.  Yes.

11   Q.  And, finally, this individual that was marked I think

12   number 9 on this exhibit, but it's the same exhibit 231, do you

13   recognize the individual shown in that picture?

14   A.  Yes.

15   Q.  And who is that?

16   A.  Ronny.

17   Q.  Do you know Ronny's last name?

18   A.  That name was Williams, something like that.

19   Q.  Do you know whether Ronny was one of the guys charged with

20   you out in Baltimore County?

21   A.  Yes.

22   Q.  Thank you.

23         Your Honor, I don't have any further questions.

24         THE COURT:  All right.  Thank you.

25         Cross-examination, Mr. Purpura?

1          MR. PURPURA:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3     BY MR. PURPURA:

4     Q.  May I have the photograph, please?

5              Miss Graham, good morning.

6     A.  Good morning.

7     Q.  Let's go back to the last photograph you just looked at,

8     government's exhibit 231, and I believe you identified this

9     person as Ronny; is that correct?

10    A.  Yes.

11    Q.  And you've seen Ronny around before; is that right?

12    A.  Yes.

13    Q.  And you've seen Ronny when Pound or Mr. Pearson's around,

14    is that correct?

15    A.  Yes.

16    Q.  And they are friends; is that correct?

17    A.  Yes.

18    Q.  And do you know if -- well, do you know if at the time of

19    July second, 2007, whether Ronny was a Blood at that time?

20    A.  No.

21    Q.  You do know or you don't know?

22    A.  I don't know that he was.

23    Q.  Did Mr. Pearson ever tell that you Ronny wanted to be a

24    Blood and they were going to initiate him into the Bloods?

25    A.  No.

1  Q.  Now, I'm going ask you, first of all, a series of question,

2  basically three phases of my questions.  The first phase is

3  going to be about Mr. Pearson, what you know about him.

4          You know that Marcus Pearson, Pound, is a Blood; is

5  that correct?

6  A.  Yes.

7  Q.  And how long were you dating him again?

8  A.  Probably for like five months.

9  Q.  Five months?

10 A.  Yeah, five, six months.

11 Q.  And you know he's a Blood because, number one, he probably

12 told you he was a Blood, right?

13 A.  Yes.

14 Q.  And number two, because he wore the distinctive colors of

15 red?

16 A.  Yes.

17 Q.  And give us an idea, he wore red, what would he be wearing?

18 A.  Like a red shirt, sometimes a red scarf.

19 Q.  Well, University of Maryland, their colors are red, like

20 was he wearing a Maryland sweatshirt?

21 A.  No.

22 Q.  So how -- were what would be distinctive about his red

23 versus a red sweatshirt from Maryland, what would it be?

24 A.  He just have red shirt, red scarf.

25 Q.  Red scarf?

```
 1    A.   Yeah.

 2    Q.   And was that distinctive for Blood, the red scarf?

 3    A.   Yes.

 4    Q.   And I think you've indicated, at least to the grand jury,

 5    you probably agree, that he never wore blue; is that right?

 6    A.   No, he never wore blue.

 7    Q.   Did he tell you?

 8    A.   No.

 9    Q.   Do you know why he never wore blue?

10    A.   No.

11    Q.   Now, in the five months that you were dating or going with

12    Marcus Pearson, and how old were you at that time?

13    A.   24.

14    Q.   During those five months, did he ever have -- did he ever

15    go to a pay job?  In other words, did he have to go in the

16    morning like regular working, did he ever do that?

17    A.   No.

18    Q.   To your knowledge, did he have any legitimate legal day job

19    in the five months that you were with him?

20    A.   No.

21    Q.   But he was able to pay for things, correct?

22    A.   Yes.

23    Q.   And he didn't have a credit card, did he?

24    A.   No.

25    Q.   And so this Marcus Pearson, Pound, he paid cash, right?
```

1   A.  Yes.

2   Q.  And you all in those five months that you were together,

3   you went to a lot of motels?

4   A.  Yes.

5   Q.  Can you give us in one month's time during your

6   relationship how many times would you stay in a motel with him?

7   A.  Probably like three times.

8   Q.  Three times?

9   A.  Yeah.

10  Q.  That's not particularly -- that's about it?

11  A.  Probably like three times a month.

12  Q.  Three times a month.  So each time he went to the motel,

13  he'd be paying, right?

14  A.  Most of the times.  I paid for it sometimes.

15  Q.  You did, too?

16  A.  Yes.

17  Q.  We'll get to that.  Let's, who would be paying for the

18  food?

19  A.  I pay for it.  He pay for it sometimes.

20  Q.  And how about when you bought your E pills?

21  A.  He got them.

22  Q.  He got E?

23  A.  Yeah.

24  Q.  How about when you bought?

25  A.  He got them sometimes.  Sometimes I give him money for it.

1   Q.  And how about didn't he buy you some things?

2   A.  Yeah, sometimes.

3   Q.  And actually you've seen him with large amounts of cash in

4   the past, haven't you, during your relationship?

5   A.  Not really large amounts of cash.

6   Q.  Well --

7   A.  I've seen him with money before.

8   Q.  Well, do you remember testifying before the United States

9   Grand Jury?

10   A.  Yes.

11   Q.  Do we have a clean copy of the grand jury, by any chance?

12        Now, I'm going to ask you again, so I'm really clear,

13   did you see him with large amounts of cash?

14   A.  I've seen him with money.

15   Q.  Well, I'm not saying money, because money could be

16   anything.  Would you agree money could be a couple quarters,

17   right?

18   A.  Uh-huh.

19   Q.  Or it could be a large amount of cash?

20   A.  Not a large amount.  I'd seen him with a couple dollars

21   before.

22   Q.  Excuse me.

23   A.  I've seen him with a couple dollars before.

24   Q.  When someone says a whole large amount of cash, what does

25   it mean to you?

1 A. Thousands of dollars.

2 Q. Good.  If you were asked the question before the United

3 States Grant Jury, this is after you cooperated and were

4 telling the truth, did you ever see him with large amounts of

5 money?

6   And let me -- just so there's no mistake, it's page

7 13, line 21, do you see the question?  Mr. Purcell right there

8 asks you the question under oath did you ever see him referring

9 to Pound with large amounts of money?

10   And your answer was what?

11 A. Sometimes.

12 Q. Okay.  Well, I'm going to ask you now under oath, did you

13 see Pound, your boy friend, during those five months you dated,

14 with large amounts of cash?

15 A. Sometimes, I already said sometimes.

16 Q. Okay.  Thank you.  Did he tell you how he got the large

17 amounts of cash?

18 A. No.

19 Q. But you knew how he got the large amounts of cash, didn't

20 you?

21 A. No.  I knew he sold marijuana sometimes, that's it.

22 Q. And I believe you testified that he bought at least Prada

23 sneakers on a couple of occasions, right?

24 A. Yes.

25 Q. And he bought Prada sneakers during the time you were

1    dating him, before July second, before Mr. Lackl was killed,
2    right?
3    A.   Yes.
4    Q.   And even after, right?
5    A.   Yes.
6    Q.   Okay.   Those are fairly expensive; isn't that correct?
7    A.   Yes.
8    Q.   Okay.   And clearly he wasn't working during that time,
9    right?
10   A.   No.
11   Q.   Was his mother rich?
12   A.   No.
13   Q.   Was she giving him money to your knowledge?
14   A.   I'm not sure.
15   Q.   Did he ever tell you he got money from mom?
16   A.   He ain't never tell me where he got money from.
17   Q.   And he also he gave you money and he bought you things,
18   didn't he?
19   A.   Uh-huh.
20   Q.   Is that a yes?
21   A.   Yes.
22   Q.   How much stuff was he buying for you?
23   A.   I mean, little stuff, get my hair done, probably bought me
24   a pair of tennis sometimes.   He never give me money for rent or
25   no car insurance or anything like that.

 1    Q.  All right.  And he told that you he was dealing marijuana,

 2    right?

 3    A.  Yes.  He told me that before.

 4    Q.  And did you believe him that he was only dealing marijuana

 5    when he told you that?

 6    A.  Yes.

 7    Q.  Now, did he tell you, during the time that you were dating

 8    him, that he was on probation for distribution of crack

 9    cocaine?

10    A.  No.

11    Q.  So he never told you that actually the drug that he dealt

12    in East Baltimore was crack cocaine?

13    A.  No, I never knew that.

14    Q.  All right.  But he was good enough at least to make you

15    believe the only thing he was doing was selling marijuana,

16    right?

17    A.  Yes.

18    Q.  So you took him for his word, right?

19    A.  Yes.

20    Q.  Now, July second, 2007, you went to the Marriott Inner

21    Harbor; is that correct?

22    A.  Yes.

23    Q.  And Pound, Marcus Pearson, paid for that room?

24    A.  Yes.

25    Q.  And you spent the night with him, correct?

```
 1    A.  Yes.

 2    Q.  Now, you remember that night?

 3    A.  Yes.

 4    Q.  And then the next night, do you remember where you went the

 5    next night, July third, 2007?

 6    A.  He went outside on Normal Avenue.

 7    Q.  Let me be clear.  You can picture Marcus Pearson early in

 8    the morning on July third watching TV, the news, do you

 9    remember that?

10    A.  Yes.

11    Q.  And then you should be able to picture that day pretty

12    well, do you remember that day?

13    A.  I mean I remember some of the day.

14    Q.  What I want to get to is the night of July third.

15    A.  Uh-huh.

16    Q.  Did you spend the night of July third with him?

17    A.  Yes, we stayed together.

18    Q.  Okay.  And then the next day is July fourth, the Fourth of

19    July?

20    A.  Yes.

21    Q.  And that's usually sometimes a fairly memorable day, right?

22    A.  Yes.

23    Q.  And you can remember, at least I'm not going to ask you

24    what you did that day, but I'm going to ask you that night, on

25    the Fourth of July, did you spend the night with Pound, Marcus
```

1    Pearson?

2    A.  I'm not sure. I don't remember.

3    Q.  Now, during the time you were dating, or with him, was

4    Marcus Pearson also dating other women, to your knowledge, at

5    least?

6    A.  Yes.

7    Q.  And do you know Eunice Gray, or Eunice?

8    A.  No.

9    Q.  You don't know?

10   A.  No.  Okay.

11   Q.  Okay.  The night of July fifth, do you know if you spent

12   the night with him?

13   A.  I'm not sure exactly the days, we weren't together every

14   day.

15   Q.  Did you spend the night soon after this incident with him

16   at the America Best Inn?

17   A.  No.

18   Q.  You didn't?

19   A.  No.

20   Q.  Did he tell you that he was going to be spending that night

21   with a Eunice Gray?

22   A.  No.

23   Q.  On July fifth?

24   A.  No.

25   Q.  Did he ever tell you that he was spending the night in a

1    motel with Eunice Gray?

2    A.  No.

3    Q.  Do you know if he was literally sleeping with other women

4    while he's dating you?

5    A.  Yes.

6    Q.  And you knew that?

7    A.  Yes.

8    Q.  And it was no problem with that?

9    A.  It wasn't a problem.

10   Q.  And he told you about that?

11   A.  No.  He ain't tell me.  I heard from other people.

12   Q.  You've heard it after it happened from other people?

13   A.  Yes.

14   Q.  Afterwards?

15   A.  Yes.

16   Q.  Okay.  You know he had tattoos, right, Marcus Pearson?

17   A.  Yes.

18   Q.  You've seen his tattoos, right?

19   A.  I seen a couple.

20   Q.  Some of his tattoos?

21   A.  Yes.

22   Q.  You know he had Dog Pound inside of the forearm?

23   A.  Yes.

24   Q.  You know he had outlaw on his other forearm?

25   A.  Yes.

1  Q.  Do you know that he had a cobra snake on his upper forearm?

2  A.  No, I ain't.

3  Q.  How about a rifle, didn't he have a gun on his tattooed on

4  this body?

5  A.  No, not that I know of.

6  Q.  Not that you remember?

7  A.  Not that I remember.

8  Q.  How about I think he's actually bragged about it, he's had

9  Blood life tattooed on him?

10  A.  No.  Only tattoos I seen him on was the outlaw and I think

11  I saw MOB.

12  Q.  MOB standing for what?

13  A.  I don't know.

14  Q.  You never asked him what MOB?

15  A.  No.

16  Q.  And you don't recall seeing the Blood tattoo?

17  A.  No.

18  Q.  Now, July second, 2007, after you drove past Mr. Lackl

19  standing there, you indicated went to a corner store, right?

20  A.  Gas station, yes.

21  Q.  And you obtained a blunt; is that correct?

22  A.  Yes.

23  Q.  Why did you obtain that blunt?

24  A.  Because we got marijuana before we went up there.

25  Q.  And Marcus, did Marcus ask you to go into to get a blunt?

1    A.   No.  He actually asked me why I was stopping.  I went and
2    got a soda, too.
3    Q.   Tell the jury why did you get a blunt?  What is a blunt,
4    first of all?
5    A.   It is a cigar.
6    Q.   And what do you do with a cigar?
7    A.   You take the cigar paper out and put the marijuana in
8    there.
9    Q.   So after you drove past Mr. Lackl, you went in the store to
10   get the blunt?
11   A.   Right.
12   Q.   Because you were going to smoke marijuana; is that correct?
13   A.   Yes.
14   Q.   And Marcus, Pound, was going to smoke the marijuana with
15   you?
16   A.   Yes.
17   Q.   And is it fair to assume that after you drove past Mr.
18   Lackl, that you began smoking a blunt?
19   A.   No.
20   Q.   When did you smoke your blunt?
21   A.   Probably when we got back, when I went down the hill after
22   I dropped him off.
23   Q.   So soon after, within half hour, 15 minutes?
24   A.   Probably like a hour.
25   Q.   An hour?

1    A.    Yeah.

2    Q.    And you and Marcus smoked the blunt at that time?

3    A.    Yes.

4    Q.    And Marcus didn't tell you at all what happened, did he?

5    A.    No.

6    Q.    Did he seem upset at that point?

7    A.    No.

8    Q.    Anything unusual about Marcus Pearson?

9    A.    No.

10   Q.    Was he pretty cold about killing people, to your knowledge?

11   A.    Not that I know of.

12   Q.    One thing you do know about Marcus Pearson is that

13   eventually a couple days after this killing, he told you that

14   if the police come to you, tell him you weren't in Baltimore

15   County, right?

16   A.    Yes.

17   Q.    Okay.  Did you have anything to worry about at that time?

18   Did you do anything wrong?

19   A.    No.

20   Q.    Then who were you -- why would you have to lie, then?

21   A.    Because I was scared.

22   Q.    Scared.  Wasn't Marcus trying to get you to help him at

23   that point?

24   A.    No, not that I know of.  He just told me.

25   Q.    Did Marcus Pearson tell you to tell the police to make sure

 1    that you say you were not in Baltimore County and you weren't

 2    with him?

 3    A.   Yes.

 4    Q.   And that's because he was trying to protect himself, right?

 5    A.   I guess.

 6    Q.   He wasn't trying to protect you, was he?

 7    A.   No.

 8    Q.   He was trying to protect himself?

 9              MR. PURCELL:  Objection.  Let her answer, please.

10              THE COURT:  Sustained.  Sustained.  Let her answer

11    the question.

12    Q.   He wasn't trying to protect you, was he, ma'am?

13    A.   Did he?  I guess, I'm not sure.  I guess not.

14    Q.   You didn't do anything wrong?

15    A.   No.

16    Q.   Okay.  So he's not protecting you.  Who did something wrong

17    on that day, Marcus Pearson?

18    A.   Yeah, I guess.

19    Q.   So who was Marcus protecting?

20              MR. PURCELL:  Objection.

21              THE COURT:  Overruled.

22    Q.   Who, himself, or you?

23    A.   His self, I guess.

24    Q.   Marcus like that, take care of himself?

25    A.   You say do he take care of himself.

```
1    Q.  Yes.

2    A.  I don't know who take care of him.

3    Q.  He wasn't taking care of you, was he?

4    A.  Sometimes.

5    Q.  You identified the picture of Patrick Byers, right, do you

6    remember that?

7    A.  Yes.

8    Q.  Have you seen Patrick Byers on the street?

9    A.  No.  Before.  He used to ride the dirt bikes and stuff.

10   Q.  So how long ago was it when you saw Patrick Byers?

11   A.  I'm not sure.  It was years ago.

12   Q.  Okay.  And at that point, you saw him riding dirt bikes?

13   A.  Yes.

14   Q.  Was that East Baltimore?

15   A.  Yes.

16   Q.  And you also know Patrick Byers because I believe a girl

17   friend of yours, Natasha Powell, dated Patrick Byers, right?

18   A.  Yes.

19   Q.  Do you remember when that was?  I know it's been some time.

20   A.  No.

21   Q.  You don't remember?

22   A.  No, it was years ago.  I'm not sure exactly when it was.

23   Q.  But at least you recognize Patrick Byers enough that you

24   know his face?

25   A.  Yes.
```

```
 1    Q.  And you know his name, right?

 2    A.  Yes.

 3    Q.  Now, I'm going to bring you back to July second, 2007

 4    again.  In your trip to West Baltimore, do you remember going

 5    up to West Baltimore?

 6    A.  Yes.

 7    Q.  You went from East Baltimore to West Baltimore?

 8    A.  Yes.

 9    Q.  Takes about 10 minutes, maybe?

10    A.  Probably so.

11    Q.  Excuse me?

12    A.  Probably.

13    Q.  So during that entire time, did you ever hear the name Pat

14    referenced?

15    A.  No.

16    Q.  You never heard of anyone talking on a cell phone and say,

17    hey, Pat or anything else, did you?

18    A.  No.

19    Q.  Now, on the way back from West Baltimore when you picked up

20    some people, did you ever hear the name Pat or Byers

21    referenced?

22    A.  No.

23    Q.  And when you're on East Baltimore and you're in your car,

24    and there's a group of people around, did you ever hear the

25    name Patrick or Pat or any reference at all to Pat?
```

1   A.  No.

2   Q.  And when you went from East Baltimore out to East Baltimore

3   County with Pound and you're driving, did you ever hear Pound

4   or Marcus Pearson ever referencing Pat or Patrick Byers?

5   A.  No.

6   Q.  And you never heard him when Pound was on his cell phone

7   talking to the people behind, in particular Brazy, you never

8   heard the name Pat or Patrick Byers referenced that time,

9   either, did you?

10   A.  No.

11   Q.  And let me take you after you left the store with your soda

12   and your blunt, and you are driving back to East Baltimore, you

13   never heard the name Pat or Patrick Byers referenced, did you?

14   A.  No.

15   Q.  And when you're back in East Baltimore and there's a group

16   of people standing around talking, you never hear the word Pat

17   or Patrick Byers referenced, do you?

18   A.  I was in the car, so I didn't hear it.  But, no, nothing.

19   Q.  But then again, you're in a car and you're going now to

20   West Baltimore, another 10 minute drive, and you got those two

21   little boys in the car along with Pound, right?

22   A.  Yes.

23   Q.  And you hear some talk during that time, right?

24   A.  Yes.

25   Q.  But during that talk, never once do you hear the name Pat

1    or Patrick Byers referenced, do you?

2    A.  No.

3    Q.  And that night, when you're with Marcus Pearson, Pound, and

4    you're over at the Marriott in your $400 a night room, you

5    never once hear the reference to Pat or Patrick Byers, do you?

6    A.  No.

7    Q.  The next night when you're with Pearson, and Pearson tells

8    you to lie, he never once references my man Pat, or Patrick

9    Byers, does he?

10   A.  No.

11   Q.  Now, let me focus on your involvement.

12              July 2, 2007.

13              THE COURT:  I'm sorry.

14              MR. PURPURA:  Just waiting until Mr. Purcell finishes

15   his conversation.

16   BY MR. PURPURA:

17   Q.  July second, 2007, you pick up Pound that morning, right?

18   A.  Yes.  No.  We was actually together.

19   Q.  Were you together?

20   A.  Yes.

21   Q.  You're driving your car?

22   A.  Yes.

23   Q.  Now, you didn't have a license?

24   A.  No.

25   Q.  What was the problem?

1    A.   I had a permit.

2    Q.   You had a permit?

3    A.   Yeah, I had a permit.

4    Q.   Permit's are good, but know you need a license, right --

5    A.   Yes.

6    Q.   -- to drive?

7    A.   Yes.

8    Q.   Did you have insurance on that car?

9    A.   Yes.

10   Q.   And you drive with that permit, right?

11   A.   Yes.

12   Q.   So you're with Mr. Pearson, and I guess you start off in

13   East Baltimore, right?

14   A.   Yes.

15   Q.   And then he asks you to drive to West Baltimore, correct?

16   A.   Yes.

17   Q.   Did he tell you why you were going to West Baltimore?

18   A.   To pick his home boys up.

19   Q.   Home boys?

20   A.   Yes.

21   Q.   And you picked up two home boys, right?

22   A.   Yes.

23   Q.   And have you ever seen them before?

24   A.   No.

25   Q.   And one of the home boys you've identified in government's

1    exhibit 231 as Brazy, right?

2    A.  Yes.

3    Q.  And, actually, I think you referred to him as the little

4    boy, right?

5    A.  Yes.

6    Q.  Young boy?

7    A.  Yes.

8    Q.  Because he was young, right?

9    A.  (The witness nodded affirmatively.)

10   Q.  Yes?

11   A.  Yes.

12   Q.  And he was quite a bit younger, at least he appeared to be

13   a lot younger than Marcus Pearson, right?

14   A.  Yes.

15   Q.  And this young boy, he had something distinctive on his

16   head, didn't he?

17   A.  Yes.

18   Q.  And what he had on his head was a red bandana, correct?

19   A.  Yes.

20   Q.  And you know what that red bandana means, right?

21   A.  Yes.

22   Q.  That red bandana means he's a Blood, right?

23   A.  Yes.

24   Q.  And the other boy that you picked up over in West

25   Baltimore, he had a bandana in his pocket, right?

```
1    A.   Yes.

2    Q.   And that was a red bandana, correct?

3    A.   Yes.

4    Q.   And you know what that means, right?

5    A.   Yes.

6    Q.   It's a Blood, right?

7    A.   Yes.

8    Q.   You know you're doing -- at least on July second, 2007

9    you're taking one Blood, the Blood you're with, to meet up with

10   two other Bloods, right?

11   A.   I was taking my boyfriend to meet his home boys.

12   Q.   And the home boys are Bloods, right?

13   A.   I guess, yes.

14   Q.   You know they are, right?  You know --

15   A.   From the -- yes.

16   Q.   Okay.  And I guess that's what I am trying to ask you.

17             What do you know about the Bloods?  Are they boy

18   scouts that help old ladies in the street, stuff like that?

19   A.   I don't know nothing about them.

20   Q.   Do you watch TV?

21   A.   I mean, it's a gang.

22   Q.   Gang, right?

23   A.   Yes.

24   Q.   A good gang, or bad gang?

25   A.   I don't know.
```

1    Q.  And that's the truth, right?  Right?  You got to tell the

2    truth today?

3    A.  I don't know.

4            MR. PURCELL:  Objection.

5            THE COURT:  Overruled.

6    Q.  All right.  So you pick up these two young boys, these

7    Bloods, along with Mr. Pearson, and you head back into East

8    Baltimore, correct?

9    A.  Yes.

10   Q.  And do you at that time, or does anybody in the car tell

11   you what you're doing?

12   A.  No.  He told me to take him back.  I asked him where he was

13   going, he said back over Normal Avenue to eat.

14   Q.  Back on Normal Avenue?

15   A.  Yes.

16   Q.  Did he tell you why he had to pick up these two Bloods?

17   A.  No.

18   Q.  And you didn't ask?

19   A.  No.

20   Q.  You just --

21   A.  I take him to pick up people, sometimes pick up his

22   daughter.

23   Q.  Daughter's one thing, Blood's another?

24   A.  His friend.

25   Q.  Now, so bring these Bloods back to East Baltimore, and

1    you're there for a period of time, correct?

2    A.  Yes.

3    Q.  And then someone eventually comes to you and asks you about

4    how do you get out to Baltimore County, right?

5    A.  Yes.

6    Q.  And in particular, Philadelphia Road, right?

7    A.  Yes.

8    Q.  And that was Mr. Pearson, right?

9    A.  Yes.

10   Q.  And Mr. Pearson is using you to the extent that he's going

11   to use your knowledge of Baltimore County, right?

12   A.  Yes.

13   Q.  He knows your mom lives out in East Baltimore County?

14   A.  He knew I had a house out there.

15   Q.  A house?

16   A.  Yes.

17   Q.  Your mother?

18   A.  No, it was mine.

19   Q.  It was your house?

20   A.  Yes.

21   Q.  And so he needs you, again, to get him out to Baltimore

22   County, correct?

23   A.  Yes.

24   Q.  And so he asked you how to get to Philadelphia Road, right?

25   A.  Yes.  He said he was going to look at a car.

```
1    Q.  And you agreed to show him --

2    A.  Yes.

3    Q.  -- right?

4         So who's going to look at the car?

5    A.  He said his home boys was going to look at a car.  They

6    didn't know how to get there.

7    Q.  Which home boys?

8    A.  I guess the ones that I picked up.  I'm not sure.

9    Q.  The little boy right there on the screen who's about 15

10   years old to look at a car?

11   A.  Yes, people 15, 16, driving.

12   Q.  Is he going to look at what's he going to do with it?

13   A.  I don't know.

14   Q.  I just want to know, is anything in your head at that point

15   saying I'm taking out these two real young kids --

16   A.  No.

17   Q.  -- to go look at a car?

18   A.  No.  People 15, 16, drive all the time.  They buy cars.

19   Q.  All right.  So it doesn't seem strange to you?

20   A.  No.  I was 16 when I had my first car.

21   Q.  That you're taking out these young Bloods with their Blood

22   uniform on out to look to buy a car?

23   A.  No.

24   Q.  Okay.  Then what happens is you drive out there, and

25   there's some contact back and forth, correct?
```

```
 1    A.  Yes.
 2    Q.  And, apparently, Mr. Pearson's upset that they're driving
 3    too close, correct?
 4    A.  Yes.  He just said don't drive, why are you drying so crazy
 5    or whatever.  It was like he was mad or upset or anything.
 6    Q.  And then you hear another phone call with Mr. Pearson calls
 7    over to the Lackl residence, which ends up being the Lackl
 8    residence?
 9    A.  Yes.
10    Q.  And apparently he's talking to a woman at that time,
11    correct?
12    A.  Yes.
13    Q.  And he asks the woman to have her husband come outside to
14    greet you?
15    A.  Yes.
16    Q.  Right?
17    A.  Yes.
18    Q.  And then actually you drive right past the Lackl residence;
19    isn't that correct?
20    A.  Yes.
21    Q.  And what did you see?  Why don't you -- what do you see?
22    A.  I seen a man standing out there like he was waiting for
23    somebody because he put his hand up.
24    Q.  You saw a white man, right?
25    A.  Yes.
```

1   Q.  Blond hair?

2   A.  Yes.

3   Q.  With his hand up?

4   A.  Yes.

5   Q.  Did you stop at that point and say that's the car we want

6   to buy?

7   A.  No.

8   Q.  You kept --

9   A.  He already told me I had to stop when I was getting ready

10  to take them.  You can show them where it's at and come back

11  here.

12  Q.  And how about the car behind you, that's right behind you,

13  the car with the young boys, going out to buy a car, did that

14  car stop when they saw the white man with his hand up?

15  A.  They turned around.

16  Q.  They went right past, right?

17  A.  Yes.

18  Q.  And then there was a call by Pound saying that's him,

19  right?

20  A.  Yes.

21  Q.  And then they turned around?

22  A.  Yes.

23  Q.  And then you didn't see anything else?

24  A.  No.

25  Q.  According to you, right?

1   A.   No.

2   Q.   You didn't hear any guns?

3   A.   No.

4   Q.   You didn't hear the police come while you're in the store?

5   A.   No.

6   Q.   How far away is the store from the house?

7   A.   It was a little ways up.  I'm not sure how far, but it was

8   a little ways up.

9   Q.   But you didn't see any of those things?

10   A.   No.

11   Q.   You drove back to Baltimore County, or excuse me, drove

12   back to Baltimore City, East Baltimore, right?

13   A.   Yes.

14   Q.   Later that afternoon, did those young boys, this boy in

15   particular, did he come back and have that gold Cadillac?

16   A.   I ain't seen him after that.

17   Q.   Yeah, you did, you drove him home, right?

18   A.   You saying after.  I didn't see him after I took them back.

19   Q.   When you went back to East Baltimore?

20   A.   Right.

21   Q.   You saw him back in East Baltimore, right?

22   A.   Correct.

23   Q.   Did he have the Cadillac?

24   A.   I didn't see it.

25   Q.   Okay.  Then they get back into your car, right?

```
 1    A.  Yes.

 2    Q.  Because you've got to drive them back, right?

 3    A.  Yes.

 4    Q.  Did you ever say, you know, I guess I'm driving you back

 5    because you didn't buy the car?

 6    A.  No.  I just took them back.  I wasn't --

 7    Q.  Did you ever ask?

 8    A.  I wasn't paying it no mind.

 9    Q.  Did you ever ask them what about the Cadillac, didn't you

10    like it?

11    A.  No.  I wasn't paying them no mind.  I didn't say nothing to

12    the little boys.

13    Q.  This is all the truth, right?

14    A.  Yes.

15    Q.  Okay.  Good.  Now, let me just ask you, you do know you

16    eventually met -- and this is almost at the end.  We do know

17    that you eventually did meet with Detective Ruby and Detective

18    Massey; do you remember that?

19    A.  Yes.

20    Q.  And that was on July 31, 2007, correct?

21    A.  I think.

22    Q.  But if I tell you the reports indicate July 31st, 2007 --

23    A.  Okay.

24    Q.  -- you'll probably agree with me?

25    A.  All right yeah.
```

1   Q.  At that point, as Mr. Purcell pointed out, you didn't have

2   Miss Finn as your lawyer at that point, right?

3   A.  No.

4   Q.  So you went in there on July 31st of 2007, and you got to

5   agree with me, you were not truthful; is that correct?

6   A.  Yes.

7   Q.  As a matter of fact, what you told Detective Ruby and

8   Detective Massey on July 31st, 2007, first of all, you were not

9   in Baltimore County in the month of July, do you remember

10  telling them that?

11  A.  Yes.

12  Q.  We know that's a lie, correct?

13  A.  Yes.

14  Q.  And actually he questioned you a second time, he said are

15  you sure you weren't in Baltimore County?  And for the second

16  time in that same interview, you lied again, right?

17  A.  Yes, I was scared.

18  Q.  Okay.  That's fair.  And then he asks you about that night

19  at the Marriott, do you remember that?

20  A.  Yes.

21  Q.  And he asked you about payment, right?

22  A.  Yes.

23  Q.  And you told Detective Massey that Pound paid some money,

24  but you paid $220 for the room, right?

25  A.  Yes, I think so.

1  Q.  That would have been a lie, too, right?

2  A.  Yes.

3  Q.  Right, yes?

4  A.  Yes.

5  Q.  Did Pound tell you to say that?

6  A.  No.

7  Q.  You just made that one up on your own?

8  A.  I was just scared.  I didn't know.  I knew he was in some

9  trouble.

10  Q.  That's fair enough.  Bottom line is you were lying to get

11  out of any trouble?

12  A.  No, I was scared.

13  Q.  When you get scared, you lie?

14  A.  Yes.

15  Q.  Scared like spooky scared or scared that you're going to go

16  to jail when you lie?

17  A.  I was scared.

18  Q.  Scared about what?

19  A.  I was just scared, because I knew something had happened,

20  and I was scared.

21  Q.  Okay.  Now, you also indicated that you had an alibi that

22  day because you said you were with your girl friend Christy all

23  day long, right?

24  A.  Christy with us, she was with us.

25  Q.  What you told the police was you were with her all day?

1    A.  Uh-huh.

2    Q.  Do you remember that?

3    A.  No, I don't remember that.

4    Q.  Well, let me show it to you.  Counsel, this is the

5    interview Tammy Graham, July 31, 2007.  205, actually.

6         Now, I'm just going ask you, read this to yourself,

7    here.  Start here.  Just to yourself where it says she advised

8    that she --

9         (Pause.)

10   Q.  I want to emphasize this.

11   A.  She advised that she.

12   Q.  And I guess the simple question is, and I know you were

13   scared back then, July 31st, before you had your attorney

14   object, you lied to the detective when you said that you were

15   with Christy all day, correct?

16   A.  Christy was with me.  I'm not sure what time she got with,

17   me but we was together that day.

18   Q.  Together that day is one thing, I agree with you, but all

19   day would be something else, right?

20   A.  We was together that day.

21   Q.  But what did you tell -- you said all day, didn't you?

22   A.  And I will say I also said I wasn't sure what time we got

23   together.

24   Q.  Now, was Christy with you when you went to Baltimore

25   County?

```
 1    A.   No.

 2    Q.   Was Christy with you when you picked up the Bloods?

 3    A.   No.

 4    Q.   Was Christy with you when you drove the Bloods back home?

 5    A.   No.

 6    Q.   Now, again, you spoke to the detectives on August 23rd,

 7    2007, do you remember that?  This after you've been arrested,

 8    they take you from Baltimore County's Women's Detention Center,

 9    they bring you, I believe, probably to homicide, do you

10    remember that?

11    A.   Yes.

12    Q.   Okay.  And at that time, if it helps your recollection, you

13    have your lawyer with you then, right?

14    A.   Yes.

15    Q.   And she's a good lawyer, correct?

16    A.   Yes.

17    Q.   She's a good person, too, right?

18    A.   Yes.

19    Q.   Now, she's with you, right?  And you've had time to talk to

20    her at that point, right?

21    A.   Yes.

22    Q.   Now, you weren't completely, completely truthful even at

23    that time, were you?

24    A.   Yes.

25    Q.   You were completely truthful or you weren't completely
```

1    truthful?

2    A.   I was.

3    Q.   Completely truthful?

4    A.   Yes.

5    Q.   Okay.  Good.

6         MR. PURCELL:  Objection to that.

7    Q.   The now part?

8         MR. PURCELL:  No, to the good part.

9         THE COURT:  Overruled, Mr. Purcell.

10   Q.   Now, do you remember denying telling the detectives that

11   you did not hear any conversation that Pearson, your boyfriend

12   Pound, was having during the trip to Philadelphia Road?

13   A.   I'm not sure.  I don't remember.

14   Q.   Well, let me show you.  August 23, 2007, Bates stamp 2 2 1

15   page.

16        Right here.  Detective's notes.  However, she denied

17   hearing any conversation that Pearson was having during the

18   trip to Philadelphia Road.

19        Do you remember saying that?  You deny any

20   conversation?

21   A.   I mean I could have said, I don't remember.  That's why I

22   said it.

23   Q.   But the truth is you did hear conversations, correct?

24   A.   Yes.  I heard them say something.

25   Q.   And so if you would have told the Detective back on August

1    23rd when you had an attorney after you were arrested you

2    denied it, that wouldn't have been the truth, right?

3    A.   What you say again?

4    Q.   What I'm saying is if you told the detectives that you did

5    not hear any conversations on the way to Philadelphia Road,

6    that would have not been the truth?

7    A.   No.

8    Q.   Now, also, you told the detectives that day, August 23,

9    2007, that you didn't know that anyone was following you to

10   Philadelphia Road.  She denied knowing that anyone was

11   following her to Philadelphia Road.  Do you remember telling

12   that to the detectives on August 27?

13   A.   Again, I don't remember.

14   Q.   And if you did tell that to the detectives, that again

15   would not have been the truth; is that correct?

16   A.   Yes.

17   Q.   Final, final question, now, just about what's happening to

18   you.

19          When you met with those detectives, when you had Miss

20   Finn, your attorney, you were charged in Baltimore County

21   Circuit Court with what charges?

22   A.   First degree murder, accessory after the fact, two handgun

23   violations.

24   Q.   Obviously, when you talked to Miss Finn, she told you it

25   was a serious case?

1    A.  Yes.

2    Q.  And that was charged in Baltimore County, right?

3    A.  Yes.

4    Q.  Not here in Federal Court, that charge, that was Baltimore

5    County?

6    A.  Yes.

7    Q.  And that's because the murder of Mr. Lackl happened in

8    Baltimore County, correct?

9    A.  Yes.

10   Q.  Now, in your plea agreement, can we have the plea

11   agreement, please?  Government exhibit 13?

12           MR. PURCELL:  You already do have it.

13           THE COURT:  Where is the government exhibit is the

14   question.

15           MR. PURPURA:  That's what I was asking.  Thank you.

16           MR. PURCELL:  Here's an extra copy.

17           (Pause.)

18           THE COURT:  It's government exhibit 202, I thought

19   was plea agreement of Miss Graham.

20           MR. PURPURA:  I don't have the number.

21           THE COURT:  Is that correct, Mr. Purcell?

22   Government's exhibit 202 is the plea agreement of Miss Graham?

23           MR. PURCELL:  Let me see if I have it.  It may have

24   been put away.

25           It's right here, thank you.  We have it.

1          THE COURT:  Thank you, Mr. Giblin.

2    BY MR. PURPURA:

3    Q.  I'm now going to show you what has been marked as what is

4    in evidence is your plea agreement, which is government exhibit

5    202.  And, obviously, it's your signature on the back of the

6    plea agreement, correct?

7    A.  Yes.

8    Q.  All right.  Okay.  And I'm just going to ask you to look at

9    paragraph 13.  And this entire exhibit will go back to the

10   jury, and we're not going to go through everything, but I'm

11   just going to ask you to look at paragraph 13, because this

12   paragraph talks about your Baltimore County murder charge,

13   right?

14          Take your time.  I'm sorry.

15          (Pause.)

16   Q.  Yes?

17          (Pause.)

18   Q.  You looked at paragraph 13?

19   A.  Uh-huh.

20   Q.  Is that a yes, Miss Graham?

21   A.  Yes.

22   Q.  Okay.  You've look at that is agreement before, right?

23   A.  Yes.

24   Q.  Okay.  And, obviously, paragraph 13 is the paragraph which

25   says that in return for your federal plea, all those Baltimore

1    County Circuit Court charges are going to be dismissed,

2    correct?

3    A.  Yes.

4    Q.  Okay.  That was important to you, wasn't it?

5    A.  Yes.

6    Q.  Of course.

7         THE COURT:  You have to answer yes or no, Miss

8    Graham, the Court Reporter doesn't get a nod of the head.

9    A.  Yes.

10   Q.  Because what happened after that, you were relieved from

11   Baltimore County Detention Center, correct?

12   A.  Yes.

13   Q.  Okay.  And in return -- or strike that.

14        Before I get to that, this may sound silly despite

15   the fact you drove from Baltimore County and Baltimore City

16   without a license, you never got charged with that, either, did

17   you?

18   A.  No.

19   Q.  And despite the fact that you admit using marijuana, you

20   never got charged with that, either, did you?

21   A.  No.

22   Q.  And despite the fact that you admitted buying and using E

23   pills, you never got charged with that, did you?

24   A.  No.

25   Q.  And despite the fact you gave a false statement to police

1  officers on two separate occasions, you didn't get charged with

2  that in Baltimore County, did you?

3  A.  No.

4  Q.  But you entered a plea to misprison of a felony?

5  A.  Yes.

6  Q.  Maximum period is three years?

7  A.  Yes.

8  Q.  You're not in jail, are you?

9  A.  No.

10  Q.  And you hope your lawyer keeps you out of jail; is that

11  fair to say?

12  A.  Yes.

13            MR. PURPURA:  No further questions.

14            THE COURT:  Mr. Davis?

15            MR. DAVIS:  Yes, thank you.

16                    CROSS-EXAMINATION

17  BY MR. DAVIS:

18  Q.  Good morning, Miss Graham.

19  A.  Good morning.

20  Q.  Miss Graham, I would like to direct your attention back to

21  July second on the day you went out to Philadelphia Road with

22  your then boyfriend Pound.  You testified that on the way out

23  to Philadelphia Road, you stopped and Pound purchased some

24  weed?

25  A.  Yes.

1    Q.  Where did he stop to purchase that weed?

2    A.  I forgot the street, but it's on the other side of Harford

3  Road.

4    Q.  And he had you stop, right?

5    A.  Yes.

6    Q.  Did he just tell you just to stop, I need to see somebody?

7    A.  Told me to pull over the side of the road.

8    Q.  Hold for a minute and he jumped out?

9    A.  Yes.

10    Q.  And did you see where he went?

11    A.  He walked down the street to the corner by the store.

12    Q.  And then he came back?

13    A.  Yes.

14    Q.  So he left your sight for a few minutes?

15    A.  Yes.

16    Q.  Then he got back in the car, right?

17    A.  Yes.

18    Q.  Then you continued to drive out to Philadelphia Road --

19    A.  Yes.

20    Q.  -- correct?

21         There was a car that was following you that day,

22  correct?

23    A.  Yes.

24    Q.  Did they stay behind you when all this was going on, or did

25  anyone accompany Pound?

1    A.   No, sir.  They didn't get behind me until we came back from

2    getting marijuana.

3    Q.   So they weren't directly behind you when you -- oh, wait a

4    second.  I'm sorry.  You said you went to get the marijuana

5    then you went back to Normal?

6    A.   We came up Harford Road, and they came out on.

7    Q.   Okay.  And did you smoke marijuana that day?

8    A.   Did I who?

9    Q.   Did you smoke that weed that day?

10   A.   Later on.

11   Q.   Is that's what's commonly referred to as purple?

12   A.   I don't think it was purple.  I think it was regular.  I'm

13   not sure.

14   Q.   Can you tell us the difference between purple and regular?

15   A.   No.  I mean, one's stronger than the other one.

16   Q.   Which, purple would be stronger than regular?

17   A.   Yes.

18   Q.   And do you know what, you said that you didn't think it was

19   purple, the weed that was purchased?

20   A.   No, I'm not sure.  I don't think so, though.

21   Q.   Did it feel as strong as purple --

22   A.   No.

23   Q.   -- when you smoked it?

24   A.   No.

25   Q.   But you did get high, correct?

1   A.  Yes.

2   Q.  And Pound also got high, correct?

3   A.  Yes.

4   Q.  And I was a little bit confused in response to Mr.

5   Purpura's questions.  Were you saying that you smoked that out

6   in the parking lot, out on Philadelphia Road?

7   A.  No.

8   Q.  That's where you purchased the cigar, though?

9   A.  In a gas station, yeah.

10  Q.  And when did you actually load the weed into the cigar and

11  smoke it?

12  A.  It was a little while after, we came back.  It was after we

13  took his home boys back over the way.

14  Q.  After you went back over to West Baltimore?

15  A.  Yes.

16  Q.  Pound also likes -- well, first of all, you dated Pound for

17  about five months?

18  A.  Yes.

19  Q.  Up until this occurred?

20  A.  Yes.

21  Q.  And when I say date, I don't mean to dig into your sex

22  life, but when I say date, you had a personal intimate

23  relationship with him during that time period?

24  A.  Yes.

25  Q.  Would it be fair to say over that five-month period, that

1    many times you would spend the night with him?

2    A.   Yes.

3    Q.   And you were close to him, correct?

4    A.   Yes.

5    Q.   In addition to smoking marijuana with him, you and Pound

6    had a taste for E pills, what is referred to as E pills,

7    correct?

8    A.   We ain't have no taste for them.   It wasn't like we was

9    doing it all the time.

10   Q.   That would be my next question. Did Pound do E pills every

11   day?

12   A.   No.

13   Q.   He didn't?

14   A.   Uh-uh.

15   Q.   How often would he do E pills?

16   A.   Probably the weekend, we go out and stuff.   We wasn't

17   really --

18   Q.   Are E pills illegal?

19   A.   Yes.

20   Q.   But compared to heroin or cocaine or something like that, E

21   pills are basically feel good pills, correct?

22   A.   Yes.

23   Q.   I mean they're mood enhancers?

24   A.   Yes.

25   Q.   They make you feel good, and you're not seeing double,

1    you're not falling down?

2    A.   No.

3    Q.   You're not nodding off?

4    A.   No.

5    Q.   You're not hyper, running around, you just feel good,

6    right?

7    A.   Yes.

8    Q.   And they keep you going?

9    A.   Yes.

10   Q.   I mean if you go out clubbing, or if you're out to a

11   concert, you want to stay up and party, it's a good -- that's a

12   good thing to take to accomplish those aims, correct?

13   A.   Yes.

14   Q.   Now, that night at the Marriott on July second, Tavon was

15   there, correct?

16   A.   No.

17   Q.   He wasn't?

18   A.   No.

19   Q.   When you arrived at the Marriott, who was there at the

20   room?

21   A.   Me, Pound, and my friend Christy.

22   Q.   And when you went up to the room in response to Mr.

23   Purcell's question, you indicated that no one had purchased a

24   DVD player?

25   A.   No.

1   Q.  Had anyone asked you about a DVD player before?

2   A.  Except for that time he asked me yesterday.

3   Q.  But no place else?  No place else?

4   A.  No.

5   Q.  And when you got up to the room, do you recall what time

6  you got to the room?

7   A.  No, I'm not sure of the time.

8   Q.  Had you made arrangements to rent a room that evening?

9   A.  No.

10   Q.  Who made the arrangements, was it Christy?

11   A.  Who got the room?

12   Q.  Yes.

13   A.  Well --

14   Q.  Who made the arrangements?

15   A.  No arrangements.  Pound, he just say we're going down Inner

16  Harbor, and I was okay.

17   Q.  How did Christy get involved?

18   A.  I lost my license.  I asked her.

19   Q.  So you contacted her?

20   A.  Yes.

21   Q.  All right.  Now, was Tavon there at all?

22   A.  No.

23   Q.  Did he ever show up that evening?

24   A.  No, not that day.

25   Q.  When you got to the room, was Christy already in the room?

1    A.  No, she went with us.

2    Q.  She went with --

3    A.  Yes, we drove down there together.

4    Q.  Okay.  And then she rented the room?

5    A.  Yes.

6    Q.  Did she come up to the room?

7    A.  Yes.

8    Q.  And would it be fair to say that people partied for a

9  while?

10   A.  Yes.

11   Q.  Smoked weed?

12   A.  Yes.

13   Q.  Was there -- you didn't indicate in your direct testimony

14   that you stopped off to purchase anything to drink, would it be

15   just smoke weed, cocaine?

16   A.  No.

17   Q.  E pills?

18   A.  No.

19   Q.  Now, you didn't take E pills?

20   A.  No.

21   Q.  Did Christy?

22   A.  No.

23   Q.  Do you know for a fact she didn't?

24   A.  That night.

25   Q.  Or you didn't see her?

1    A.   That night, no, I don't think she took.

2    Q.   What about Pound?

3    A.   I don't think, no, he ain't take no pills.

4    Q.   When you say you don't --

5    A.   No, he wasn't.  We had no pills that night.

6    Q.   We didn't, you didn't?

7    A.   No.  He ain't stopped to get none, so and ain't said he was

8    going to take no pills, so --

9    Q.   He didn't say anything --

10   A.   No.

11   Q.   -- that he was going to --

12   A.   No.

13   Q.   Where would you stop to get them if you stopped to get

14   them?

15   A.   Different places.  Sometimes we get them from Frank.

16   Sometimes we go different places.

17   Q.   All right.  Now, referencing Frank, you're speaking about

18   Frank Goodman, correct?

19   A.   Yes.

20   Q.   Now, sometimes you would stop to get pills from Frank

21   Goodman, and these would be these feel good pills that we were

22   talking about, correct?

23   A.   Yes.

24   Q.   Where would you stop to get those from Frank?

25   A.   On Cliftview.

1    Q.  On Cliftview.  Now, Cliftview's about a block from Normal,

2    correct?

3    A.  Yes.

4    Q.  So you got Cliftview, what else is down there, Harford?

5    A.  Uh-huh.

6    Q.  Darly?

7    A.  Yes.

8    Q.  So that's -- what's that neighborhood called there?

9    A.  I think Harford Road, something like that.

10   Q.  And how often -- not -- let's exclude everyone else, how

11   often during the five-month period did Pound see Frank to

12   purchase E pills with you being present, or taking him up

13   there?

14   A.  I ain't sure, not that much.

15   Q.  Now, did he buy in bulk?

16   A.  No, not that I know of.

17   Q.  And what would he pay for them, do you even know?

18   A.  No.  Probably like 10, $15.

19   Q.  So basically if he gave you one, you'd know he had them,

20   correct?

21   A.  Yes.

22   Q.  And on the way back in from Philadelphia Avenue, Pound

23   asked to you stop, correct?

24   A.  Yes.

25   Q.  And you stopped in that neighborhood, correct?

```
 1    A.  Yes.

 2    Q.  Pound got out of the car?

 3    A.  Yes.

 4    Q.  You don't know why he stopped, do you?

 5    A.  No.

 6    Q.  But you know when he stopped, right?

 7    A.  Yes.

 8    Q.  Because you stopped for him, right?

 9    A.  Yes.

10    Q.  And he asked you to stop?

11    A.  Yes.

12    Q.  Kind of like when you were going out to Philadelphia Road,

13    he told you to pull over and hold for a minute?

14    A.  Yes.

15    Q.  So you just do it, right?

16    A.  Yes.

17    Q.  And you didn't see Frank Goodman when you stopped that

18    night, right?

19    A.  No.

20    Q.  But you did see a car that you associated with Frank

21    Goodman?

22    A.  Yes.

23    Q.  A black T-Bird, correct?

24    A.  Yes.

25    Q.  And you referenced something about black wheels, correct?
```

1  A.  Yes.

2  Q.  Now, this is in the summer, this is on July second,

3  correct?

4  A.  Yes.

5  Q.  And did you come back in from Philadelphia Road fairly -- I

6  mean, did you stay out there that long?

7        Or did you kind of go out and just come back in?

8  A.  Just went out there and came back.

9  Q.  So it's probably about 9, 9:30, somewhere in that range,

10  between 9 and 10:00?

11  A.  I'm not really sure of the time.

12  Q.  Is it dark out?

13  A.  Yes.

14  Q.  It is dark?

15  A.  Yes.

16  Q.  Okay.  It's hot, isn't it?

17  A.  Yes, summertime.

18  Q.  What's Pound got on that night, if you remember?

19  A.  I don't remember.

20  Q.  Not a whole lot, though, correct?

21  A.  Yeah, I don't remember.

22  Q.  But when he came back to the car, you saw that he was

23  empty-handed?

24  A.  Yes.

25  Q.  Now, Pound lived on Normal, he lived in that neighborhood

1   for most his life, according to your knowledge, correct?

2   A.  I think so, yes.

3   Q.  That's clearly the impression you got from the time, you

4   know, that five-month dating period that you had spent with

5   him?

6   A.  Yeah.  He wasn't living up there, he just hung out up

7   there.

8   Q.  Well, where did his mother used to live, at one point

9   during your direct --

10  A.  North Avenue.

11  Q.  North Avenue?

12  A.  Yes.

13  Q.  Is that close to Normal?

14  A.  (The witness nodded affirmatively.)

15  Q.  So same neighborhood?

16  A.  It's not right the same neighborhood.  It's a little ways

17  away, but it's not that far away.

18  Q.  But he would hang out on Normal?

19  A.  Yes.

20  Q.  That's where he had his little shop set up or little

21  operation, or whatever?

22  A.  I guess.

23  Q.  Whatever you want to call it?

24  A.  I guess.

25  Q.  You didn't get involved in that, though?

```
 1    A.   No.

 2    Q.   Basically, you were there for Pound and with Pound if he

 3    needed rides or if he wanted to hang out with someone

 4    independent of the guys that he hung out with, right?

 5    A.   Yes.

 6    Q.   When he wanted downtime from the streets, correct?

 7    A.   Yes.

 8    Q.   And you knew he was a member of the Blood, correct?

 9    A.   Yes.

10    Q.   And you know what Bloods are, right?

11    A.   Yes.

12    Q.   You've grown up in the city, you know exactly what they

13    are?

14    A.   Yes.

15    Q.   And you knew that he sold drugs in order to finance the

16    hotel and basically his lifestyle, and yours, for that

17    five-month period?

18    A.   I knew he sold marijuana.

19    Q.   Okay.  But he didn't go to work, he wasn't going down and

20    driving a bus for the city or something.  I mean, he'd go up to

21    Normal Avenue, and he'd move some weed, correct?

22    A.   Yes.

23    Q.   And on that particular day, in July, he had you go down and

24    pick two kids up in West Baltimore, right?

25    A.   Yes.
```

1   Q.  And it's your testimony you had no idea why you were doing

2   this?

3   A.  Yes.  No.

4   Q.  And you didn't ask him?

5   A.  No.

6   Q.  And Pound really didn't tell you whole lot of the time, did

7   he?

8   A.  No.

9   Q.  And you didn't ask him a lot, right?

10  A.  No.

11  Q.  And then you took those two kids that you picked up in West

12  Baltimore and brought him back up to the street that he didn't

13  live on, but the street they ran his little operation on,

14  correct?

15  A.  Yes.

16  Q.  And then two cars go out to Philadelphia Road, and you knew

17  that's what was going on.  You knew that you were showing these

18  two kids how to get out there, right?

19  A.  Yes.

20  Q.  Now, did you know that other guys from the street got in

21  the car there other than those two kids?

22  A.  No.

23  Q.  Did you think that was those two kids driving that car, the

24  ones you had pick up, or did you think someone else is driving?

25  A.  I'm not sure.  I seen -- I remember I seen ones, the one in

1    the passenger side, but I seen it was two other passengers in

2    it.

3    Q.  Now, do you know why they were going out there?  I mean,

4    just -- did you have a version of why they were going out there

5    on that day?  Did anyone tell you why?

6    A.  To look at a car.

7    Q.  And Pound told you that?

8    A.  Yes.

9    Q.  Now, did you ask him that, or did he tell you that?

10   A.  No, he just -- he told me that was like can I show them,

11   because that's why they was going out there, to look at a car.

12   Q.  Did you ask him why you were sitting in a parking lot out

13   of the view of the car after you got there?

14   A.  We ain't sit in no parking lot.  We stopped at the gas

15   station, and that was it, I got right back.

16   Q.  You went out, stopped at the gas station, got back in and

17   just drove, you didn't wait for the kid, though?

18   A.  He told us we didn't have to wait, show them where they was

19   at.  I stopped at the gas station and got in the car and came

20   back down.

21   Q.  So they didn't follow you back into the city?

22   A.  No.

23   Q.  Now, you mentioned something about you thought they were

24   going to rob somebody?

25   A.  After we came back, and he asked somebody what had

1   happened, he was -- I asked him for directions or something, he
2   say like that. And that's when I thought they did something.
3   But I thought they took the man's car or something like that.
4   Q.  This is after you got back into the city?
5   A.  Yes.
6   Q.  And that came about as a result of Pound saying something
7   to you?
8   A.  No.  When I was taking his home boys back over west, and
9   Pound said something to them.
10  Q.  Do you remember what he said to them?
11  A.  I think he said like, you know, what happened?  What
12  happened, like that, something like that.
13  Q.  What did he say?
14  A.  He was like --
15  Q.  When you say he, which one?
16          MR. PURCELL:  Objection, please let her finish.
17          THE COURT:  Sustained.  Let her answer the question.
18  A.  He was like the little boy with the corn rows, with the
19  bandana on his head, Brazy.  He was saying that I asked him for
20  directions, and it was done with, he was done, something like
21  that.
22  Q.  He was done?
23  A.  No, I think -- no, it was done.
24  Q.  So at that point, you realized, you realized you're driving
25  this little boy back over to West Baltimore, and he has

1    probably done something?

2    A.  Yes.

3    Q.  Now, do you ask Pound about that in between that time

4    period and when you've testified you learned what happened?

5    A.  On our way back, after I dropped him off, I asked him like

6    what y'all, what you they go out there and do?

7            He was like they ain't do nothing, you know, they

8    went to look at the car, something like that.

9    Q.  So he lied to you?

10   A.  Uh-huh.

11   Q.  He lied to you?

12   A.  Yes.

13   Q.  And he really got you into something, as you found out

14   later on, right?

15   A.  Yes.

16   Q.  And you ended up spending four months in jail because of

17   this, correct?

18   A.  Yes.

19   Q.  And you ended up having to plead guilty to a federal

20   offense of not reporting a crime, correct?

21   A.  Yes.

22   Q.  And you have a potential exposure of 36 months?

23   A.  Yes.

24   Q.  Minus the four that you've done?

25   A.  (The witness nodded affirmatively.)

1  Q.  And you were arrested in August of '07, correct?

2  A.  Yes.

3  Q.  Now, before you were arrested, on direct you were

4  testifying that Pound's mother would relay messages to you?

5  A.  Yes.

6  Q.  Was she relaying messages between Pound and before you got

7  arrested?

8  A.  No.  She would -- before I got arrested?

9  Q.  Uh-huh.

10  A.  No.

11  Q.  Did you go see Pound before you got arrested?

12  A.  No.

13  Q.  Did you stop?  So you didn't go down to visit him at the

14  detention center?

15  A.  No.

16  Q.  Is there a reason you didn't go down to visit him?

17  A.  No.  I ain't really know a reason.  I just didn't go down

18  there.

19  Q.  Were you close to him, spending the nights with him for

20  five months, you were very close to him?

21  A.  I just really wasn't trying to deal with him at that time

22  because I knew he had got me in trouble, and got me in trouble,

23  so I wasn't trying to deal with him.

24  Q.  You hadn't been arrested, yet?

25  A.  Yeah, but I had been called down there for questioning.

1   Q.  By the detectives?

2   A.  Yes.

3   Q.  And before you were arrested, right?

4   A.  Yes.

5   Q.  Now, you didn't talk to them when you went in then, though,

6   did you?

7   A.  No.

8   Q.  Isn't it a fact you were telling Detective Ruby --

9   actually, that was videotaped?

10   A.  Uh-huh.

11   Q.  You were telling him that he was tricking people?

12   A.  Yes.

13   Q.  And you were upset?

14   A.  Yes.

15   Q.  Well, when did Pound's mother start relaying information,

16   messages to you from Pound, was it after you got arrested?

17   A.  Yeah.  It was just like he was like I talk to him, he said

18   tell him that he love me and stuff like that.  She only did it

19   like one or two times.

20   Q.  Okay.  And did you feel comfortable that your role in this

21   offense would be brought to light?

22   A.  No.

23   Q.  Were you worried that they would think that you did

24   something here?

25   A.  Yes.

1  Q.  So you didn't feel reassured after talking to Pound's

2  mother that at least someone was going to indicate what you

3  really did here?

4  A.  I don't understand what you saying.

5  Q.  Well, Pound told you on July fifth in the early morning

6  hours that you didn't do anything, right?

7  A.  Yes.

8  Q.  And wasn't that substance of what was being relayed to you,

9  that you didn't have anything to worry about, you didn't really

10  do anything?

11  A.  Yes.

12  Q.  And Pound had been locked up already, right?

13  A.  Yes.

14  Q.  Now, correct me if I'm wrong, I just want to get this

15  straight.  These messages were relayed from Pound's mother to

16  you before you were actually incarcerated.  They had to have

17  been?

18  A.  No, not before, no.  She didn't come.  She called my

19  friends Tiara.  She was asking her how I was doing.  She

20  couldn't get in touch with me, asked how I was doing.

21          She told me tell her that she talked to him, he was

22  saying all right.

23  Q.  This is was one of your friends?

24  A.  Yes.

25  Q.  Are you still friend with this person?

1    A.  Yes.

2    Q.  Who is this person?

3    A.  Her name Tiara.  I was calling her when I was incarcerated,

4    because that's the only house I could get through to, so I was

5    calling her.

6    Q.  And Pound told you that morning on July fifth that you

7    didn't do anything, and that's basically what you've pled guilt

8    to here, not doing anything, just not reporting what you knew

9    later was a crime, correct?

10   A.  Yes.

11   Q.  So basically what he told you turned out to be true, you

12   didn't do anything?

13   A.  Yes.

14   Q.  At least according to what has actually unraveled in the

15   courthouse now, correct?

16   A.  Yes.

17   Q.  Now, there came another point when you were interviewed on

18   videotape, and you appeared to be incarcerated at that point in

19   time, you were wrapped up in a blanket, and you have an

20   attorney with you, a young African American woman, and they're

21   asking you questions.

22           Actually, there's a state prosecutor in there, do you

23   remember her?

24   A.  I don't remember.

25   Q.  She was the white lady, maybe in her early 50s, late 40s?

1    A.   I'm not sure.

2    Q.   Would you remember being -- do you remember being -- do you

3    being remember upset about having to talk to her?

4    A.   I don't remember.

5    Q.   Bear with me for one moment.  I'd like to play a little

6    clip for you.

7              THE COURT:  This is exhibit number what, Mr. Davis?

8              MR. DAVIS:  Your Honor, this is -- I don't -- this is

9    from her videotaped interrogation.  I have not had this marked.

10   I can have it marked.

11             THE COURT:  If it's going to be played, it has to be

12   an exhibit.

13             MR. DAVIS:  Defendant's exhibit 1.

14             THE COURT:  Defendant Goodman's exhibit number 1?

15             MR. DAVIS:  Yes.

16             THE COURT:  All right.

17             MR. DAVIS:  That's provided it plays.

18             THE COURT:  This has been reviewed by both sides.

19   Purcell, are you aware --

20             MR. PURCELL:  I'm not aware of the edit, but all the

21   tapes we have, it's from.

22             THE COURT:  It's been exchanged in discovery?

23             MR. DAVIS:  Yes, it is.  I'm playing maybe two

24   minutes of it.  I think I am.  Bear with me one moment.

25             THE COURT:  Miss Gardner's there to help you if you

1    need it.

2              (Pause.)

3              MR. DAVIS:  Bear with me one moment, Miss Graham.

4              (Pause.)

5              MR. DAVIS:  Your Honor, can we take a break for a

6    moment?

7              THE COURT:  We're going to take a brake in another 10

8    or so.  If it's going to take much longer, we will, Mr. Davis.

9              MR. DAVIS:  I don't have this on a hard drive.  I

10   have it on a disk.  It's not moving as quickly as I would like

11   it to move.

12             (Pause.)

13             MR. DAVIS:  I think we may have solved the problem.

14             (Pause.)

15             MR. DAVIS:  Your Honor, I hate to keep the jury

16   sitting here.

17             THE COURT:  Why don't we'll take our morning recess

18   now, and we'll take our 10 or 15 minute recess.

19             (Recess.)

20             THE COURT:  All right.  Mr. Davis, ready to proceed?

21             MR. DAVIS:  We're ready.

22             THE COURT:  All right.

23             (Jury present)

24             THE COURT:  Thank you.  Okay.  Mr. Davis, ready to

25   continue?

1          MR. DAVIS:  She's right here, Your Honor.

2          THE COURT:  You're still under oath, Miss Graham.

3     BY MR. DAVIS:

4     Q.  Miss Graham, when we broke a few moments ago, we were

5     talking about how you had been interviewed on a couple of

6     occasions, and the interviews were videotaped, correct?

7     A.  Yes.

8     Q.  Toward the end of the month of August -- and actually at

9     this time, Your Honor, I would introduce defendant Goodman's

10    exhibit number 1, which is a videotape of August 23, 2007

11    interview of Miss Graham.

12          Now, Miss Graham, the first time you interviewed with

13    Detective Ruby is when you said you denied everything, and you

14    indicated to him that he was trying to trick you, correct?

15    A.  Yes.

16    Q.  When you came back in toward the end of the month, that's

17    when you started talking to him, correct?

18    A.  Yes.

19    Q.  To some extent, right?

20    A.  Yes.

21    Q.  You were upset, weren't you?

22    A.  Yes.

23    Q.  You were very upset that you might have to testify against

24    Pound, weren't you?

25    A.  No.

1  Q.  I'm going to play a clip for you at 14:44 and 14 seconds,

2  take a listen to this for a minute.  It will kick on in a

3  minute.

4        (Recording played)

5  Q.  Now, Miss Graham, were you visibly upset during this

6  portion of this interview, weren't you?

7  A.  Yes.

8  Q.  Because you had been hanging out with a member of the

9  Bloods for five months, correct?

10 A.  Yes.

11 Q.  And you had accompanied this man to what they were telling

12 you was a hit?

13 A.  Yes.

14 Q.  And you helped him?

15 A.  Yes.

16 Q.  Correct?

17 A.  Yes.

18 Q.  And it's your position you knew nothing about this,

19 absolutely nothing, even though you were sleeping with the man

20 on the very night it occurred, and for five months before that,

21 correct?

22 A.  Yes.

23 Q.  I have one final question for you.  Those tears, were they

24 tears because you feared testifying against Pound?

25 A.  No.  I was scared, just scared.

1          MR. DAVIS:  Thank you.  I have no further questions.

2          THE COURT:  All right.  Any redirect, Mr. Purcell?

3          MR. PURCELL:  Just, just a couple of questions, if I

4     may.

5                    REDIRECT EXAMINATION

6     BY MR. PURCELL:

7     Q.  Miss Graham, maybe there's another part of the tape.  I

8     missed the part where it said you were telling the prosecutor

9     you were scared of testifying against Pound.

10             Did you tell the prosecutor that's why you were

11    scared?

12    A.  No, not that I remember, I don't think so.

13    Q.  I didn't see it, either.

14             Ma'am, at that particular time, that was August 23rd,

15    I think we were told?

16    A.  Yes.

17    Q.  At that time, the detectives were there, and the prosecutor

18    whose name I think is Miss Coffin?

19    A.  Yes.

20    Q.  They were accusing you of having been right across the

21    street?

22    A.  Yes.

23    Q.  Weren't they?

24    A.  Yes.

25    Q.  And you had been telling them that you weren't across the

1   street?

2           MR. PURPURA:  Objection, I guess to the form.  This

3   is redirect, and I apologize.  It's leading.

4           THE COURT:  It is leading.  Just sustained.  Rephrase

5   the question, Mr. Purcell.

6   Q.  Had you -- did the detectives question you about across the

7   street?

8   A.  Yes.

9   Q.  And that is for the Lackl murder?

10  A.  Yes.

11  Q.  And did you tell them -- well, what did you tell them in

12  response when they accused you of being across the street?

13  A.  They said they know we were sitting across the street.  I

14  told them it was impossible, because I was never sitting across

15  the street and watching nothing.

16  Q.  And were they believing you?

17  A.  No.

18  Q.  Did they keep accusing you of having been across the

19  street?

20  A.  Yes.

21  Q.  And it upset you?

22  A.  Yes.

23  Q.  And did it make you cry?

24  A.  Yes.

25  Q.  Were you upset testifying against anyone?

```
 1   A.   No.
 2   Q.   Now, there were some questions about whether you had been
 3   in contact with Mr. Pearson's mother after he was locked up.
 4   How many times did that happen?
 5   A.   After he was locked up?  I'm not sure.
 6   Q.   Would it be several times, one time, how many times, if you
 7   know?
 8   A.   After he was locked up, I talked to her maybe once or
 9   twice.  I'm not really sure how many times I talked to her.  It
10   wasn't that many times.
11   Q.   And was it as if you were being relayed actual messages
12   from her?
13   A.   No.  She was calling to see how I was doing.
14   Q.   She was a nice woman?
15   A.   Yes.
16   Q.   Is she still with us?
17   A.   No.
18   Q.   I know we're not prosecuting you for this marijuana you
19   told us about, but when you went over to get some marijuana,
20   some weed prior to going up Philadelphia Road, about how much
21   did you typically buy when you and Pound bought marijuana?
22   A.   Probably one to two bags.
23   Q.   Tell the jury what you mean by one or two bags, garbage
24   bags?
25   A.   Little bags.
```

1    Q.  Little tiny bags?

2    A.  Yes.

3    Q.  Like that big?

4    A.  Not that, not that little, but --

5    Q.  Okay.  Like an inch?

6            I'll just wait until you're finished, there, counsel.

7            MR. PURPURA:  That's okay.

8            THE COURT: Counsel, why don't you approach the bench

9    for a moment?  Please approach the bench.

10           (At the bench)

11           THE COURT:  All right.  Mr. Purpura, we had one

12   moment when you stopped because Mr. Purcell was talking, and

13   then Mr. Purcell we've now had one moment when you stopped

14   because Mr. Purpura was talking.

15           MR. PURPURA:  I wasn't talking.  I was laughing

16   because I thought it was funny.

17           THE COURT:  You were laughing.  Let's leave the

18   banter between very lawyers, down the banter between the two of

19   you.  That's fine.  Thank you.

20           (Open court)

21   BY MR. PURCELL:

22   Q.  When you bought this marijuana, how much would you buy at a

23   time?

24   A.  Probably a bag or two.

25   Q.  How much does a bag cost?

1   A.   $10 dollars, $20.

2   Q.   $10?

3   A.   Yes.

4   Q.   This is the amount of money you're spending on marijuana?

5   A.   Yes.

6   Q.   Okay.  And you said that day that you went to buy a blunt?

7   A.   Yes.

8   Q.   Okay.  And how many blunts did you buy?

9   A.   Just one.

10  Q.   One?

11  A.   Yes.

12  Q.   You bought one cigar?

13  A.   Yes.

14  Q.   So this big person you were with Pound is buying little $10

15  bags of marijuana single cigars for his use of it?

16  A.   Yes.

17  Q.   Okay.  How much does a single cigar cost?

18  A.   A dollar.

19  Q.   And sometimes you actually paid for it, didn't you?

20  A.   Yes.

21  Q.   Now, there were -- there was a lot of references to the

22  individuals in the back of the car when you picked them up when

23  you went over to the west side?

24  A.   Yes.

25  Q.   And they were I believe you called them little boys?

1  A.  Yes.

2  Q.  Do you know how old the other person, Michael Randle, how

3  old is he?

4  A.  No.

5  Q.  And how old is -- how old's Mr. Pearson, if you know?

6  A.  26.  I think, yeah, 26.

7  Q.  Okay.  Your Honor, I have no further questions.

8         THE COURT:  Thank you.  Any recross just on those

9  points?

10         MR. PURPURA:  I do, just on the marijuana.

11         THE COURT:  That's fine.

12                  RECROSS-EXAMINATION

13  BY MR. PURPURA:

14  Q.  Just Pound tells you he sells marijuana, right, yes?

15  A.  Yes.

16  Q.  And that's how he makes a living, right?

17  A.  Yes.

18  Q.  Yes.  Then why were you buying marijuana if he sells

19  marijuana?

20  A.  He must not had none had.

21         MR. PURPURA:  I have nothing further, thank you.

22         THE COURT: Any recross just on these points, Mr.

23  Davis?

24         MR. DAVIS:  No, your Honor.

25         THE COURT:  Miss Graham, you may step down.  You

1    should not discuss your testimony with anyone in the course of

2    this trial in the event you were called back.  Do you

3    understand that?

4           THE WITNESS:  Yes.

5           THE COURT:  All right.  You're excused.

6           Next witness, Mr. Giblin?

7           MR. GIBLIN:  Yes Your Honor, the government calls

8    Ryan Harger.

9           THE CLERK:  Sir, if you would step forward, please,

10   and raise your right hand?

11          (The Witness is sworn.)

12          THE CLERK:  Thank you.  Please have a seat.  Please

13   state your full name for the record.

14          THE WITNESS:  Ryan Harger, H A R G E R.

15          THE CLERK:  Thank you.

16                  DIRECT EXAMINATION

17   BY MR. GIBLIN:

18   Q.  Good morning, sir.

19   A.  Good morning.

20   Q.  Who do you work for?

21   A.  Sprint Nextel, a telecommunications company.

22   Q.  And what's your job title with Sprint Nextel?

23   A.  I'm a supervisor in the legal compliance group.

24   Q.  How long have you worked for Sprint Nextel?

25   A.  Approximately nine years.

1   Q.  And in the course of your duties as a supervisory of legal

2   compliance, are you familiar with Sprint billing records and

3   subscriber information, that sort of thing?

4   A.  I am.

5   Q.  And prior to your testimony today, I've asked you to review

6   some record that Sprint provided to the United States pursuant

7   to a subpoena; is that right?

8   A.  That's correct.

9   Q.  First let me ask you Sprint is -- or Sprint Nextel is a

10   telephone communications service provider; is that right?

11   A.  That is correct.

12   Q.  And calls that are taking place over phones using Sprint

13   service are on what's called the Sprint network; is that

14   correct?

15   A.  That's correct.

16   Q.  What's the Sprint Nextel?

17   A.  A nationwide cellular telephone network.

18   Q.  And you say nationwide, that means it's pretty much

19   available anywhere in the country; is that right?

20   A.  That's correct.

21   Q.  So not just in Maryland?

22   A.  That's correct.

23   Q.  And can someone using a Sprint cell phone make call to

24   another network member in say California?

25   A.  Yes, they can.

1  Q.  And can someone using a Sprint cell phone contact and have

2  conversations with people using telephone service from other

3  service providers like T Mobile, ATT, that sort of thing?

4  A.  Yes, they can.

5  Q.  Where's Sprint's headquarters?

6  A.  Overland Park, Kansas.

7  Q.  Is that where you came from for your testimony today?

8  A.  Yes.

9  Q.  At the government's expense, I might add?

10  A.  Yes.

11          THE COURT:  Thank you for brink your weather with

12  you.  It's cold and wet out there.  You clearly brought it with

13  you, sir.

14          I'm just kidding.  Thank you very much.  Welcome to

15  Baltimore.

16  Q.  And I was just referring to, I was using the term calls,

17  but for Sprint Nextel that means regular dial-up calls as well

18  as the direct connect feature; is that correct?

19  A.  Yes, that's correct.

20  Q.  Let me show you what's been admitted in evidence as

21  government's exhibit 343.  I will try -- it's going to be on

22  your screen.  Let me move it out here.

23          And I've asked you to take a look at this exhibit

24  prior to your testimony as well, correct?

25  A.  Yes, you have.

1    Q.  Just so it's clear, Sprint did not prepare this exhibit,

2    but it's based on records provided by Sprint; is that correct?

3    A.  That is correct.

4    Q.  Okay.  One question I have for you, which I'm hoping you

5    can explain to the jury, is when Sprint bills people who are

6    using the Sprint network for telephone calls or direct connects

7    that they're making, how do they determine what the duration is

8    for each call?

9    A.  The duration of -- the clock on the duration would start

10   when the actual conversation starts.  So if I call you, you

11   never answer me, there's no -- there's no duration, it's not

12   billed.

13   Q.  So if someone makes a call or a direct connect hoping that

14   the other person will pick up and kind of respond, and that

15   never happens, that shows up as a zero call in duration; is

16   that correct?

17   A.  That's correct.

18   Q.  Okay.  And when the other person picks up, the clock starts

19   running; is that correct?

20   A.  That's correct.

21   Q.  And then when does the clock actual cease?

22   A.  On a direct cell call, as long as there is constant two-way

23   communication between the two parties with the break, that's

24   the longest break no longer than three five seconds, it's

25   considered to be a continuous call.  If there's a break in the

1   conversation for three to five seconds, it is considered a new

2   call.

3   Q.  People simply stop talking the phone or network will

4   recognize the fact there's no longer any conversation back and

5   forth, and it will cease the duration; is that correct?

6   A.  That's correct.

7   Q.  So, for example, if I were in the bathroom shaving or in

8   the shower and someone was direct-connecting me, saying pick

9   up, pick up, pick up, and I never picked up, that would show up

10  on their records as a zero duration call; is that correct?

11  A.  That's correct.

12  Q.  But if I were to pick up say seven seconds later and call

13  them back and then we had a conversation lasting about a

14  minute, that would show up on my direct connect records as a 55

15  second call; is that correct?

16  A.  That's correct.

17  Q.  Now, if you have a Sprint -- I'm sorry, a Sprint cell phone

18  customer, they're I guess randomly generated or given a phone

19  number when they sign up for service; is that right?

20  A.  That's correct.

21  Q.  And when they get a Sprint account, they're also given a

22  unique direct connect number; is that correct?

23  A.  That is correct.

24  Q.  And the phone number is like the area code and then seven

25  digits; is that right?

 1   A.   Yes.

 2   Q.   Just like everybody's phone number?

 3   A.   Yes.

 4   Q.   How is the direct connect number, what does that look like?

 5   A.   Typically, it's three digits, with a star, another two

 6   digits, and then with star, and there can be any number of

 7   digits after that depending on --

 8   Q.   Let me ask you this, what is an IMSI, or IMSI number?

 9   A.   International mobile subscriber identifier.  It's a unique

10   identifier assigned to subscriber that the network uses to

11   recognize who they are allowed them to make or receive calls on

12   the network.

13   Q.   And the IMSI number or IMSI number is different than phone

14   number or direct connect number; is that right?

15   A.   That's correct.

16   Q.   Now, if somebody wants to say change their phone number,

17   the number that other people will call in order to contact

18   them, what do they have to do?

19   A.   Simply contact Sprint Nextel either through a store or

20   customer care rep on the phone.

21   Q.   They can just call up and say hey I want my number changed,

22   and Sprint can do that over the phone?

23   A.   Yes.

24   Q.   Now, can they call up Sprint and ask them to change the

25   IMSI or IMSI number on their phone remotely?

1    A.   I believe they could.

2    Q.   Okay.  Now, if you wanted to exchange the IMSI number on

3    the actual chip inside the phone, you would have a technician

4    actually go and do that?

5    A.   That's correct.

6    Q.   You couldn't just call up Sprint say change my number

7    without them having access to the microchip itself; is that

8    correct?

9    A.   That's correct.

10   Q.   Okay.  Now, I'm showing you what's been admitted as

11   government's exhibit 324, and this is one of those records that

12   we looked at yesterday when you got in from Kansas City?

13   A.   Yes.

14   Q.   You've had a chance to familiarize yourself with this

15   exhibit; is that right?

16   A.   Yes, I have.

17   Q.   I'm showing you the second page, the highlighted areas.

18   First of all, this is for a subscriber identified as Shantay

19   Johnson; is that correct?

20   A.   That's correct.

21   Q.   Of Baltimore, Maryland?

22   A.   Yes.

23   Q.   And can you tell the members of the jury what is reflected

24   here in terms of phone number and direct connect number of this

25   phone as of October 7, 2006?

1   A.   The telephone number is -- it's Blurry up here for me.

2   Q.   Okay.  Well, the document will speak for itself.

3          How about the direct connect number, better now that

4   my assistant has helped me.

5   A.   That's much better.

6   Q.   Can you correct the record?

7   A.   Certainly.  Telephone (443) 367-6682.

8   Q.   What's the direct connect?

9   A.   183 * 940 * 9082.

10   Q.   Okay.  And what is this document reflect in terms of if and

11   when that number was ever changed?

12   A.   Indicates that the phone number was changed on July 6th of

13   2007.

14   Q.   And do you have any knowledge of the facts of this case

15   that you're here testifying about?

16   A.   Very little.

17   Q.   So you don't know anything about the dates of any murders

18   or crimes or anything like that?

19   A.   No, I do not.

20   Q.   What is in the yellow highlighting there?  What does --

21   what does that reflect in terms of activity of this account?

22   A.   That would reflect there was a new phone number and a new

23   UFMI or direct connect number issued on July 6, 2007 through

24   July 24, 2007.

25   Q.   Okay.  How about the pink number?

1   A.  It reflects another change of telephone number and UFMI or

2   direct connect number on July 24.

3   Q.  And that stays until October 11, 2007; is that right?

4   Actually going over to the next page, excuse me.

5           From Sprint's perspective, when does service on this

6   phone actually end?  I'm not asking about when the calls actual

7   end, but when does service end?

8   A.  Expiration date is December 10, 2007.

9   Q.  That means that the phone is no longer active, doesn't have

10  an active Sprint account?

11  A.  That's correct.

12  Q.  Now, you walked the jury through those phone number

13  changes, but based on this subscriber's history, does the IMSI

14  number that's unique to the microchip inside the phone ever

15  change?

16  A.  No, it did not.

17  Q.  Also, just so the record's clear, the phone number that was

18  being used for this account from July 6th, 2007 to July 24,

19  2007, could you read those numbers for the record?

20  A.  Certainly. (443) 806-2872.  and the direct connect number

21  was 183 * 940 * 253.

22  Q.  And how about the phone numbers for the remainder of the

23  service period?

24  A.  (443) 806-7850 and direct connect 183 * 940 * 42.  And

25  three more numbers (443) 806-1708.  (443) 806-7850.

1          And (410) 500-3732.

2     Q.  And what was the phone number that was in use at the time

3     the service ended on this subscriber's history?

4     A.  It's got to be on the next page.  The (410) 500-3732 and a

5     direct connect number of 183 * 940 * 42.

6          MR. GIBLIN:  Your Honor, I don't have any further

7     questions.

8          THE COURT:  Thank you.  Cross-examination, Mr.

9     Balarezo?

10         MR. BALAREZO:  Thank you.

11                    CROSS-EXAMINATION

12    BY MR. BALAREZO:

13    Q.  Good morning, sir, how are you?

14    A.  Good morning.  Well.

15    Q.  Sir, you've had an opportunity, as the prosecutor said, to

16    review the documents related to that particular phone, right?

17    A.  Some of them, yes.

18    Q.  Some of them?  Okay.

19         And you work at Sprint Nextel as the legal compliance

20    officer?

21    A.  That's correct.

22    Q.  Part of your job is to testify, if necessary, about

23    telephone service and telephones, right?

24    A.  That's correct.

25    Q.  Now, let me show you what is government's exhibit 343,

1    which you've been shown?

2    A.  Okay.

3    Q.  Can you see that?

4    A.  Yes.

5    Q.  Let me just focus right now your attention on line 18.  Do

6    you see that?

7    A.  Yes, I do.

8    Q.  Which on this chart has a couple names, some times, dates,

9    numbers, that kind of thing, right?

10   A.  Yes.

11   Q.  From your review of your company records, can you tell this

12   jury what conversation, if any, was being had during that

13   particular activation?

14   A.  No, sir, I cannot.

15   Q.  For any of these communication, activations, can you tell

16   the jury what was the context, or what was the -- yes, what was

17   the context of any of these conversations, if any, that took

18   place during these particular activations?

19   A.  I wasn't present.  I didn't make those calls.  I have no

20   idea.

21   Q.  Well, clearly you didn't make the calls, but does your

22   company keep any record of what those conversations might have

23   been?

24   A.  No.

25   Q.  And can you tell the jury whether or not in fact there was

1    any actual conversation during any of these activations?

2    A.  No, I cannot.

3    Q.  The particular -- I'll show you exhibit number 324, which

4    you saw, for this particular -- what would you call it, account

5    or a phone?

6    A.  It would be subscriber account.

7    Q.  For this particular subscriber account, it indicates

8    billing name of Shantay Johnson; is that correct?

9    A.  Yes.

10   Q.  Do you know who is Shantay Johnson?

11   A.  No idea.

12   Q.  Have you ever had any communication with her?

13   A.  No.

14   Q.  Do you know if Shantay Johnson is a person or individual

15   who requested a change in the phone numbers?

16   A.  No, I do not.

17   Q.  Your records don't indicate that, do they?

18   A.  That's correct.

19   Q.  Okay.  Now, can you tell from your examination of the

20   records, either that's before you or any other information that

21   your company had, whether or not this particular telephone was

22   capable of sending text messages?

23   A.  On the second page, it may say. Yes, lists as text messages

24   and enhanced text messages.

25   Q.  Right there?

1    A.   Yes.

2    Q.   Okay.  Can you tell the jury whether or not you've been

3    able to locate any text messages sent from that particular

4    account or phone or phone number around the time of June 30,

5    2007?

6    A.   No, I cannot.

7    Q.   Has the government asked to you to do that?

8    A.   I don't believe so.

9         MR. BALAREZO:  Thank you.  I have nothing else.

10        THE COURT:  Any questions, Mrs. Davis?

11        MS. DAVIS:  Yes, Your Honor.

12                   CROSS-EXAMINATION

13   BY MS. DAVIS:

14   Q.   Good morning, sir.

15   A.   Good morning.

16   Q.   Couple questions.

17        How long have you worked for Sprint?

18   A.   Almost nine years.

19   Q.   Nine years?  And you started out in what position?

20   A.   I initially started out with Sprint as network analyst in

21   the network operation center for approximately a year.

22   Q.   What were your duties there?

23   A.   To watch a computer screen to determine keep make sure the

24   cell towers and the switches that carry a call are functioning

25   properly.

1   Q.  After that one year, what did you do then?

2   A.  Then I moved to the legal compliance department.

3   Q.  Okay.  And what exactly do you do in legal compliance?

4   A.  We receive and respond to legal demands for customer

5   information.

6   Q.  Okay.  So that's basically responding to subpoenas?

7   A.  For subpoenas or court orders, yes.

8   Q.  What's your educational background?

9   A.  I have a bachelor's degree.

10   Q.  In?

11   A.  Safety management.

12   Q.  Okay.  And what exactly is the connection between safety

13   management and the telephone business?

14   A.  Absolutely none.

15   Q.  None.  Okay.

16         And you spoke about how the billing features work.

17   How did you come to become familiar with that?

18   A.  My experience, on-the-job training, and training courses.

19   And also speaking with people who were actually working on the

20   billing platform.

21   Q.  So in your capacity in the legal sector of the company, you

22   were trained in the billing?

23   A.  Yes

24   Q.  Okay.  And what did that training consist of?

25   A.  Training courses and just conversations with people who are

1  familiar with that, that platform.

2  Q.  So basically things that people told you?

3  A.  Yes, ma'am.

4  Q.  Okay.  It wasn't anything that you specifically dealt with,

5  or you programmed, or you did anything?

6  A.  No, ma'am.

7  Q.  Okay.  So basically your position is to respond to

8  subpoenas?

9  A.  Correct.

10  Q.  Okay.  A lot of your testimony today is dealing with what

11  people have told you, how it works?

12  A.  That's correct.

13  Q.  Okay.  The direct connect feature on phones, it works like

14  a walkie-talkie pretty much?

15  A.  More or less, yes.

16  Q.  Are you familiar with all the various types of phones?

17  A.  No, I'm not.

18  Q.  You're not?  Okay.

19       So you wouldn't know, for instance, if any particular

20  phone that you were asked about whether it had a silence mode

21  feature on it?

22  A.  No, I don't.

23  Q.  Let me ask you this, is it possible that when a call is

24  made that if the speaker's not on, the caller will hear the

25  conversation?

1    A.  That's possible.

2    Q.  And Isn't it true that there's also on some phones there's

3    a three to five second hang time even though the call isn't

4    taken?

5    A.  That's possible.

6    Q.  So it is possible that there's several seconds where there

7    would be a billing even though there was no actual pick up on

8    the other end; isn't that true?

9    A.  That's possible, yes.

10          MS. DAVIS:  Okay.  I have no other questions, thank

11   you.

12          THE COURT:  All right.  Thank you very much.

13          Any redirect, Mr. Giblin?

14          MR. GIBLIN:  No, Your Honor.

15          THE COURT:  Thank very much, Mr. Harger, you're

16   excused.  In the unlikely event you would be around this area,

17   do not talk with anyone about your testimony, and have a nice

18   trip back to Kansas, thank you.

19          MR. PURCELL:  Thank you.

20          THE COURT:  Next witness, Mr. Giblin?

21          MR. GIBLIN:  Yes, Your Honor.  Michael Thomas.  I've

22   seen him today, Your Honor.

23          THE COURT:  That's a good step, we know he's in the

24   building.

25          MR. GIBLIN:  He's in the building.

1           (Pause.)

2           THE CLERK:  Sir, if you would step forward, please,

3    and raise your right hand.

4           (The Witness is sworn.)

5           THE CLERK:  State your full name and spell your name

6    for the record.

7           THE WITNESS:  My name is Michael Joseph Thomas

8    Junior.

9           THE CLERK:  Thank you.

10                      DIRECT EXAMINATION

11   BY MR. GIBLIN:

12   Q.  Good morning.  Who do you work for, sir?

13   A.  I work for Baltimore County Police Department.

14   Q.  What's your job title?

15   A.  I'm a firearms and tool mark examiner.

16   Q.  How long have you been a firearms and tool mark examiner

17   with Baltimore County Police?

18   A.  I've been work there as trainee or examiner for just about

19   ten years.

20   Q.  Could you describe for the jury what your duties are as an

21   examiner?

22   A.  Basically any evidence that would come into the Baltimore

23   County Police Department that would be firearm-related or with

24   tools and tool marks, I would look at that, that evidence to

25   determine whether or not a particular cartridge or bullet would

1    have been fired from a particular firearm.

2    Q.  And could you explain for the jury just briefly how you do

3    that?

4    A.  A tool is the harder of two objects, basically, if you have

5    a hammer and a nail, the hammer's going to mark the nail.

6          A cartridge going into a firearm when it's fired, the

7    firearm itself is a lot harder, so it will leave marks on the

8    bullet on the cartridge case when it's fired.  Anything that

9    has pressure against it, the harder of two objects is going to

10   mark the softer one.

11         So I look at that under a comparison microscope, and

12   given the right circumstances, can make a judgment as to

13   whether or not a particular tool marked one or more items.

14   Q.  And when you're talking about a tool in terms of a

15   projectile or a gun, the tool is the gun and the projectile is

16   the bullet; is that correct?

17   A.  That's correct.

18   Q.  And it's your job basically to compare in certain instances

19   a firearm to either a cartridge that's -- cartridge case that's

20   leftover or projectile that actually came out of the gun at

21   some point; is that correct?

22   A.  That's correct.

23   Q.  In your eight or ten years or so of experience, about how

24   many comparisons have you made or undertaken as part of your

25   official duties?

1    A.  It would be thousands.

2    Q.  And what training have you undergone in the area of

3    firearms identification?

4    A.  I initially worked with a court-qualified examiner, started

5    off with Baltimore County.  It's a two-year program run by the

6    Association of Firearm and Tool Mark Examiners.

7            I was then accepted into the Alcohol Tobacco and

8    Firearms National Firearm Examiner Academy, which is a one-year

9    program.  And I successfully completed both of those.

10   Q.  And you've had on-the-job training basically back to 1999;

11   is that correct?

12   A.  Actually before that, but, yes.

13   Q.  And you mentioned the AFTE, what is the AFTE?

14   A.  Association of Firearm and Tool Mark Examiners.  It's an

15   organization that oversees the science of firearms

16   identification that started off in 1969.

17   Q.  And then, I'm sorry?

18   A.  It continues today.

19   Q.  Have you ever been qualified as an expert in either state

20   or Federal Court in the area of firearms identification?

21   A.  Yes, I have.

22   Q.  An approximately how many times?

23   A.  Approximately 40 times.

24   Q.  And has any court ever rejected you as an expert in the

25   field of firearms identification?

1   A.   No, they have not.

2           MR. PURPURA:  Judge, for the purpose of this trial, I

3   have no objection to his expertise for this trial.

4           THE COURT:  Do you agree with that, Mr. Davis?

5           MR. DAVIS:  I have no objection.

6           THE COURT:  Do you proffer him as an expert in

7   firearms examination?

8           MR. GIBLIN:  Yes, Your Honor.  Firearms

9   identification.

10          THE COURT:  Ladies and gentlemen, the witnesses are

11  ordinarily not permitted to do give opinions.  One exception

12  that is Rule 700 series, Federal Rules of Evidence with respect

13  to expert testimony, and with respect to expert testimony, an

14  individual can be qualified as an expert and then is permitted

15  to give his or her opinion as to any witness.

16          You can accept or reject the opinions that are

17  offered, strictly up to you as the finder of fact, but an

18  expert witness is permitted to give his opinion.  And this

19  gentleman, Mr. Thomas, has been qualified as an expert and all

20  agree he's an expert.  He is permitted give his opinion in the

21  areas of his expertise.

22          You may continue, Mr. Giblin.

23          MR. GIBLIN:  Thank you, Your Honor.

24  BY MR. GIBLIN:

25  Q.  Just for those of us and the members of the jury who don't

1    know about these sort of things, can you just briefly kind of

2    describe what the pieces of a round of ammunition are?

3    A.   Yes.  If I could bring it out, I have that larger piece

4    that I use as a demonstration model.

5            The cartridge is composed of four different items.

6    You have the cartridge case that holds everything together.

7    There's a primer in the back ordinarily in the center.  That

8    initiates the reaction of firing the cartridge itself.  The

9    bullet, which comes out.  And then there's the powder inside,

10   which is the fuel that causes the pressure and makes everything

11   work.

12   Q.   Okay.  And you mentioned before in your preliminary

13   testimony that when a round of ammunition is fired, the firearm

14   actually leaves unique marks on the cartridge casing as well as

15   the projectile that comes out of the gun; is that correct?

16   A.   That's correct.

17   Q.   And could you describe for the jury how you determine what

18   you do in your testing to determine whether a firearm that's

19   submitted to you was or was not the firearm that fired, for

20   example, a recovered projectile?

21   A.   Well, when we get a fired projectile, we would determine

22   the size, shape, the number of lands and grooves that were

23   engraved on the bullet when it went down the barrel and

24   determine what the possible caliber was, what size cartridge

25   would have possibly fired it.

1          So that we could eliminate most of the guns out

2     there, because they would be of different size, they wouldn't

3     shoot this bullet.

4          And once we would determine caliber and such, then we

5     would go on to looking at possible firearms that would have

6     fired it.

7          And if that was submitted to us, then we would

8     test-fire that firearm with cartridges that would shoot the

9     same or similar type bullet, and then we can look at these

10    under the microscope and see if those fine markings that were

11    left by the barrel on this bullet would match up with the test

12    fires that we recovered.

13    Q.  And based on doing this, what do you conclude, what can you

14    conclude in making that comparison?

15    A.  I can conclude that either the two -- the two bullets were

16    fired from the same gun, the two bullets were not fired from

17    the same gun, or it would be inclusive that I couldn't tell

18    either way.

19    Q.  Were you submitted some evidence in case number 0 7 1 8 3 1

20    8 0 7?

21    A.  Yes.

22          MR. GIBLIN:  May I approach Your Honor?

23          THE COURT:  Yes.

24    Q.  Just providing you government's exhibit 117.  Do you

25    recognize what that is?

1   A.  It's a copy of my report that I issued on July 19th, 2007.

2   Q.  In the case number that I just stated?

3   A.  That's correct.

4   Q.  And you were asked to essentially compare a gun to a

5   recovered projectile; is that correct?

6   A.  Yes, sir.

7   Q.  Let me show you what's on the screen to your left is going

8   to appear as government's exhibit 104.  Do you recognize that?

9   A.  It appears to be a Colt firearm similar to the one that I

10   examined in this case.

11   Q.  And in this case you were asked essentially to compare this

12   firearm with the projectile that was recovered and submitted to

13   you by Detective Ruby; is that right?

14   A.  That's correct.

15   Q.  Can you tell the members of the jury -- well, let me ask

16   you this, government's exhibit 107, I will put it on the screen

17   next to you.  And the bag that that came from, do you recognize

18   your handwriting on that bag?

19   A.  I signed for that on July fifth of 2007 when I took

20   possession of that evidence.

21   Q.  And then based on the cc number, that's the case number for

22   the Lackl case; is that right?

23   A.  Yes, sir.

24   Q.  Can you tell the members of the jury what you did and what

25   you concluded comparing government's exhibit 107 and the object

1    depicted in government's exhibit 104?

2    A.  I examined the fragment that was there, determined the

3    size.  It was approximately .431 inches, about 43 caliber.  And

4    which is approximately what the size of a 44 magnum would have

5    fired.

6         Weighed it, determined that the rifling was six lands

7    and grooves with a left twist.  And that's consistent with the

8    Colt firearm.

9         And then I test-fired the firearm in question and

10   looked at the evidence bullet as well as my test-fires and was

11   able to make a conclusion.

12   Q.  And what was your conclusion?

13   A.  My conclusion was that the QB F1 item 2450-002 had been

14   fired from K 1, the Colt Anaconda.

15   Q.  So the record's clear, you rattled off a long number.

16   You're referring to the way you described government's 107 in

17   your report that you prepared; is that right?

18   A.  That's correct.

19        MR. GIBLIN:  Your Honor, I don't have any further

20   question for Mr. Thomas.

21        THE COURT:  Thank you, Mr. Giblin.  Any

22   cross-examination, Mr. Purpura?

23        MR. PURPURA:  Just a couple.

24        THE COURT:  Sure.

25                    CROSS-EXAMINATION

1    BY MR. PURPURA:

2    Q.  Can you put your whole cartridge back together for a

3    second?

4    A.  Sure.

5    Q.  Just can you just demonstrate to the jury what physically

6    happens when the primer is struck, what happens?

7    A.  Okay.  You'll consider this --

8    Q.  Tell them.

9    A.  When the fire pin strikes the primer, the primer has a

10   compound inside of it that explodes setting fire into the

11   powder to ignite that.  That primer slams back against the

12   firing pin and the breech face of the gun, taking an impression

13   of that surface.

14          The casing is slammed forward at the same time.  And

15   then as the powder burns and gets more pressure in it, it will

16   eventually get enough to force the bullet out of the casing and

17   start it down the barrel.

18          Now, when this pressure gets up high, it's going to

19   force the casing back over the primer, and these small marks on

20   the chamber from the chamber walls on the casing itself.

21          And the bullet, seeing how it's larger than the bore,

22   actually is going to be engraved by the rifling as it goes down

23   the barrel, and it will take the markings from that barrel.

24   Q.  Okay.  Now, just in your demonstration suggests a revolver,

25   nd that's the weapon in this particular case?

1    A.  Yes.

2    Q.  In a revolver, what happens to the casing?

3    A.  The casing stays in the cylinder.

4    Q.  And the difference between revolver and a semiautomatic, in

5    a semiautomatic, the casing would be ejected; is that correct?

6    A.  That's correct.

7    Q.  Let me ask you about the powder itself.  This is a rather

8    large caliber handgun; is that correct?

9    A.  Yes, sir.

10   Q.  Regardless, it's a large caliber handgun or not, that's

11   really not the issue.  Powder in there that's what causes the

12   explosion, the force?

13   A.  Actually, it burns, but it burns giving off large amount of

14   gas.

15   Q.  And there's actually a residue from the powder, which

16   escapes as well, is that correct, the unburned powder?

17   A.  There is some.

18   Q.  Okay.  And that residue can actually get on the person's

19   hands, the person who fires that gun; is that correct?

20   A.  It's like a -- it's dirt.  You don't actually have a an

21   affinity or anything like that, it's not sticky or anything.

22   Q.  It's very small particles and there's an explosion there,

23   correct?

24   A.  That's correct.

25   Q.  And those particles can get in your hand or get on your

1    clothing; is that fair to say?

2    A.  They can.

3    Q.  Thank you.

4          And that's -- this may not be your science, but

5    that's where you have the gunshot residue that comes in; is

6    that correct?

7    A.  That's correct.

8          MR. PURPURA:  Thank you.  Nothing further.

9          THE COURT:  Mr. and Mrs. Davis, any questions?

10          MS. DAVIS:  No, Your Honor.

11          THE COURT:  Any redirect?

12          MR. GIBLIN:  No, Your Honor.

13          THE COURT:  Mr. Thomas, you should not discuss your

14    testimony with anyone in the unlikely event you were called

15    back to the witness stand.  Thank you very much, sir.

16          THE WITNESS:  You're welcome.

17          THE COURT:  Mr. Giblin, next witness?

18          MR. PURCELL:  Your Honor, Marcus Pearson.

19          THE COURT:  Marcus Pearson.

20          MR. PURCELL:  Yes.  He's in custody, Your Honor.

21          (Pause.)

22          THE COURT:  Stand there and be sworn, sir, raise your

23    right hand.

24          (The Witness is sworn.)

25          THE CLERK:  Thank you.  You please have a seat.

1    Please state your full name for the record.  Keep your voice

2    up.

3              THE WITNESS:  Marcus Pearson.

4              THE CLERK:  Thank you.

5                        DIRECT EXAMINATION

6    BY MR. PURCELL:

7    Q.  Good morning, Mr. Pearson, over here, please, can you see

8    me?

9              THE COURT:  Mr. Pearson, pull the chair forward a

10   little bit and bring that microphone will move, will come right

11   down, so speak clearly into the microphone, sir.

12   Q.  Now, Mr. Pearson, you know why you're here today?

13   A.  Yes.

14   Q.  Now, are you the individual Marcus Pearson who has entered

15   a guilty plea to basically the murder for hire, being involved

16   conspiracy for murder for hire of Carl Lackl?

17   A.  Yes.

18   Q.  Did you plead guilty to that in Federal Court already?

19   A.  Yes.

20   Q.  Are you awaiting sentencing?

21   A.  Yes.

22   Q.  How old are you, Mr. Pearson?

23   A.  28.

24   Q.  And where are you from, what part of Baltimore?

25   A.  East Baltimore.

1    Q.   And is that where you were born?

2    A.   Yes.

3    Q.   And where were you living specifically, or where was your

4    basically legal address back in July of 2007?

5    A.   On Normal Avenue.

6    Q.   Who did you live there when you stayed there?

7    A.   My mom.

8    Q.   I understand she's passed away --

9    A.   Yes.

10   Q.   -- recently?  Sorry for that.

11        Now, did you live there with anybody else --

12   A.   No.

13   Q.   -- at that time?

14        Now, were you employed back in July, 2007?

15   A.   Yes.

16   Q.   Have a job?

17   A.   No.

18   Q.   Have you ever had any sort of regular 9 to 5 or regular

19   employment?

20   A.   No.

21   Q.   What have you been doing to support yourself all these

22   years?

23   A.   Selling drugs.

24   Q.   And where did you sell drugs?

25   A.   On Normal.

```
 1    Q.   What did you sell?

 2    A.   Coke.

 3    Q.   Coke or crack?

 4    A.   Crack.

 5    Q.   Crack cocaine?  Did you do it by yourself?

 6    A.   No.

 7    Q.   Now, do you know a person named Frank Goodman?

 8    A.   Yes.

 9    Q.   Tell me if you see him in court today.

10    A.   Yes.

11    Q.   Did you see him already?

12    A.   Yes.

13    Q.   Where is he?

14    A.   Right there.

15    Q.   Okay.

16         THE COURT:  The record will reflect the witness is

17    pointing toward the defendant Frank Goodman.

18    Q.   Thank you.

19         And how long have you known Mr. Goodman?

20    A.   All my life.

21    Q.   Did you go to go school together?

22    A.   No.

23    Q.   What street do you associate him with, where do you live?

24    A.   On Cliftview.

25    Q.   What block?
```

1    A.   A block around the corner from Normal.

2    Q.   The same number of block as yours?

3    A.   Same number?

4    Q.   Yeah, what block were you on on Normal?

5    A.   1600.

6    Q.   1600 block right off of Harford Road?

7    A.   Yes.

8    Q.   Okay.  Now, Mr. Pearson, do you know Patrick Byers?

9    A.   No, I don't know him much.

10   Q.   Do you know who I'm talking about?

11   A.   Yes.

12   Q.   Do you see him in the courtroom, do you recognize him?

13   A.   Yes.

14   Q.   When did you come know who he was so that you can identify

15   him?

16   A.   When an incident happened about this case.

17   Q.   When's the first time you actually saw him, if you

18   remember?

19   A.   When I first, the 11th of this month.

20   Q.   Okay.  In custody?

21   A.   Yes.

22   Q.   Okay.  Up to that point, you don't remember seeing him

23   before in your life?

24   A.   No.

25   Q.   Had you heard about him?

1 A. No.

2 Q. Did you ever hear his name, who he was, Pat?

3 A. No.

4 Q. Did you know any people who knew him?

5 A. I -- yeah, on the street, but not like people I hang

6 around.

7 Q. Uh-huh.  What about your friend, do you remember Tammy

8 Graham?

9 A. Yes.

10 Q. Did you know her to have any associates that knew Mr.

11 Byers?

12 A. No.  Oh, yeah, her cousin.

13 Q. Who was that?

14 A. A girl, I don't know her name.

15 Q. Don't remember her name?

16   All right.  Now, Mr. Pearson, I'm going to ask you a

17 question right off the bat here.  You were involved in the

18 murder of Mr. Lackl; is that right?

19 A. Yes.

20 Q. And you and I have talked before about how you were

21 involved; is that right --

22 A. Yes.

23 Q. -- along with agents, and you'd actually been before the

24 grand jury and told them how you were involved, haven't you?

25 A. Yes.

```
 1   Q.  You're the only person who was involved?

 2   A.  No.

 3   Q.  Who else was involved?

 4   A.  Me, Cornish, Ronny, Frank, Trigger, Dino, and Lump.  And

 5   Terry, they wasn't involved, but they was --

 6            THE COURT:  Keep your voice up, please, sir.

 7   A.  They wasn't involved, but they was there when it first

 8   started off.

 9   Q.  And who did you -- did you do this for yourself, this

10   murder of Mr. Lackl?

11            Did you have something against Mr. Lackl that you

12   wanted to kill him?

13   A.  No.

14   Q.  Who did you do it for?

15   A.  Pat.

16   Q.  Why did you do it?

17   A.  For the money.

18   Q.  Why did you get involved and do the things we'll be talking

19   about in a minute, but why did you get involved and

20   participate, deeply participate, in the murder of somebody you

21   didn't even know?

22   A.  For the money.

23   Q.  For how much money, Mr. Pearson, please?

24   A.  2500.

25   Q.  Did you say $2,500?
```

1   A.  Yes.

2   Q.  And who asked you, who was the first person to ask you to

3   be involved in this murder?

4   A.  Frank.

5   Q.  Was it for Frank?  Was Frank the person who had some

6   problem with Mr. Lackl?

7   A.  No.

8   Q.  Did he ask you to do it on behalf of someone else?

9   A.  Yes.

10   Q.  Who did he ask you do it for?

11   A.  Pat.

12   Q.  Now, did he tell you why he wanted this done?  Why he

13   wanted to kill Mr. Lackl?

14   A.  Because he was ready to go to court.

15   Q.  Who was?

16   A.  Pat.

17   Q.  Do you know what Pat was in jail for that, or what he was

18   going to go to court for?

19   A.  Murder.

20   Q.  And who told you that?

21   A.  Frank.

22   Q.  And who told you you would be paid $2,500?

23   A.  Frank.

24   Q.  Now, before you did this, did you speak to anybody else?

25   Did you speak to Pat?

1    A.  Before?

2    Q.  Uh-huh.

3    A.  Yeah.  I speak to him before we went out there.

4    Q.  Did you go to the jail and visit him and talk to him?

5    A.  No.

6    Q.  How did you talk to him?

7    A.  Through the cell phone.

8    Q.  Did you have a cell phone?

9    A.  Yes.

10   Q.  Where was he, in the Baltimore City Jail?

11   A.  Yes.

12   Q.  Did you call him there?

13   A.  Yes.

14   Q.  On a cell phone?

15   A.  Yes.

16   Q.  And how did he get the number for that cell phone?

17   A.  From Frank.

18   Q.  Now, how did you know where to go to kill Mr. Lackl in the

19   first place?

20           How did you know where to go?

21   A.  Cause Frank gave me the directions.

22   Q.  Do you remember how he gave them to you?

23   A.  Yes.

24   Q.  How did he give them to you?

25   A.  On the cell phone.

1  Q.  How were they -- can you just tell the jury, please, how it

2  was displayed?

3  A.  On one of the Blackberries.

4  Q.  Blackberry?  What did you say what information did Pat show

5  you?

6  A.  Pat?

7       MR. BALAREZO:  Objection.

8  Q.  I'm sorry, did Frank show you?

9  A.  The name, address, and the phone number.

10  Q.  Do you know where they got the phone number?

11  A.  No.  I don't know where they got the phone number.

12  Q.  Was there any other information that Frank gave you about

13  this Mr. Lackl that you were going to help kill?

14  A.  Yeah, a car, it was a car for sale, Cadillac, he was

15  selling a car.

16  Q.  Did you ever call the home of the Lackl family?

17  A.  Yes.

18  Q.  Prior to the murder?

19  A.  Yes.

20  Q.  Why did you call?

21  A.  To let them know I was coming out there to buy.

22  Q.  Now, let me ask you, because you're going to be asked a lot

23  of times today, you say you don't even know this man, Mr.

24  Byers; is that right?

25  A.  Yes.

1  Q.  Are you setting him up?  Did you set him up in this murder?

2  A.  No.

3  Q.  Was he involved?

4  A.  Yes.

5  Q.  Did you do it for him?

6  A.  Yes.

7  Q.  What about Frank, are you setting him up?

8  A.  No.

9  Q.  Is he the one who asked you to do it in the first place?

10  A.  Yes.

11  Q.  Did you ever ask him why he just wouldn't do it himself?

12  A.  No.

13  Q.  Was Tammy involved in this?  Did she know what was going

14  on?

15  A.  No.

16  Q.  You didn't tell her?

17  A.  No.

18  Q.  All right.  Mr. Pearson, let's go back to the beginning of

19  this, okay?  When were you first approached in relation to the

20  murder, the murder was July second, 2007?

21  A.  Like June.

22  Q.  Monday, I think when were you first approached about this?

23  A.  Like June 28th, 29th.

24  Q.  Okay.  Did you mark down the day?

25  A.  Did I mark it down?

1   Q.  Yeah.

2   A.  No.

3   Q.  Now, who was it who first approached you?  Tell the jury,

4   they don't know what happened, you do, you have to tell them,

5   right?

6   A.  Frank approached me.

7   Q.  Where did he approach you?  Did you call you, come see you,

8   what happened?

9   A.  On Normal.  I was standing on the corner.

10  Q.  Uh-huh.

11  A.  He drove up there.

12  Q.  In what?

13  A.  A car.

14  Q.  Speak up.

15  A.  He asked me about the murder, was we going to take care of

16  it?

17  Q.  What did he say to you?

18  A.  He asked me could I handle something for his home boy, that

19  they'll pay me.

20          THE COURT:  You need to keep your voice up, sir.

21  Speak clearly into the microphone.

22  A.  He asked me would I handle something.

23  Q.  Did he say what that something was?

24  A.  Yeah.

25  Q.  What did he say it was?

1    A.   A murder.

2    Q.   Did he say who it was to be murdered?

3    A.   His home boy witness.

4    Q.   And did he -- when you said to be something in it for you,

5    what did he say was going to be in it for you?

6    A.   Money.

7    Q.   Did he say how much?

8    A.   $2,500.

9    Q.   You said you he pulled up in a car.  What kind of car do

10   you remember Frank having at that time?

11   A.   A Thunderbird.

12   Q.   What color was it?

13   A.   Black.

14   Q.   Anything distinctive about the wheels?

15   A.   Black.

16   Q.   And did Frank -- do you know anybody else to drive that

17   car?

18   A.   No.

19   Q.   And was anybody else involved with Frank in soliciting you

20   to do this; that is, anyone, was there anybody else on the

21   street that came with Frank to solicit you to do this murder?

22   A.   No.

23   Q.   Just Frank?

24        Now, why would he come to you, Mr. Pearson, why?  Had

25   you ever done this before for him?

```
 1    A.   No.

 2    Q.   Had you ever killed anyone before?

 3    A.   No.

 4    Q.   Now, you've been involved in shootouts, haven't you?

 5    A.   Yes.

 6    Q.   Ever been shot?

 7    A.   Yes.

 8    Q.   Ever hit anyone in a shootout?

 9    A.   No.

10    Q.   You've never been involved in a murder?

11    A.   No.

12    Q.   Why would he come to you?

13    A.   Because like I'm in a gang.

14    Q.   What gang is that?

15    A.   Bloods.

16    Q.   Now, you also hung out on Normal, though, right?

17    A.   Yes.

18    Q.   Now, tell the jury whether those people that -- you named

19    some people I think from Normal, like Dino and Ronny and some

20    others.  Were any of them Bloods?

21    A.   No.

22    Q.   Was Ronny a Blood?

23    A.   No.

24    Q.   Ronald Williams, do you know who I'm talking about?

25    A.   Yes.
```

1   Q.  Was he a Blood?

2   A.  No.

3   Q.  Did he assist you at all, though, in terms of selling

4   whatever it is you sold?

5           Did he have a shop, or did you all do your own thing?

6   What was it like over there?

7   A.  We did our own thing.

8   Q.  You got your drugs from somebody?

9   A.  Yes.

10  Q.  Sold them?

11  A.  Yes.

12  Q.  What about him, what about Ronny, did he do that, or did he

13  do it for you, or what?

14  A.  He ain't never sell it for me.

15  Q.  Did you have people selling for you?

16  A.  Yes.

17  Q.  How much, how much back in July, 2007, what were you

18  selling?

19  A.  Crack.

20  Q.  How often -- how much?

21  A.  Like $2500 worth a day.

22  Q.  $2,500 worth a day?

23  A.  Yes.

24  Q.  You were making $2,500 or selling that much?

25  A.  Selling that much.

1   Q.   How much were you making?

2   A.   Around about 1600, 1700.

3   Q.   What were you using the money for?

4   A.   Staying in hotels, smoking weed.

5   Q.   Okay.  So Frank came to you, and how long was that, if you

6   remember, before the day of the murder?

7   A.   Just like two to three days before the murder.

8   Q.   And what did you tell him when he asked you to do this?

9   A.   Told him I was going to take care of it.

10  Q.   Why did you say that?

11  A.   Why?

12  Q.   Yeah.

13  A.   Because I wanted the money.

14  Q.   So you were ready to kill somebody for $2,500?

15  A.   Yes.

16  Q.   Now, did Mr. Goodman, did Frank, the person you were

17  talking about, is the Frank you're talking about to solicit you

18  the same Frank you identified here today?

19  A.   Yes.

20  Q.   So did that person tell you when this had to be done or

21  when it should be done, anything like that?

22  A.   He said he was -- his home boy's ready to go to court in a

23  couple days.

24  Q.   So you knew the man you were going to be paid $2,500 to

25  kill was a witness --

1  A.  Yes.

2  Q.  -- in a murder case?

3      Did you know it was a murder case?

4  A.  Yes.

5  Q.  Did you know where the case was to be tried, did he say

6  what court, or did you just understand it to be in the city?

7  A.  In the city, because he was already over at the jail.

8  Q.  Because he was at the jail?

9  A.  Yeah.

10  Q.  Now, did Frank tell you how he knew this, why this guy was

11  his home boy?

12  A.  No.

13  Q.  Did you know how he was friends?

14  A.  No.

15  Q.  Did he name the person at that time when he said it was for

16  my friend in jail, my home boy, whatever it was he said, I'm

17  sorry, did he name him?

18  A.  For my man Pat.

19  Q.  My man Pat?

20      Did you know who he was talking about at that point?

21  A.  No.

22  Q.  Now, did you go out and do it that day?

23  A.  No.

24  Q.  What did you do about it?

25  A.  I waited.

1   Q.   Okay.   And waited for what?

2   A.   Like another day or two.

3   Q.   And did you see Pat?   I'm sorry.

4             Did you see Frank again?

5   A.   Yes.

6   Q.   Before you did the murder?

7   A.   Yes.

8   Q.   Where did you see him?

9   A.   Come back around there.   Normal.

10   Q.   Now, you had Frank's phone number, didn't you?

11   A.   Yes.

12   Q.   Did you have it in your cell phone directory?

13   A.   Yes.

14   Q.   Now, so Pat, you say, came back again a couple more days, a

15   couple days later; is that right?

16   A.   Pat, not Pat.

17   Q.   I'm sorry.   I really apologize.   I'm sorry, that Frank came

18   by?

19   A.   Yes.

20   Q.   And was that the day of the murder or another day?

21   A.   The day of the murder.

22   Q.   All right.   Tell the jury, please, what happened when Frank

23   came by the day of the murder.

24   A.   He came by, and asked was we still going to handle it.   I

25   told him yeah.   And then when he left, I went around up people

1    that I went and got, then we went in and drove out there.

2    Q.  Now, before you drove out there, did you ever have any

3    contact with Pat?

4    A.  Yeah, I called him on the cell phone.

5    Q.  And when did you get the number, where did you get the

6    number for Pat?

7    A.  From Frank.

8    Q.  And when did he give that to you, do you remember?

9    A.  When did he give it to me?

10    Q.  When did you get that number for Pat?

11    A.  The same day.

12    Q.  The same day of which event, the day of the murder?

13    A.  Yes.

14    Q.  And did you call Pat or did he call you?

15    A.  I called Pat.

16    Q.  Okay.  And tell us what conversation -- did you have a

17    conversation with him at all?

18    A.  Just that we was ready to handle it.

19    Q.  Basically just as you said it there?

20    A.  Yes.

21    Q.  Did you say anything to him about, or did he say anything

22    to you about the money?

23    A.  No.

24    Q.  Did you ask anything about whether the money was for real?

25    A.  I asked him, yeah, I asked him was it for real about the

```
 1   2,500.

 2   Q.  And what did he say?

 3   A.  Yes.

 4   Q.  He say anything else?

 5   A.  No.

 6   Q.  Did he indicate that he knew you?

 7         MR. DAVIS:  Objection.

 8   A.  No.

 9         MR. DAVIS:  Your Honor --

10         THE COURT:  The basis of the objection?

11         MR. DAVIS:  Leading.

12         THE COURT:  Overruled.

13   Q.  I'm sorry.  Did he say anything else, Pat, that is?

14   A.  No.  Like what?  About the money?

15   Q.  Well, when you called him to let him know you were going to

16   handle it?

17   A.  He ain't say nothing else.  We was going to handle it.  I

18   told him I would call him after we get finished.

19   Q.  Did you call him after it got finished?

20   A.  Yes.

21   Q.  How long after you got finished?

22   A.  Probably right after.

23   Q.  Now, this number that you called was given to you by Frank?

24   A.  Yes.

25   Q.  And other than the calls you made to Patrick on the day the
```

1  murder, was he somebody you had would have ever called at any

2  other time in your life?

3  A.  No.

4  Q.  Have you called him since?

5  A.  No.

6  Q.  Has he called you since?

7  A.  No.

8  Q.  So when Frank came back the day of the murder, you say you

9  called Patrick; is that right?

10  A.  Yes.

11  Q.  Now, you're not the guy who pulled the trigger, are you?

12  A.  No.

13  Q.  So how was it that the other people got involved?  Tell the

14  jury how it came to be that other people were involved than

15  you?

16  A.  Because I called my home boy Trigger and told him that I

17  needed to get some BG to go handle something for.

18  Q.  Did you tell him what it was?

19  A.  Yeah.  I told it was for a witness to get killed.  And he

20  told me he going to hit me right back.

21  Q.  Did he?

22  A.  Yeah.

23  Q.  Okay.  And was Trigger also in your phone directory?

24  A.  Yes.

25  Q.  Is that a person you talked to from time to time?

```
 1    A.  Yes.
 2    Q.  Now, you called him your home boy.  Is he a friend of
 3    yours?
 4    A.  Yeah.
 5    Q.  Okay.  Did you guys have anything in common you said?
 6    A.  We was Bloods.  He Blood.
 7    Q.  He was a Blood and you were a Blood?
 8    A.  Yeah.
 9    Q.  Is that right?
10    A.  Yes.
11    Q.  Okay.  Now, tell the jury why, what you were thinking about
12    why you were going to get somebody else to do this,
13    particularly some --
14    A.  Because --
15    Q.  -- BG?
16    A.  Because he the top of the OYG.
17    Q.  You called him for approval?
18    A.  Yes.
19    Q.  Or permission?
20    A.  Yes.
21    Q.  But why didn't you just go do it yourself?
22    A.  Because I couldn't.
23    Q.  Why not?
24    A.  Because I had to get permission from him if I was going to
25    get somebody to do it from the gang.
```

1  Q.  I understand that you had to get permission from him to use

2  somebody in his gang.

3  A.  Yes.

4  Q.  Right?

5  A.  Yes.

6  Q.  Okay.  But my question is, why didn't you just Mr. Pearson,

7  you had an opportunity just to go out there and do it yourself,

8  why didn't you just do it yourself?

9  A.  I didn't want to do it myself.

10  Q.  Pardon me?

11  A.  I didn't want to do it myself.

12  Q.  Did you think it was worth the risk for you to do it

13  yourself?

14  A.  I didn't hear you.

15  Q.  Did you think it was worth the risk --

16  A.  No.

17  Q.  -- to do it yourself?

18  A.  No.

19  Q.  Not worth $2,500?

20  A.  No.

21  Q.  If you got a BG to do it, what would you have to pay them?

22  A.  Nothing.

23  Q.  They'd do it just to make you happy?

24  A.  Yes.

25  Q.  Now, did you tell Trigger that were you getting paid $2,500

1   for this, and you weren't going to be giving any of it to the

2   kids?

3   A.  No.

4   Q.  So you basically had the money and an opportunity to get

5   some free, get a free murder done; is that right?

6   A.  Yes.

7   Q.  So Mr. Goodman didn't do it, you didn't do it, who did you

8   get to do it?

9   A.  Cornish.

10  Q.  Okay.  Did you know Cornish before this happened?

11  A.  Yes.

12  Q.  How did you know him?

13  A.  Because he a Blood.

14  Q.  Okay.  But how well did you know him at that point?  You

15  just knew he was a Blood, or was a person you hung with, or

16  what?

17  A.  I knew he was a Blood.  He used to go meetings.

18  Q.  So you'd see him at a meeting?

19  A.  Yes.

20  Q.  Did you know what his Blood name was?

21  A.  Brazy.

22  Q.  Okay.  Do you know who gave him that name?

23  A.  Trigger or one of them.

24  Q.  Did you give it to him?

25  A.  No.

1    Q.  Now, when you say -- let's digress for a moment, please.

2            When you say you went to meeting, just tell the jury

3    Blood meetings, how often are they held?

4    A.  11th and 21st every month.

5    Q.  Okay.  So twice a month; is that right?  11th and 21st?

6    A.  Yes.

7    Q.  Okay.  And what do you all do at these meetings?

8    A.  We got to pay $25 every meeting.

9    Q.  Uh-huh.  Dues?

10   A.  Huh.

11   Q.  Like a dues?

12   A.  Yes, yes.

13   Q.  Who do you pay that to?

14   A.  Cash.

15   Q.  Okay.  And he's like the boss?

16   A.  Yes.

17   Q.  What's his title?

18   A.  OG.

19   Q.  He's the OG and you were -- what was your rank?

20   A.  OYG.

21   Q.  What was Trigger, what was he?

22   A.  Top OYG.

23   Q.  So you had to ask him for his permission to use one of this

24   people, right?

25   A.  Yes.

1  Q.  Now, these guys that you had over on Normal they weren't

2  Bloods?

3  A.  No.

4  Q.  Did you tell them you were getting paid $2,500?

5  A.  No.

6  Q.  Did you tell Ronny he was getting paid $2,500 before you

7  asked him to drive these guys out there?

8  A.  No.

9  Q.  Did you tell Cornish you were getting paid $2,500 before

10  you told them to go kill Mr. Lackl?

11  A.  No.

12  Q.  How about Randle, you didn't even ask him, did you?

13  A.  No.

14  Q.  Now, I asked you about the meeting, let's go back to that

15  for a second.

16       Tell us what sort of things you all did at these

17  meetings, what did you do besides pay $25 dues?

18  A.  Discuss about taking over blocks and beefing with Crips.

19  Q.  Are there Crips in Baltimore?

20  A.  Yes.

21  Q.  Where?

22  A.  Poplar Grove, Wilcox, and Ashland and Preston.

23  Q.  So there are Crips, huh?

24  A.  Yes.

25  Q.  All right.  And so you guys talked about your gang and you

1  talked about the other gang?

2  A.  Yes.

3  Q.  Did you ever go out and -- just let me ask you this, if you

4  were walking down the street in Baltimore, even over in one of

5  your neighborhoods on Normal Avenue or just anywhere in East

6  Baltimore, if you saw a crip, would you automatically kill him?

7  A.  Yes.

8  Q.  You would?

9  A.  Yes.

10  Q.  Have you ever done that?

11  A.  No.

12  Q.  Like what you're supposed to do?

13  A.  Yes.

14  Q.  Okay.  Well, I'm asking you what you do do.

15           MR. PURPURA:  Judge --

16  Q.  What you would actually do.  Did you ever -- have you ever

17  seen and shot a Crip on the street?

18           MR. BALAREZO:  Objection.  Asked and answered

19  already.

20           THE COURT: Overruled.

21  A.  No.

22  Q.  I guess they're supposed to shoot you, too, huh?

23  A.  Yes.

24  Q.  All right.  All right.  So you called Trigger, and after

25  you called Trigger, did he put you in contact with somebody?

```
 1   A.  Yes.

 2   Q.  Did you have contact then with the person he put you in

 3   touch with?

 4   A.  Yes.

 5   Q.  And do you remember who called who first?

 6   A.  He hit me.

 7   Q.  He did?

 8   A.  Yes.

 9   Q.  Okay.  And he being whom?

10   A.  Brazy.

11   Q.  And what did you tell Brazy?

12   A.  That I needed him, I'm ready to come get him for a mission.

13   Q.  A mission.  Did you tell him what the mission was?

14   A.  For a witness to get killed.

15   Q.  Did you tell him who it was for?

16   A.  I say for my home boy.

17   Q.  For your what?

18   A.  Home boy.

19   Q.  Did you tell him it was for any particular named person,

20   did you name who it was?

21   A.  No.

22   Q.  Now, this man over here, Mr. Byers, do you know him to be a

23   Blood?

24   A.  No.

25   Q.  In fact, he isn't a Blood, is he?
```

```
 1    A.  No.

 2    Q.  So you wouldn't just do a murder for a Blood you would do a

 3    murder for apparently anybody who pays $2,500?

 4    A.  Yes.

 5    Q.  Or actually wouldn't do it, get somebody else to do it?

 6    A.  Yes.

 7    Q.  Now, when you spoke to Brazy, where was he?  Did you have

 8    to arrange to pick him up?

 9    A.  On the west side of Baltimore.

10    Q.  And did you do that?

11    A.  Yes.

12    Q.  Now, you don't drive, do you?

13    A.  No.

14    Q.  You have actually -- tell the jury how good, you don't even

15    know, you have fairly bad vision, don't you?

16    A.  Yes.

17    Q.  If I put you something in front of you to read, as I will

18    soon, they'll see that.

19              Did you have a girl friend at that time?

20    A.  Yes.

21    Q.  Who was it?

22    A.  Tammy.

23    Q.  Was she your only girl friend?

24    A.  Yes.

25    Q.  Do you have other girls you hung out with, though?
```

```
 1   A.  Yes.

 2   Q.  So you went -- so how did you get over to the west side?

 3   A.  I called her to come get me.

 4   Q.  Had you been with her recently that day?

 5   A.  Yes.

 6   Q.  Okay.  Did Tammy have any idea what it was about?

 7   A.  No.

 8   Q.  Did you tell her I need to you go give me a ride over to

 9   pick up two Bloods, we're going to drive out to Baltimore

10   County to whack a witness?

11   A.  No.

12   Q.  Did she have any idea?

13   A.  No.

14   Q.  Now, did you pick up -- did you go to pick up Brazy?

15   A.  Yes.

16   Q.  And where did you pick them up?

17   A.  Penrose and Pulaski.

18   Q.  Was he alone?

19   A.  No.

20   Q.  Who was was he with?

21   A.  Killa.

22   Q.  Did you know Killa?

23   A.  I seen him around.

24   Q.  Did you know -- who did you know better, did you know Brazy

25   better or Killa better?
```

```
1    A.  Brazy.

2    Q.  Okay.  Have you ever, if you remember, had you ever had any

3    phone conversations with Brazy prior to this day?

4    A.  No.

5    Q.  But you did have his number?

6    A.  Yes.

7    Q.  Okay.  Excuse me for a second.

8             Now, did Randle go with you?

9    A.  Yes.

10   Q.  Did you mind that he went?

11   A.  No.

12   Q.  Is Randle older than Cornish, do you know?

13   A.  I don't know.

14   Q.  Do you know what rank is he?

15   A.  I think he BG.

16   Q.  And what was Cornish?

17   A.  A BG.

18   Q.  You knew, did you know --

19            MR. BALAREZO:  Objection.

20   Q.  Did you know Randle to be a Blood?

21            THE COURT:  Sustained.

22   A.  Yeah.

23            THE COURT:  Sustained.  Rephrase the question.

24   Sustained.

25   Q.  I actually did, in the course of the objection.
```

1   A.  Yes.

2           THE COURT:  All right.

3   Q.  Did you know Randle to be a Blood?

4   A.  Yes.

5   Q.  So now you're in the car and who was in the car, just you,

6   Tammy, and the two west side guys?

7   A.  Yes.

8   Q.  Could you tell the jury whether or not you had any

9   conversation about what you were going to do on the way over to

10  Normal Avenue?

11  A.  Did I have a conversation with them then?

12  Q.  Did you tell them what you were going to do while you were

13  in the car?

14  A.  No.

15  Q.  Did you say any of this in front of Tammy?

16  A.  No.

17  Q.  What happened when you got over to Normal Avenue?

18  A.  They got out the car, and Dino was parked on Normal with

19  his car.

20  Q.  Who was that?

21  A.  Dino.

22  Q.  All right.  And what kind of car did Dino have?

23  A.  A Camero.

24  Q.  All right.  Before we put the Normal Avenue picture up,

25  take it off for a second.  You've seen photographs, you

1    actually saw the Camero before; is that right?

2    A.  Yes.

3    Q.  Have you seen photographs of it before?

4    A.  No.

5    Q.  Let's take a look, maybe actually if you look to your left

6    there, Mr. Pearson, do you recognize that vehicle?

7    A.  Yes.

8    Q.  Is is that the Camero you're talking about?

9    A.  Yes.

10   Q.  Do you know how long Dino had that car before July second,

11   2007?

12   A.  Just a couple days.

13   Q.  And how long did he keep it after July second?

14          MR. BALAREZO:  Objection, Your Honor, basis.

15   A.  He took it back.

16   Q.  If you know?

17          THE COURT:  Overruled.

18   Q.  If you know, how long did he keep it after July second?

19   A.  Not probably like a day or two, he took it right back.

20   Q.  Okay.  Now, when you got back to Normal Avenue, who was

21   there?  Who else would you get involved in this?

22   A.  Who else was down the car.

23   Q.  Let me ask you this, who else did you enlist, or get into

24   doing something in relation to the murder of Mr. Lackl?

25   A.  Lump.

1  Q.  Okay.  And how did you get Lump involved?

2  A.  Because we went and got his gun.

3  Q.  Okay.  And was Lump there or did you just go get his gun?

4  A.  He was there.

5  Q.  Okay.  Did you tell Lump what were you going to do with it?

6  A.  No, no, I ain't have to tell him.

7  Q.  You didn't have to at the time him, just --

8  A.  No.

9  Q.  Just get the gun?  Where did you all keep the gun?

10 A.  On the step, on Normal.

11 Q.  On Normal Avenue?

12 A.  Yes.

13 Q.  Just describe for the jury, I don't think they're used to

14 people keeping guns on steps --

15        MR. BALAREZO:  Objection to the commentary.

16        THE COURT:  Approach the bench, please.

17        (At the bench)

18        THE COURT:  Mr. Balarezo, your objection as to the

19 commentary would be well taken if you weren't doing the same

20 thing with respect to the manner in which you're asking

21 questions.  Now, do you object to the phrase I don't think

22 we're all used to such and such, technically you're correct,

23 that is commentary.  But if you are going to make that

24 objection and have it stopped, then I'm going to impose the

25 same limit upon you.  And the record will reflect you and Mr.

1   Purpose have a nice style on occasion to say those things, so

2   your objection's without merit, all right.  If you're going to

3   make those objections, I'm going hold you to the same standard.

4   I don't think you need -- the objection is without merit,

5   that's it.

6         MR. BALAREZO:  I apologize.  I'll withdraw it, Your

7   Honor.

8         (Open court)

9   BY MR. PURCELL:

10  Q.  Now, before the interruption, I asked you to describe to

11  the jury what you mean by a gun being kept in the steps?

12  A.  Pull the top step out, put it behind the step, push it

13  back.

14  Q.  Now, who was able to access the gun that you're talking

15  about?  Did you have more than one gun that was all --

16  A.  Terry.

17  Q.  Terry?

18  A.  Yes.

19  Q.  Who else was able to access it?

20  A.  Lump.

21  Q.  How about you?

22  A.  I can get it, anybody can get it, if they was outside on

23  the step.

24  Q.  So it was there for anybody to use.  Why did you all have

25  to stash a gun in the step?

```
 1    A.  Because we was selling drugs out there.

 2    Q.  Well --

 3    A.  Protect the block.

 4    Q.  Oh, protect the block from whom?

 5    A.  From whatever come through there trying and rob us,

 6    anything.

 7    Q.  Does that happen that people rob drug dealers?

 8    A.  Yes.

 9    Q.  I guess you can't call the police when that happens, can

10    you?

11    A.  No.

12    Q.  So if you have a thousand dollars in your pocket, there are

13    actually people who will come around and take your money?

14    A.  Yeah, and rob.

15    Q.  Pardon me?

16    A.  Yeah, if they rob you.

17    Q.  Robbers?  So you keep a gun for that purpose?

18    A.  Yes.

19    Q.  And I think I may have asked you this on another occasion,

20    but did you guys have any other gun besides the gun we'll be

21    looking at in a moment to kill Mr. Lackl, did you have any

22    other guns out there?

23    A.  Yes.

24    Q.  What kind of guns other than the 44?

25    A.  A Glock.
```

1   Q.  A Glock?  Semiautomatic?

2   A.  Yes.

3   Q.  Where was that kept?

4   A.  Under the step.

5   Q.  And how long, if you know, how long had you guys had the

6   44?

7   A.  For a little minute.  For a nice little minute.

8   Q.  A nice little minute, if you could explain?

9   A.  A couple months.

10  Q.  Couple months?  How about the 9, the Glock?

11  A.  A couple months.

12  Q.  Couple months?

13  A.  Yes.

14  Q.  Okay.  During that time, anybody could get at it?

15  A.  Yes.

16  Q.  Is it hard to get guns in Baltimore City?

17  A.  No.

18  Q.  Is it correct to say they sometimes change hands?

19  A.  Yes.

20          MR. BALAREZO:  Objection, Your Honor.

21          THE COURT:  Sustained as to that question.

22  Q.  Do you always hold onto the guns, or do you trade, do guns

23  get traded?

24          MR. BALAREZO:  Objection.

25          THE COURT:  Sustained as to the objection.  I think

1    you need to rephrase the question basis of his knowledge, so

2    the objection is sustained.

3    Q.   Based on your knowledge and experience as a drug dealer

4    living in Baltimore, can you say whether guns used the way you

5    use your guns in your drug business get traded?

6    A.   Yes.

7    Q.   They do?  And change hands?

8    A.   Yes.

9    Q.   Sold?

10   A.   Yes.

11   Q.   Okay.  Now, when you got back to Normal Avenue with these

12   guys from West Baltimore, you said that dino and Lump were

13   there.  Who told Lump to get the gun, do you remember telling

14   Lump to get the gun, or what?

15   A.   Yeah.  I told them get it, but Ronny went and got the gun.

16   Q.   Ronny did?

17   A.   Yes.

18   Q.   Did you see him?

19   A.   I didn't see him get it.

20   Q.   Now, what were you doing in terms of setting up, getting a

21   ride for those guys?

22   A.   I was sitting in the car.  Once Dino said we can get the

23   car, and once Lump went to go get it, I already knew they was

24   going to get it, so I sat in the car.

25   Q.   Where were the two guys you brought over, Brazy and Killa,

```
 1    where were they?

 2    A.  Getting in the car, the Camero.

 3    Q.  All right.  Now, Mr. Pearson, why didn't you just drive

 4    them out in Tammy's car?

 5    A.  Because I ain't want to be involved.

 6    Q.  You wanted the money?

 7    A.  Yes.

 8    Q.  But you didn't want to get near the murder?

 9    A.  Right.

10    Q.  Now, Mr. Pearson, that day you said you had your cell

11    phone, did you have any other cell phones?

12    A.  Yes.

13    Q.  Can you tell the jury, please, what other cell phone you

14    had?

15    A.  I had bought a chip especially for Mr. Lackl.

16    Q.  Uh-huh.  And when did you buy that in relation to the

17    murder, if you remember?

18    A.  I mean like a day or two before the murder.

19    Q.  Okay.  Now, what happened to that phone or that chip?

20    A.  After the murder, I took it out and throw it out window.

21    Q.  What happened to the phone itself?

22    A.  I kept it, but I lost it.

23    Q.  You lost it?

24        But you got rid of that phone?

25    A.  I got rid of the chip.  I lost the phone.
```

```
 1    Q.  Now, let me ask you, you mentioned that before you went
 2    over to the west side, after you talk to Frank, you called Pat;
 3    is that right?
 4    A.  Yes.
 5    Q.  Now, after you called Pat, did you call the Lackl home?
 6    A.  Yes.
 7    Q.  Why did you do that for?
 8    A.  To let them know that I was coming to get the car.
 9    Q.  Do you remember who you spoke to?
10    A.  A lady.
11    Q.  And did you ask about whether Mr. Lackl was there, anything
12    like that?
13    A.  Yes.
14    Q.  Okay.  What did they tell you?
15    A.  He was waiting outside.
16    Q.  Okay.  I'm asking about when you called after you talked to
17    Pat earlier in the day?
18    A.  I can't hear.
19    Q.  I'm sorry.  Did you call earlier in the day?
20    A.  Yes.
21    Q.  Earlier in the day?
22    A.  Who, Mr. Lackl?
23    Q.  Yes.
24    A.  Yes.
25    Q.  And what did you ask them then?
```

1   A.   Just about the car.

2   Q.   So you asked if it was there, for instance?

3   A.   Yes.

4   Q.   Okay.  Did you tell them when were you coming out, or did

5   you ask when you should come out?

6   A.   I ain't exactly tell them like a time or nothing I was

7   coming out there, but I told them I was coming to get the car

8   from them that day.

9   Q.   Did anyone tell you when Mr. Lackl would be there, do you

10   remember that?

11   A.   No.

12   Q.   Do you have any idea when he was supposed to be there that

13   day?

14   A.   No.  I just knew he was there already.

15   Q.   All right.  Now, after you talked to Lump about the gun and

16   Ronny got the gun, these guys got into another car, was it the

17   green car we just saw a moment ago?

18   A.   Yes.

19   Q.   And who drove your car?

20   A.   I ain't have no car.

21   Q.   Who drove the car you were in?  I'm sorry.

22   A.   Tammy, her car.

23   Q.   What did you tell Tammy about where you were going?

24   A.   I told her -- I ain't tell her.  I just told her ride out

25   Philadelphia Road.

```
1    Q.   Now, where did you get the information about going to

2    Philadelphia Road?

3    A.   From Frank.

4    Q.   And where did you get the information about saying you were

5    looking for a car?

6    A.   On a paper.

7    Q.   From what?

8    A.   On a paper that said it was for a car, he was selling car.

9    Q.   I'm not asking where Frank got it, where did you get the

10   information?

11   A.   Oh, I got it from Frank.

12   Q.   And did Frank tell you where he got that information?

13   A.   No.

14   Q.   Now, I think I may have asked you this, but when you got

15   the information about where the car was and the address and

16   everything, was that on paper, or was that on a screen?

17   A.   It was on his phone at first and then he gave me the paper

18   the the day of the murder.

19   Q.   I'm sorry?

20   A.   The day of the murder, I had the paper.

21   Q.   What was the paper?

22   A.   A little piece of paper said his name and address.

23   Q.   And who gave you that?

24   A.   Frank.

25   Q.   What did you do with that?
```

1   A.  I used it to get out there, then I throw it away once we
2   got there.
3   Q.  Is that what you used to tell Tammy where you were going?
4   A.  Yes.
5   Q.  Now, on the way out, where was the other car in relation to
6   your car?
7   A.  Behind.
8   Q.  Did you guys stop and get any marijuana or anything on the
9   way out?
10  A.  No.
11  Q.  You and Tammy I mean?
12  A.  To get some marijuana?
13  Q.  Uh-huh.
14  A.  We ain't stopped.  We kept -- from Normal we went straight
15  out there.
16  Q.  How about before you went out there, did you get any
17  marijuana with her?
18  A.  Yeah, I had some weed.
19  Q.  Did you get some weed before you went out Philadelphia
20  Road?
21  A.  Yes.
22  Q.  When you get weed, how much do you buy?
23  A.  Like a hundred 25 dollars' worth.
24  Q.  And how does that come to you?
25  A.  How it come to me?

1    Q.  Well, how is it packaged?

2    A.  In a sandwich bag.

3    Q.  Do you remember how much you bought that day?

4    A.  Seven grams.

5    Q.  Of marijuana?

6    A.  Yes.

7    Q.  Seven grams?

8    A.  Yes.

9    Q.  How much is that?

10   A.  $125.

11   Q.  And then you went out to Philadelphia Road?

12   A.  Yes.

13   Q.  Now, on the way out, where was the other car, the green

14   car, in relation to your car?

15   A.  Behind.

16   Q.  About how close?

17   A.  Like behind the car, behind like should be when you

18   driving.

19   Q.  Now, let me ask you this, you had your phone with you; is

20   that right?

21   A.  Yeah.  They kept swerving behind.  I had them on the phone,

22   told them to stop swerving.

23   Q.  Who?

24   A.  Brazy.

25   Q.  Now, this other phone you had with you that you got just

 1    for the Lackl murder, during the course of the day, did you use

 2    that phone to call the Lackl house at any time?

 3    A.  Yes.

 4    Q.  Do you remember, you don't know how many times, do you?

 5    A.  No.

 6    Q.  Why were you doing that?  Why were you calling the Lackl

 7    home on that burner phone or the other the phone which we call

 8    the burner for some reason?

 9    A.  I didn't want to call from my phone.

10    Q.  Why didn't you want to call from your phone?

11    A.  I didn't want them to find out who it was.

12    Q.  Were you aware that day that you actually had called from

13    your phone?

14    A.  Yes.

15    Q.  From your own phone?

16    A.  Yes.

17    Q.  You did know that?

18    A.  Yes.

19    Q.  Was that a mistake?

20    A.  Yes.

21    Q.  Do you know how many times you called from the burner phone

22    or the phone you got just for the mission?

23    A.  A couple times.

24    Q.  Who did you speak to in any of those conversations or any

25    of those calls?

1    A.   A lady.  I speak to the lady the day that it happened, I

2    speak to him before, too.

3    Q.   Spoke to Mr. Lackl?

4    A.   Yes.

5    Q.   All right.  Now, on the way out, did you call the Lackl

6    house?

7    A.   Yes.

8    Q.   And what was the purpose of your call on the way out?

9    A.   To let them know that I was coming right there.

10   Q.   Did you remember who you spoke to, that, was it a male or

11   female?

12   A.   Female.

13   Q.   Did you ask Mr. Lackl to meet any particular place because

14   you were now on your way?

15   A.   I say yes, be waiting outside, because I'm ready to pull up

16   up there.

17   Q.   Let me ask you something, do you remember when the police

18   first found you on July 5, 2007?

19   A.   Yes.

20   Q.   And following that, there were all kinds of meeting with

21   the police, I think, on the 7th, the 31st, and a couple of

22   times in August, do you remember those?

23   A.   Yes.

24   Q.   Did you know they were videotaped?

25   A.   Yes.

1    Q.   Okay.  During that period of time, during that summer, from

2    July through August when the police were question ing you, at

3    one point after I guess August first arrested you, did you tell

4    them that you were the person who had actually made that call

5    to ask Mr. Lackl to come outside?

6    A.   No.

7    Q.   Why not?

8    A.   Because I ain't try put myself there.

9    Q.   Who did you say did it?

10   A.   Cornish.

11   Q.   Brazy?

12   A.   Brazy.

13   Q.   In fact, when the first, when the police first found you at

14   a motel and brought you to homicide, do you remember that?

15   A.   Yes.

16   Q.   Did you tell them that, did you admit to having anything to

17   do with this at all?

18   A.   No.

19   Q.   What did you tell them, if you remember?

20   A.   I told them I ain't -- I told them that I know a guy that

21   had his home boy that was locked up, and he was trying to get

22   him to come home, his name was Brazy, and I think he killed

23   somebody for his home boy Pat.

24          And then I told them you can get him on the phone,

25   hear him say it, get him on the phone.  And he said it over the

1    phone.

2    Q.  And that was recorded.  You know Detective Ruby right here,

3    don't you?

4    A.  Yes.

5    Q.  You did that with Detective Ruby?

6    A.  Yes.

7    Q.  But you didn't tell the police that you had called Pat that

8    day, did you?

9    A.  No.

10   Q.  You didn't tell them you actually talked to Frank about

11   that day, did you?

12   A.  No.

13   Q.  In fact, you didn't tell them that their numbers of the

14   people you had spoke to were right in your phone directory --

15   A.  No.

16   Q.  -- did you?

17          Why not?  What would that have done to you?

18   A.  Put me there at the scene.

19   Q.  You didn't want that, did you?

20   A.  No.

21   Q.  So you put it on Brazy?

22   A.  Yes.

23   Q.  Now, you knew Brazy knew that you were the one who

24   recruited him to do this, didn't you?

25   A.  Yes.

1  Q.  Were you trusting that as a Blood he wouldn't rat you out?

2  A.  Yes.

3  Q.  And he didn't, did he?

4  A.  No.

5  Q.  Not then, anyway.

6        But the thing you said Brazy did, like Brazy knowing,

7  I think some of the comments were that Brazy was close with Pat

8  --

9  A.  Yes.

10  Q.  -- you knew that wasn't true, didn't you?

11  A.  Yes.

12  Q.  So you couldn't say Frank, because you had talked with

13  Frank right?

14  A.  Yes.

15  Q.  To your knowledge, did Brazy know Byers ever?

16  A.  No.  Ain't know none of them.

17  Q.  But he got locked up on July 12, didn't he?

18  A.  Yes.

19  Q.  Before you were locked up; isn't that right?

20  A.  Yes.

21  Q.  And during that summer, when you were talking to Detective

22  Ruby before the federal government got involved, and before you

23  had a lawyer, is there a lawyer here today?

24        Yes, he is.  Do you see Mr. Saunders here today?

25  A.  Yes.

1    Q.  Have you seen, had an opportunity to talk to him today and

2    meet with him?

3    A.  Yes.

4    Q.  Now, before you met with Mr. Saunders and had an attorney,

5    did you tell the state authorities, for instance, that you had

6    gone and picked up the two guys from West Baltimore and brought

7    them back, that was you who did that?

8    A.  I ain't hear you.

9    Q.  I'm sorry.  Prior to you getting a lawyer and being

10   involved in the federal investigation, did you tell detectives

11   that you were the one who went and got Cornish to get involved

12   in the first place?

13   A.  Yeah, I was like lying to him at first.

14   Q.  Uh-huh.  In fact you told them you had nothing to do with

15   it, right?

16   A.  Yes.

17   Q.  And then as they showed you more evidence --

18            MR. BALAREZO:  Objection, Your Honor, leading.

19            THE COURT:  Sustained.

20   Q.  What happened to your story as the police showed you more

21   evidence that they had, for instance, that your cell tower,

22   your phone was hitting off the cell phone tower near the Lackl

23   house, what would you do, what did you do?

24   A.  Start giving them bits of the truth, but I was still lying

25   to them.

1   Q.  Were you lying to them about Pat?

2   A.  Yes, in the beginning.

3   Q.  You didn't tell them about Pat very much, did you?

4   A.  No.

5   Q.  You didn't tell them that you had talked to Pat, did you?

6           MR. BALAREZO:  Objection, Your Honor.

7           THE COURT:  Sustained.  Don't lead, Mr. Purcell.

8           MR. PURCELL:  I'm sorry.

9   BY MR. PURCELL:

10  Q.  Well, was it a lie to the police that the murder was done

11  for Pat?

12  A.  Ain't no lie.

13  Q.  That ain't no lie?

14          And that was never a lie, was it?

15  A.  No.

16  Q.  Did you ever have a reason to kill Mr. Lackl?

17  A.  No.

18  Q.  Do you know him?

19  A.  No.

20  Q.  He ever do anything to you?

21  A.  No.

22  Q.  Was he a witness against you?

23  A.  No.

24  Q.  Were you going to trial on July 10, 2007 for a murder

25  facing a life sentence?

1   A.   No.

2   Q.   Or maybe facing a life sentence?

3   A.   No.

4   Q.   Now, on the way out there, you noticed they were driving

5   erratically, who did you talk to about that?

6   A.   I hit Brazy on the phone and told him tell Ronny stop

7   swerving before the police pull him over.

8   Q.   Tell the jury, please, what happened after you got to

9   Philadelphia Road?

10  A.   We got Philadelphia Road, we seen a man standing out there,

11  so I pointed, that's the man, but we rode past him.  And we

12  went to the gas station.  We hopped out and got blunts and

13  pulled in the gas station.

14          I told Ronny and them that was him right there you

15  all just rolled past, and they rolled back down there.  And I

16  rolled toward Pulaski Highway going back to the city.

17  Q.   Okay.  So you didn't hang around to watch the murder of Mr.

18  Lackl?

19  A.   No.

20  Q.   Now, you knew that Cornish had a gun?

21  A.   Yes.

22  Q.   Can we see a picture of the exhibit, please, which is 104.

23          Mr. Pearson, do you recognize that piece?

24  A.   Yes.

25  Q.   How do you know that -- how do you recognize it?

1    A.  That's the same gun that used to be on the block.

2    Q.  Is that the one that was given to Brazy?

3    A.  Yes.

4    Q.  You may remove it, please, thank you.

5            Now, you said you were going to call, you testified a

6    moment ago that you told Pat you were going to call him after

7    the murder.

8            Did you do that?

9    A.  Yes.

10   Q.  And did you call him on the same number that you had called

11   him before?

12   A.  Yes.

13   Q.  What did you tell him?

14   A.  That it was done.

15   Q.  How did you learn that it was done since you weren't there?

16   A.  Because Brazy hit my phone and told me it was done.

17   Q.  You called Pat after you called Brazy, or after Brazy

18   called you?

19   A.  Yes.

20   Q.  And what, if you remember, this is important for the jury

21   to hear, please tell the jury, if you remember, what you told

22   Pat?

23   A.  That it's done and you can watch the news, watch the news

24   later on, and he told me some more people over the jail that

25   want to get they witness killed.

1  Q.  He told you that?

2  A.  Yes.

3  Q.  Did he sound sad that Mr. Lackl had been killed?

4  A.  No.

5  Q.  How did he sound?

6  A.  Average.

7  Q.  You heard him?

8  A.  Sound like a regular person, like a little happier, though.

9  Q.  And he had other people who wanted witnesses killed?

10  A.  Yes.

11  Q.  Did you want to actually get involved any more witness

12  killings after that day?

13  A.  No.

14  Q.  You knew what had just been done, didn't you?

15  A.  Yes.

16  Q.  How did you actually feel about it at that time?  Did you

17  feel anything about it?

18  A.  No.  I felt a little --

19  Q.  Huh?

20  A.  I felt a little wrong, but not that much.

21  Q.  Not much wrong?

22        Now, had you been paid yet?

23  A.  No.

24  Q.  How did you arrange to get paid, and when did you get paid?

25  A.  I had to hit Frank.

1   Q.  After the murder, you hit Frank as well?

2   A.  Yes.

3   Q.  And that was on your direct connect?

4   A.  Yes.

5   Q.  When you say hit, is that what you mean, you use your

6   direct connect?

7   A.  Yes.

8   Q.  Or the person-to-person or the bloop --

9   A.  Yes.

10  Q.  -- that you're talking about?

11         All right.  And what did you tell Frank?

12  A.  That it was done, too.  I'm on my way around Normal He told

13  me meet him on Cliftview.

14  Q.  And did you?

15  A.  Down by the way.

16  Q.  Down by the way, did you do that?

17  A.  Yes.

18  Q.  And where did you meet him?

19  A.  I rode past Cliftview, and we met up on Normal.

20  Q.  And was he on foot or in his car?  Where was he?

21  A.  In his car.

22  Q.  Which car?

23  A.  The black T-Bird.

24  Q.  And what did you do?

25  A.  I pulled the door got out and walked toward his car, and he

1    gave me the envelope with the money in there.

2    Q.  What kind of envelope?

3    A.  A jail envelope.

4         MR. BALAREZO:  Can he keep his voice up?

5         THE COURT:  The objection is sustained.

6         Mr. Pearson, pull the chair up.  Pull the chair up.

7    Put the microphone close to your mouth, do you understand that,

8    sir?

9         Go ahead.

10   Q.  All right.  Now, how did you arrange to meet with Mr.

11   Goodman, with Frank?

12   A.  We drove around to the next block and hopped out.  I hopped

13   out and walked to the car and he gave me the envelope with the

14   money.

15   Q.  You said you described the envelope, and I think that's

16   what counsel couldn't hear.  Can you say that again, please?

17   A.  It was a jail envelope.

18   Q.  All right.  What did you mean by a jail envelope, Mr.

19   Pearson?

20   A.  The kind that already got the stamp, stamped on the

21   envelope.

22   Q.  Okay.  And what was in the envelope?

23   A.  Money.

24   Q.  And where did he give you this money?

25   A.  On Normal.

1   Q.  And where were you when he gave you the money?

2   A.  On Normal, by his car.

3   Q.  Were you in his car, by his car?

4   A.  No, I wasn't in his car.  I was standing out, outside his

5   car.

6   Q.  And where was he?

7   A.  Standing right there.

8   Q.  And what did you do with the money?

9   A.  What I do with the money?

10  Q.  Uh-huh.

11  A.  I got the money, got back in the car, I gave a hundred

12  dollars to Brazy and a hundred dollars to Killa.

13  Q.  I know.  But you didn't do that right there, because they

14  weren't there, were they?

15  A.  No.

16  Q.  You were still in Tammy's car?

17  A.  I drove up the street.  They was at the top of the block.

18  Q.  Now, when you got back, were they already there?

19  A.  Yes.

20  Q.  The green car?

21  A.  Yes.

22  Q.  Now, what did you say to Frank?  Did you have any

23  conversation at all with Frank when he gave you the money?

24  A.  No.

25  Q.  He just gave it to you?

1    A.  Yes.

2    Q.  Did you tell him you had talked to Pat?

3    A.  Yes.

4    Q.  You told him --

5          MR. BALAREZO:  Objection, Your Honor.

6          THE COURT:  Overruled.

7    Q.  Did you tell him you had talked to Pat?

8    A.  Oh, no I ain't tell him I talked to Pat.

9    Q.  What conversation did you have with him?

10   A.  With Frank?

11   Q.  Yes.

12   A.  We ain't really had too much conversation after I got the

13   money.

14   Q.  What about before you got the money right at the scene, at

15   the place where he's giving it to you on Cliftview?

16   A.  I told him -- when I first pulled up, he told me meet

17   around the corner on Normal.

18   Q.  So it wasn't a lot of chatting about this?

19   A.  No.

20   Q.  Did you count the money in front of him?

21   A.  No.

22   Q.  When did you count it?

23   A.  When I got like in the car.  And I got at the top of

24   Normal.

25   Q.  And when you counted the money, you were still in Tammy's

1    car or someplace else?

2    A.  Tammy's car.

3    Q.  And did you find that it was $2,500?

4    A.  It wasn't $2,500.

5    Q.  How much was it?

6    A.  2200.

7    Q.  So what did you do when you found out you had been shorted

8    by $300?

9    A.  Called him back.

10   Q.  Who did you call, if you remember?

11   A.  Frank.

12   Q.  And what did you tell him?

13   A.  That it all wasn't there.

14   Q.  What did he say?

15   A.  He going to holler Pat.

16   Q.  Okay.  So he he was going to call Pat?

17   A.  Yes.

18   Q.  Did you take it upon your self to call Pat as well?

19   A.  Yes.

20   Q.  What did you tell him?

21   A.  The money was short.

22   Q.  What did he say?

23   A.  He don't know, he going to see about it with Frank.

24   Q.  Now, after that day, did you ever talk to Pat again on the

25   phone?

1   A.  No.

2   Q.  How about Frank?

3   A.  No.

4   Q.  Did you ever get your $300?

5   A.  No.

6   Q.  Did you ever call Frank again to --

7   A.  I asked him about the money again, but it was like they

8   start to play games, so I left it alone.

9   Q.  What do you mean they started playing games?

10   A.  Like putting it on each other.

11   Q.  He says the other one's supposed to take care of it?

12        MR. BALAREZO:  Objection.

13        THE COURT:  Overruled.  All right.  We'll stop here

14   now, ladies and gentlemen, it's 1:00, and we'll stop for our

15   lunch recess and proceed again at 2:00.

16        (Luncheon recess.)

17        THE COURT:  Sorry to keep you all waiting.

18        Get the jury, would you, please, Miss West?

19        (Jury present)

20        THE COURT:  Good afternoon.  You all may be seated.

21   We're ready to continue with Mr. Purcell's direct examination

22   of Mr. Pearson.

23        Mr. Pearson, you're still under oath, sir.

24        Miss Gardner, when you put things up on the screen,

25   if there's an exhibit, if we could see the exhibit number when

1    you slide it back down, that would be helpful.  Thank you very

2    much.  Thank you.

3    BY MR. PURCELL:

4    Q.  4.

5              Now, Mr. Pearson I think where we let off, we had

6    just been talking about -- I'd asked you some questions about

7    where you met Mr. Goodman to get paid?

8    A.  Yes.

9    Q.  And where was that?  Where did you first see him when he

10   got back into the neighborhood?

11   A.  On Cliftview.

12   Q.  And did you get paid on Cliftview, or where did he actually

13   give you the money?

14   A.  On Normal.

15   Q.  On Normal?  And where on Normal?

16   A.  At the bottom of the block, by the alley.

17   Q.  Okay.  I don't live there, so I'm not sure when you're

18   talking about the bottom of the block, where are you talking

19   about, toward Harford or toward the other end where the two

20   streets come together?

21   A.  Where the two streets come together.

22   Q.  So the bottom is toward -- you probably can't see this, I'm

23   sorry, if you look to your left, can you recognize or see

24   what's there before you?

25   A.  Yes.

1    Q.   Okay.  And actually I think when you talk about right

2    around there, that's the top of the block where you met him.

3         While we're over here, if you would, show the Judge,

4    just touch it I guess where it was that you met with Ronny

5    where you brought the guys from the west side to leave and go

6    out to Philadelphia Road, where was that on Normal Avenue?

7         Okay.  Down there?

8         Do you recognize that area?

9         And where did you notice that Frank was from

10   Cliftview, where did Frank live, if you could show us while

11   you're pointing?

12        You can just us the general area, down in there, I

13   think they saw your finger, you were were pointing in this area

14   toward Harford?

15        Did he live with anyone over there that you know of

16   you that you knew, any of his relatives that you knew?

17   A.   Grandmother.

18   Q.   His what?

19   A.   Grandmother.

20   Q.   His grandmother?  Did you know her?

21   A.   No, I don't think.

22   Q.   You know who she was?

23   A.   Yes.

24   Q.   Sometimes when I speak, now if I ask you a question, if I

25   ask you if you know somebody, to you that means if you know

1  them very well; is that correct?

2  A.  Right.

3  Q.  Okay.  Now, you said that when you counted the money, what

4  did you find had occurred?

5  A.  It was short.

6  Q.  And who did you call about that, if anyone?

7  A.  Frank.

8  Q.  And did you call him that same evening?

9  A.  Yes.

10  Q.  And did you call anyone else about it?

11  A.  Pat.

12  Q.  Did you call him the same evening?

13  A.  Yes.

14  Q.  Now, which phone were you using to make these particular

15  calls to Frank?

16  A.  My phone.

17  Q.  And to Pat?

18  A.  My phone.

19  Q.  Your own phone?

20  A.  Yes.

21  Q.  When you say your own phone, if we fast forward a little

22  bit to when the police first encountered you on July fifth, do

23  you remember that?

24  A.  Yes.

25  Q.  Did they take your phone for a while?

```
 1    A.  Yes.

 2    Q.  Was that the phone that you had on July second?

 3    A.  Yes.

 4    Q.  Is the same phone that you used to call, accidentally call

 5    Mr. Lackl's home?

 6    A.  Yes.

 7    Q.  And is that the same phone that you used to talk to Pat and

 8    Frank on July second?

 9    A.  Yes.

10    Q.  And Brazy and Trigger?

11    A.  Yes.

12    Q.  Did you ever get that money back?

13    A.  No.

14    Q.  The $300?

15            You're not -- strike that.

16            Now, after were you paid, after you met with Frank,

17    where did you go?

18    A.  To the top of Normal.

19    Q.  And who was there?

20    A.  Brazy, Terry, Lump, Dino, Ronny.

21    Q.  Ron was there?

22    A.  Ron.

23    Q.  So was the green car there?

24    A.  Yes.

25    Q.  I'm going to ask you again just what we have to do in court
```

1   is speak up, okay?

2   A.   Yes.

3   Q.   Okay.   That's why the mic's there.   I'll try to stand where

4   you'll be inclined toward the microphone.

5        Now, when you got back there to Normal, where was

6   Tammy?

7   A.   When I got back Normal?

8   Q.   Did she drive you back?

9   A.   Yes.

10  Q.   Did she stay or leave or what?

11  A.   She stayed there with me.   I just got out the car while she

12  sat in the car.

13  Q.   Now, do you remember if on the way back to -- before you

14  got back to Normal, does Tammy have any cousins that you

15  stopped to see on the way?

16  A.   Yeah.

17  Q.   And when was that?

18  A.   Before we went to Normal.

19  Q.   Okay.   And how long were you there?

20  A.   Like five minutes.

21  Q.   Was Tammy in or out of the car during that period?

22  A.   Out of the car.

23  Q.   Is that when you counted the money?

24  A.   Uh-uh.

25  Q.   When did you count the money?

1    A.  I ain't get the money yet.

2    Q.  You hadn't received it yet?

3    A.  No.

4    Q.  Okay.  Thank you.

5            And when she was there, did you use your phone while

6    she was in the house, did you use your phone at all, do you

7    remember?

8    A.  Did I use my phone?

9    Q.  Do you know if you called anybody?  I'm asking if you

10   called anybody while you were waiting?

11   A.  No.

12   Q.  And then you went to meet Frank?

13   A.  Yes.

14   Q.  Now, after you got back to Normal, how long did you stay

15   there?

16   A.  Probably like 20 minutes before we went to take them back

17   over West Baltimore.

18   Q.  So when you say them, who do you mean?

19   A.  Brazy and Ron or Killa.

20   Q.  And how did you get them back to West Baltimore?

21   A.  We drove over there.

22   Q.  Who drove?

23   A.  Tammy.

24   Q.  Now, how much money did you have on you at that point?

25   A.  $2200 dollars.  Well, $2,000, that I gave them $200.

```
 1   Q.  So you gave them $200 at some point?

 2   A.  Yes.

 3   Q.  Can you tell the jury when it was that you gave these two

 4   people from West Baltimore Brazy and Killa $200?

 5   A.  When we was riding over there, I give them, I gave it to

 6   them during the ride over there.

 7   Q.  Did you tell them that you had just been paid --

 8   A.  No.

 9   Q.  -- $2200?

10   A.  No.

11   Q.  Why not?

12   A.  I ain't have to.

13   Q.  You didn't have to?

14   A.  No.

15   Q.  Why did you give them a hundred dollars, you didn't have to

16   do that, either?

17   A.  I just did.

18   Q.  Did they take it?

19   A.  Yes.

20   Q.  Now, when you got back to West Baltimore, do you remember

21   where it was these Killa and Brazy were dropped off?

22   A.  Like on Penrose and Pulaski.

23   Q.  Is that anywhere near where they'd been picked up?

24   A.  Yeah, but we picked them up like not too far from there.

25   They wasn't exactly right there.
```

```
 1   Q.  So when you dropped them off, did you see anybody there
 2   that you knew?
 3   A.  Trigger.
 4   Q.  And who is Trigger?
 5   A.  Top OYG.
 6   Q.  Did you tell Trigger anything about what his BG's had just
 7   done?
 8   A.  Yes.
 9   Q.  What did you tell him?
10   A.  I told him that they'd handled it, and he said I told you
11   he being all about that mess.
12   Q.  What does that mean?  Tell the jury what it means.  Well,
13   you understood him what being about that mess means.
14   A.  Like a killer.
15   Q.  Now, had Cornish ever killed anybody before?
16   A.  Not to my knowledge, but I had heard he did.
17   Q.  You actually heard that?
18   A.  Yes.
19   Q.  Where did you hear that?
20   A.  From other Bloods.
21   Q.  What did they say?
22   A.  He robs.
23   Q.  That he robbed?
24   A.  Yeah.
25   Q.  Did you ever hear they actually killed anybody before?
```

1  A.  Yeah.  I heard he killed somebody, but I ain't know who or

2  nothing like that.

3  Q.  Now, what else did you say to Trigger?  Did you describe to

4  him anything about what happened other than you said he's all

5  about that mess?

6  A.  Yes.  I just told him that he handled it.  He was just

7  saying like I told you about that mess, that's why he like

8  picked him do the mission.

9  Q.  Now, what about Killa, was he still there with Brazy?

10  A.  Yes.

11  Q.  Now, did you give Trigger any money since he's the top OYG?

12  A.  No.

13  Q.  Did you give him any money?

14  A.  No.

15  Q.  Nothing?

16  A.  No.

17  Q.  So you got these guys do this murder for you for free?

18  A.  Yes.

19  Q.  Other than a hundred dollars?

20  A.  Yes.

21  Q.  Had you told them ahead of time; that is, Brazy or Randle,

22  that you would give them a hundred dollars if they killed

23  someone?

24  A.  No.

25  Q.  That was just a gift?

1    A.  That's what you call it.

2    Q.  Well, from you?

3    A.  Yes.

4    Q.  Now, after you dropped them off, where do you remember

5    going after that, Mr. Pearson?

6    A.  To get some weed.

7    Q.  Where did you go for that?

8    A.  Down the hill.

9    Q.  How much weed did you get?  Did you already get weed that

10    day at one point?

11    A.  Yeah.  We already had weed, but we went and got some more

12    weed.

13    Q.  Were you in the business of selling pot at that time, or

14    whatever you call it?

15    A.  No.

16    Q.  What did you sell?

17    A.  Crack cocaine.

18    Q.  Did Tammy know you sold crack cocaine?

19    A.  She knew I sold drugs.

20    Q.  Did you ever sell crack cocaine when she was there?

21          Did she help you --

22    A.  No.

23    Q.  -- bag it or vial it or whatever you do with it?

24    A.  No.

25    Q.  But she you knew you were some kind of drug dealer?

1  A.  Yes.

2  Q.  Now, did she smoke pot?

3  A.  Yes.

4  Q.  Did she sometimes help you buy pot or did she buy pot from

5  you?

6  A.  No.

7  Q.  Did she ever buy pot for you or for herself?

8  A.  Probably for herself, not for me.

9  Q.  Now, that day you say you bought some more pot --

10  A.  Yes, that night.

11  Q.  That night?

12         Is that before or after you went to the hotel?

13  A.  Before.

14  Q.  All right.  Now, when you left West Baltimore, where did

15  Tammy take you after you got the pot?

16  A.  Go pick up her home girl.

17  Q.  Did you go with them, or did you go someplace else?

18  A.  I went with.

19  Q.  Where was it that you went?

20  A.  Down the hill like.

21  Q.  Who's the home girl?  What's her name?

22  A.  I don't know her real name.

23  Q.  Okay.  Is this the woman that you sometimes used her

24  identification to get into hotels?

25  A.  Yes.

1   Q.  Is that Miss Davenport?

2   A.  Yes.

3   Q.  Okay.  Do you know her?

4   A.  Yeah, I know her, but I don't know her like that.

5   Q.  You don't know her like that.  But you know who I'm talking

6  about?

7   A.  Yes.

8   Q.  So when you picked up Miss Davenport, where did you all

9  three go?

10   A.  To the Marriott.

11   Q.  Is that place that you typically stayed?

12   A.  No.

13   Q.  So why --

14   A.  Not like that.

15   Q.  No.  How much does it cost?

16   A.  Like $400.

17   Q.  So you had -- but you had some money in your pocket; is

18  that right?

19   A.  Yes.

20   Q.  For being paid for killing Mr. Lackl?

21   A.  Yes.

22   Q.  For Pat?

23   A.  Yes.

24   Q.  So why did you go to the Marriott?  Was there some

25  particular reason, or just because you had extra money, or

1   what?  What was the reason, if any?

2   A.  Extra money, plus it's a better hotel.

3   Q.  Better than the America's Best?

4   A.  Yes.

5   Q.  How much is the America's Best a night?

6   A.  Like 80 to $90.

7   Q.  Well, did you go anywhere else before you went to the

8   Marriott that you remember?

9   A.  Yes.

10  Q.  Where?

11  A.  On Normal.

12  Q.  What did do you there, just hang out or talk to anybody?

13  A.  Lump and Terry.

14  Q.  You talked to them about what happened?

15  A.  Yeah, they -- they knew what happened.

16  Q.  How did they know?  Was anybody else talking about this?

17  A.  Ronny.

18  Q.  What was Ronny saying?

19  A.  Telling them what happened about the murder that Brazy just

20  flipped somebody on.

21  Q.  Flipped somebody means killed them?

22  A.  Yes.

23  Q.  Now, about Ronny for one second, you asked Ronny to drive,

24  right?

25  A.  Yes.

```
 1    Q.  All right.  Or why is it you picked, you asked Ronny, as

 2    opposed to anyone else who was there, to drive Dino's car?

 3    A.  Because he got a license.

 4    Q.  He has a what?

 5    A.  License.

 6    Q.  Didn't want to break any traffic laws on the way out there?

 7    A.  No.

 8    Q.  Now, Dino, did he have a license at that time?

 9    A.  Not that I know of.

10    Q.  That he had the car?

11    A.  Not that I know of.

12    Q.  Do you know whose car the green Camero was?

13    A.  Dino's.

14    Q.  But he didn't have a license?

15    A.  No.

16    Q.  Did you give Ronny any money?

17    A.  No.

18    Q.  Now, did you ever tell Ronny that you would give him

19    anything for helping you or doing this driving the guys out

20    there?

21    A.  Yeah.

22    Q.  What did you tell him you'd give him?

23    A.  Seven grams of cocaine.

24    Q.  And did you ever do that?

25    A.  No.
```

```
 1    Q.  Did you ever tell him anything else, or did he ask for
 2    anything else?
 3    A.  No.
 4    Q.  Now, who all stayed at the Marriott that night?
 5    A.  Me and Tammy.
 6    Q.  And the other woman left after a while, or --
 7    A.  Yes.
 8    Q.  And what were you guys doing before she left, what were you
 9    all doing in the motel, did you have pot?
10    A.  Smoking weed.
11    Q.  Did you get any E pills from Frank that day?
12    A.  Not that day.
13    Q.  No?  So when you met him to get the money, you didn't get
14    any E pills?
15    A.  No.
16    Q.  Now, had you ever gotten E pills from Frank before?
17    A.  Yes.
18    Q.  About how many times, if you know?
19    A.  I don't know exactly how many times, a couple times.
20    Q.  A couple times?
21    A.  Yes.
22    Q.  Was he the main person you got E pills from, or was he one
23    of the people you got E pills from?
24    A.  Just one of them.
25    Q.  Was he the person you typically got them from or usually
```

1  got them from, or just a person could get them from?

2  A.  Could get them from.

3  Q.  And you didn't get any from him that day?

4  A.  No.

5  Q.  Now, did there come a time that you saw anything about this

6  on the news that day or the next day?

7  A.  Next morning.

8  Q.  Tell us about what you saw, please.

9  A.  I seen the next morning, I seen it on the news, and that's

10  when Tammy started crying.

11  Q.  Was she a bit upset about what happened?

12  A.  Yes.

13  Q.  Had she known prior to that what was up?

14  A.  No.

15  Q.  What did you tell her?

16  A.  It was going to be all right, don't worry about it.

17  Q.  Why, why did you tell her that?

18  A.  Because I told her she ain't have nothing do with it.

19  Q.  Did you tell her what you had to do with it?

20  A.  No.

21  Q.  Did you tell her you did this for Pat/

22  A.  No.

23  Q.  Did you tell her you'd been paid $2,500 by Pat, by Frank?

24  A.  No.

25  Q.  Did you tell her that this was a murder done for Pat in

1   jail?

2   A.  No.

3   Q.  Why didn't you tell her?

4   A.  She ain't need to know.

5   Q.  She didn't need to know?

6          Now, you said that when you met Frank, he's the one

7   who gave you the information about how to get out there or

8   where Mr. Lackl lived?

9   A.  Yes.

10  Q.  And he showed to you in what way, how did he show it to

11  you, how did he get the address?

12  A.  On the phone.

13  Q.  When you saw it on the phone, did you memorize it?

14  A.  No.

15  Q.  What did you do?

16  A.  He gave me a piece of paper.

17  Q.  Frank did?

18  A.  To break off.

19  Q.  And was the same information on a piece of paper?

20  A.  Yes.

21  Q.  All right.  Now, was this a court document, or a regular

22  piece of paper?

23  A.  Regular piece of paper.

24  Q.  Did Frank ever give you any court documents?

25  A.  No.

1  Q.  Did he tell you where the information for Mr. Lackl's

2  address came from?

3  A.  No.

4  Q.  Did he ever tell you he or that Pat had court papers?

5  A.  No.

6  Q.  Do you know where the information came from, for where you

7  all got Mr. Lackl's address?

8  A.  I ain't know where it came from.

9  Q.  Well, do you know where Frank got it?

10          MR. BALAREZO:  Objection.  Asked and answered, Your

11  Honor.

12          THE COURT:  Overruled.

13  Q.  Did Frank tell you where he got the information?

14  A.  No.

15  Q.  Did he tell you from whom he got the information?

16  A.  No.

17  Q.  Did he tell you he got it from Pat?

18          MR. BALAREZO:  Objection.

19  A.  No.

20          THE COURT:  Sustained.  Question's been asked and

21  answered.

22  Q.  Did he tell you how he got the information?

23  A.  No.

24          MR. BALAREZO:  Objection, Your Honor.

25          THE COURT:  Sustained.

1   Q.  How did you get Pat's phone number to call him?

2   A.  Through Frank.

3   Q.  And did that number work when you called?

4   A.  Yes.

5   Q.  And is that the same number you called when you called

6   after the murder?

7   A.  Yes.

8   Q.  Did you call any other number or any other person in the

9   jail that day?

10  A.  No.

11  Q.  Or at that number?

12  A.  No.

13  Q.  Did you speak to anybody else other than Pat when you

14  called that number that Frank gave you for Pat?

15  A.  No.

16  Q.  So when you called -- when you called after the murder,

17  were you talking to the same person?

18          MR. BALAREZO:  Objection.

19          THE COURT:  Overruled.

20  Q.  When you called that number that Frank gave you after the

21  murder, did you speak to the same person that you had spoken to

22  on that number before the murder??

23  A.  Yes.

24  Q.  Now, do you remember a couple of days after the murder the

25  police came and found you?

1  A.  Yes.

2  Q.  At that time, did you know how the police found you, not

3  now, but then?

4  A.  No.

5  Q.  Do you know how they found you?

6  A.  No.

7  Q.  Did you expect the police to show up?

8  A.  No.

9  Q.  Did you know at that time that you had used your own phone

10  to call Mr. Lackl's house?

11  A.  No, not yet.

12  Q.  You didn't know that yet, did you?

13  A.  No.

14  Q.  You later learned that, didn't you?

15  A.  Yes.

16  Q.  Now, when the police -- did they ask to you come to Towson

17  and go to headquarters?

18  A.  When they came and got me and took me there.

19  Q.  Homicide?

20  A.  Yes.

21  Q.  In Towson?

22  A.  Yes.

23  Q.  Had you ever been to that particular building before?

24  A.  No.

25  Q.  All right.  So when you got there, did you try to help the

1   police, or try to give the police information that would

2   protect you?

3   A.   Yes.

4   Q.   What did you do?  Tell the jury what you decided to do.

5   A.   I told them that -- they got to ask me about the murder or

6   whatever, I told them that Brazy did it for his home boy.

7   Q.   Do you remember that the police took your -- they took your

8   phone and printed out your phone directory, your phone book?

9   A.   Yes.

10  Q.   Do you remember them asking you some of the names that were

11  that phone book like who these people were?

12  A.   Yes.

13  Q.   And was Brazy in your phone book?

14  A.   Yes.

15  Q.   Do you remember if they asked you about who this guy is,

16  Brazy, who's he?

17  A.   Yes.

18  Q.   Is that when you told him, told the police, told Detective

19  Ruby started talking about Brazy?

20  A.   Yes.

21  Q.   And what was your purpose?  Tell the jury, what was your

22  reason in implementing Brazy?

23  A.   So Frank and Pat wouldn't get locked up.

24  Q.   Pardon me?

25  A.   So Frank and them wouldn't get charged for it. And that

1  Brazy get locked up for it, like he wouldn't say nothing about

2  me because he a Blood.

3  Q.  So you didn't tell the police about your conversations with

4  --

5          MR. BALAREZO:  Objection.

6          THE COURT: Overruled.

7  Q.  Did you tell the police or Detective Ruby that day or the

8  next time you met or the next time after that about your

9  conversation that day with Pat and Frank?

10  A.  No.

11  Q.  Did you tell them that Frank gave you the address?

12  A.  No.

13  Q.  Did you tell them that you'd been paid 2,500, or $2200?

14  A.  No.

15  Q.  Did they tell you that you were the person who actually

16  brought Cornish into the whole thing?

17  A.  No.

18  Q.  Did you tell them this was for Pat, actually, the first day

19  talk about Pat and Brazy in any way that you remember?

20  A.  No.  I just said that for his friend that was locked up

21  named Pat.

22  Q.  Okay.  So you didn't say Pat Byers?

23  A.  No.

24  Q.  You didn't give them the phone number?

25  A.  No.

1  Q.  So did you figure the police wouldn't be able to figure out
2  who it was with just a first name?
3  A.  Not really.
4  Q.  Now, when you implicated Brazy that day, and the things you
5  said about him, did you tell the police, for instance, that
6  Brazy was Pat's home boy, or his right hand man?
7  A.  Yes.
8  Q.  Was that true?
9  A.  No.
10 Q.  Why did you say that?
11 A.  So it wouldn't come back on me.
12 Q.  All the things you now have told the jury that you did, you
13 actually put off on somebody else at that time; is that
14 correct?
15 A.  Yes.
16 Q.  What about the part that it was all for Pat, who was in
17 jail for murder?  Did you make that up?
18 A.  What you say?
19 Q.  What about the --  what you told the police about it being
20 -- that is, that the murder was committed for Pat, who was in
21 jail for murder; is that correct?  Was that true?
22 A.  Yes.
23 Q.  When you spoke to Pat earlier that day, do you remember you
24 said you called Pat to tell him you were going to do this and
25 to make sure the money was good.

1    A.  Yes.

2    Q.  Is that what you said?

3        Did he say anything to you about when this has to be

4    done or when this should be done?

5    A.  No.

6    Q.  Or about when his court day was?

7    A.  His court date?

8        MR. BALAREZO:  Objection, leading.

9    A.  It was coming up.  Like in a week, a week or two.

10   Q.  He said that?

11   A.  Yes.

12   Q.  So you went and did it right that day, didn't you?

13   A.  Yes.

14   Q.  Now, a couple of days later -- by the way, the police

15   released you that night, didn't they?

16   A.  Yes.

17   Q.  And did they give you a place to stay?  Did they offer to

18   put you in a hotel?

19   A.  Yes.

20   Q.  Did you stay there?

21   A.  Yes.

22   Q.  Did you remain there for very long, or did you go someplace

23   else, if you remember?

24   A.  I left out of there.

25   Q.  Did you leave your things there?

```
 1    A.  Yes.

 2    Q.  Now, when you left, did you mean to leave so the police

 3    couldn't find you anymore?

 4    A.  Yes.

 5    Q.  Now, after you gave the police Brazy and talked about Pat,

 6    you didn't mention Frank at all that first time, did you?

 7    A.  No.

 8    Q.  After you gave the police that information, what was your

 9    thinking in terms of whether you would ever be expecting to see

10    them again?  What were you hoping, at least?

11    A.  That they was going to lock Brazy up and leave Frank and

12    them out of it.

13    Q.  And who else?

14    A.  Leave Frank and Pat out of it.

15    Q.  What about you?

16    A.  And me, too.

17    Q.  Now, a couple of days later, I think it was July seventh,

18    the police came and found you in another motel, didn't they?

19    A.  Yes.

20    Q.  Do you know how they found you?

21    A.  Now I do.

22    Q.  Now you do?  At that time, did you expect to see them come

23    to that motel?

24    A.  No.

25    Q.  Did do you remember which one it was?
```

1   A.  It was out in Glen Burnie.

2   Q.  Who were you with that night?

3   A.  Tammy.

4   Q.  So the first night you were arrested or stopped or whatever

5   it was, brought back to Towson, were you with someone other

6   than Tammy?

7   A.  Yes.

8   Q.  Let me ask you, did you and Patrick ever have a beef over

9   any girls?

10  A.  No.

11  Q.  Now, do you remember telling the police that you did?

12  A.  Yes.

13  Q.  Do you remember the police asking you, Detective Ruby

14  asking you how you knew Pat, what did you tell him?

15  A.  I made it up like we didn't get along behind a girl and

16  Brazy was his home boy and like I ain't want to see him come

17  home from jail.

18  Q.  Why did you say that?

19  A.  Because I ain't want to go on me, either.

20  Q.  Pardon me?

21  A.  I didn't want it on me.

22  Q.  I'm not sure I heard.

23  A.  I didn't want it on me.

24  Q.  Oh, you didn't want it on you.  Right, I understood that.

25      Now, when you gave the police Brazy, did it work that

```
 1   they left you alone?

 2   A.  For a couple days.

 3   Q.  And what happened when they found you on the seventh, did

 4   you try to give them something else when they came and found

 5   you a couple days later?

 6   A.  At the hotel?

 7   Q.  Yes.

 8   A.  They got the shirt.

 9   Q.  Okay.  Now, when they took you back to Towson, do you

10   remember making a call to Lump or Terry?

11   A.  Yes.

12   Q.  And what did you tell the police you could get for them

13   that day?

14   A.  A gun.

15   Q.  And did you do that?

16   A.  Yes.

17   Q.  Where did you go to get the gun?

18   A.  On I went Harford Road, and they met me at the gas station.

19   Q.  Speak up a little bit.

20   A.  I went to Harford Road a, nd he met me at the gas station.

21   Q.  The person with the gun?

22   A.  Yes.

23   Q.  And was that in fact the murder weapon?

24   A.  Yes.

25   Q.  Now, after the police got the murder weapon from you, and
```

1  we've heard some testimony about it, but did they let you go

2  that night or that morning?

3  A.  Yes.

4  Q.  And what was your hope in terms of ever seeing these

5  detectives again after you got them the gun?

6  A.  It would go all away.

7  Q.  Did they come back?

8  A.  Yes.

9  Q.  Did you expect that to happen?

10  A.  No.

11  Q.  So did you continue to keep yourself out of the story and

12  just talk about other people?

13  A.  Yes.

14  Q.  At least for a while?

15  A.  Yes.

16  Q.  And on July seventh, when you gave the police the gun, you

17  didn't tell them that Frank and Pat's numbers were right in

18  your cell phone, did you?

19  A.  No.

20  Q.  Mr. Pearson, before I forget, this is of importance, do you

21  have any tattoos?

22  A.  Yes.

23  Q.  Tell us about your tattoos.  We'll hear about them anyway,

24  just tell us about them.

25  A.  I got one on my stomach that say Blood Life.

1    Q.  Blood what?

2    A.  Blood Life, 187.

3    Q.  When did you get that?

4    A.  A while ago.

5    Q.  How long have you been a Blood?

6    A.  About three years.

7    Q.  And you were an OYG?

8    A.  Yes.

9    Q.  Now, were you in some other gang before you got into the

10   Bloods?

11   A.  No.

12   Q.  What group of the Bloods are you in?

13   A.  L Gang.

14   Q.  And does it have a longer name than that, or different name

15   than?

16   A.  Pasadena Devil Lanes, 754 Project.

17   Q.  And you're an OYG?

18   A.  Yes.

19   Q.  Can you tell us how get into the Blood, do you have to kill

20   somebody to get into the Bloods?  Did you have to kill someone

21   to get into the Bloods?

22   A.  No.

23   Q.  Did you kill someone to get into the Bloods?

24   A.  No.

25   Q.  Did you get beaten in?

```
 1    A.  You can get beat in.

 2    Q.  I'm asking you how you got in.

 3    A.  I got in in jail.

 4    Q.  In what?

 5    A.  In jail.

 6    Q.  So what did that involve, getting in in jail?

 7    A.  You -- when I got in, then, it was a camp jail, so it was

 8    like you ain't really want to do so much because you ready to

 9    go home from jail.

10    Q.  So you got in very peacefully?

11    A.  Yes.

12    Q.  No killing?

13    A.  No.

14    Q.  No beating?

15    A.  No.

16    Q.  No boots?

17    A.  No.

18    Q.  You weren't stomped to get in?

19    A.  They can't stomp.

20    Q.  During a beating, are you allowed to kick anybody?

21    A.  No.

22    Q.  How long do these -- you're beat in, how long does that

23    last, by the way?

24    A.  Five minutes.

25    Q.  How many?
```

1    A.   Five minutes.

2    Q.   What happens -- I'm just, I'm not a very knowledgeable

3    about gangs as some people are, but what happens if, while

4    you're hitting the person, they go down on the ground?

5    A.   You got to help them up.  Wait till they get up.

6    Q.   So you don't beat them into the ground?

7    A.   No.

8    Q.   Are they allowed to fight back?

9    A.   Yes.

10   Q.   And this is for five whole minutes?

11   A.   Yes.

12   Q.   Okay.  Now, when the police interviewed you several times

13   during the course of the summer of 2007 after the murder, did

14   you tell them you were the person that got the burner phone?

15   A.   No.

16   Q.   When did you tell the police about that, is that after you

17   got an attorney?

18   A.   Yes.

19   Q.   And when you met with your attorney, did they basically

20   tell you to tell the truth?

21   A.   Yes.

22              MR. BALAREZO:  Objection, Your Honor.

23              THE COURT:  Sustained.

24   Q.   What did the attorneys tell you do in terms of what you

25   must tell the --

1     MR. BALAREZO:  Objection.

2 Q.  The prosecutors?

3     THE COURT:  Sustained.  Counsel, approach the bench,

4 please.

5     (At the bench)

6     THE COURT:  Mr. Purcell, what's the purpose of the

7 this line of inquiry?  He can't testify in one context and not

8 in other the context, so it's not appropriate to ask him what

9 his lawyer --

10     MR. PURCELL:  I appreciate that, thank you.

11     THE COURT:  You can just ask what his understanding

12 is.

13     MR. PURCELL:  Okay.  I do appreciate that.

14     (Open court)

15 BY MR. PURCELL:

16 Q.  Mr. Pearson, at some point, I guess it was October or so,

17 of 2007, did you ultimately get a lawyer?  Or get two lawyers?

18 A.  Yes.

19 Q.  Now, let me ask you, in all those meetings that you had

20 with the detectives in Baltimore County on July 7, I'm sorry,

21 July 5, July 7, I think the 31st, and then a couple times in

22 August, you were on your own, weren't you?

23 A.  Yes.

24 Q.  You didn't have any legal advice?

25     MR. BALAREZO:  Objection.

1   A.  No.

2           THE COURT:  Overruled.

3   Q.  Did you have any legal advice?

4   A.  No.

5   Q.  Now, did you get -- were you able to obtain some -- or were

6   you appointed some attorneys once the case was brought over to

7   the U.S. Attorney's office?

8   A.  Yes.

9   Q.  And one of them is in the courtroom today; is that right?

10  A.  Yes.

11  Q.  Is that one of the attorneys who counseled you on your plea

12  agreement with the government?

13  A.  Yes.

14  Q.  And what is your understanding?  What is your obligation

15  and your understanding of your obligation as to what you mustdo

16  or how you must respond to any question I ask you or anybody

17  else asks you about anything you've done?

18  A.  The truth.

19  Q.  And when did you start telling the truth about what

20  happened in this case, Mr. Pearson, the full truth?  When did

21  that start?

22  A.  When I got in federal custody.

23  Q.  And the full truth, does it include that Frank paid --

24          MR. BALAREZO:  Objection.

25          THE COURT: Sustained.

1    Q.  So what you testified here today, about here today in terms

2    of who this was for, is that part of the full truth?

3    A.  Yes.

4    Q.  And about who paid you?

5          MR. BALAREZO:  Objection.

6    Q.  Is that part of the same truth?

7    A.  Yes.

8          THE COURT:  Sustained.  Sustained.

9    Q.  Now, prior to your receiving counsel, federally-appointed

10   counsel, had you told the police that in fact it was you who

11   called Mr. Lackl, Mr. Lackl's house and asked him to come

12   outside?

13   A.  Yes, once I got federal.

14   Q.  Once you got federal?

15   A.  Yes.

16   Q.  Before that?

17   A.  No.

18   Q.  Who do you remember telling them had that burner phone

19   during that ride out there?

20   A.  Brazy.

21   Q.  You blamed Brazy for that, didn't you?

22   A.  Yes.

23   Q.  That was your phone, did Brazy even ever use it?

24   A.  Not my phone, no.

25   Q.  Nope.

```
 1    A.  He ain't never had a phone number.

 2    Q.  You did?

 3    A.  Yes.

 4    Q.  And you're the one who used it to call Mr. Lackl?

 5    A.  Yes.

 6              MR. BALAREZO:  Asked and answered, Your Honor.

 7              THE COURT:  Overruled.

 8    Q.  Now, you've reviewed your plea agreement with your attorney

 9    I guess prior to your pleading guilty?

10    A.  Yes.

11    Q.  Now, what is your understanding of the sentence you expect

12    to receive if you're found to have been a truthful witness in

13    this trial today and any other trials or matters in which

14    you're asked to cooperate?

15    A.  You take my plea away from me.

16    Q.  What's your understanding if you abide by the plea

17    agreement what your sentence will be?

18    A.  35 years.

19    Q.  And what is your understanding, Mr. Pearson, would be the

20    consequences of your breaching your plea agreement and being

21    untruthful now, what could you possibly get?

22    A.  Life.

23    Q.  Life or death; is that correct?

24    A.  Yes.

25    Q.  Or at least a possibility of it?
```

```
 1              MR. BALAREZO:  Objection.

 2              THE COURT:  Sustained.  Sustained.

 3    Q.  Let me --

 4              THE COURT:  Counsel, approach the bench, please.

 5              (At the bench)

 6              THE COURT:  Mr. Purcell, once witness has testified

 7    as to his expectation at sentence in this case, and then not be

 8    truthful, to the face death the penalty, I'm not sure if that's

 9    correct.

10              MR. PURCELL:  It actually is accurate

11              THE COURT:  I mean the  Justice Department --

12              MR. PURCELL:  He's been through it.  This is a -- do

13    you remember, you haven't seen this for a while, but --

14              THE COURT:  Put it in front of me.

15              MR. BALAREZO:  I withdraw the objection.

16              (Pause.)

17              THE COURT:  It's a C plea, an agreed 35 years, C

18    plea.

19              MR. PURCELL:  Look at the maximum, the penalty

20    provision, Your Honor, in the beginning, it does set out there,

21    it's a very unique sort of plea agreement.

22              THE COURT:  Hold on a second.

23              MR. PURCELL:  Maybe you were thinking about someone

24    else.

25              (Pause.)
```

1          THE COURT:  If you were to breach the agreement --

2     counsel don't talk to each other, paragraph 18.

3          If he fails to fulfill each and every obligation,

4     then this office shall release he itself, will recommend to the

5     Court any sentence that it considers up to the legal maximum

6     sentence.

7          (Pause.)

8          THE COURT:  The first page reflects that this

9     agreement is null and void upon a decision by the Attorney

10    General to file notice to seek the death penalty, and the

11    Attorney General did not, so under 11(c)(1)(C) in terms of the

12    agreed disposition.

13         I'm just trying to clarify in terms of when he pled

14    guilty in front of me, it was stated to him if there were a

15    breach of the plea agreement, the government could seek the

16    death penalty?

17         MR. PURCELL:  It was made fairly clear, yes, Your

18    Honor.

19         THE COURT:  I don't know that it was clear to me.

20         MR. PURCELL:  Pardon me?

21         THE COURT:  I don't think it was clear to me.  I

22    don't have the transcript, but I'm familiar with this, I'm

23    familiar with the pendency of the government making a decision.

24    Clearly, he would be able to withdraw if the government were

25    seeking the death penalty.

1          In all agreements, I have to advise the government

2     it's up to the government, it's in here that I make the

3     determination what I don't see specifically stated here, and

4     that the government can seek the maximum penalty.

5          MR. PURCELL:  Well --

6          THE COURT:  I don't see in here, Mr. Purcell.  We

7     don't have time to stop and review the details of his guilty

8     plea.

9          I don't see in here that it was indicated to this

10    defendant that in the event I determined that there'd been a

11    breach, the government would be free to seek the death penalty.

12         MR. PURCELL:  Your Honor, I'd be happy not to state

13    that as the maximum, that's fine.

14         THE COURT:  I mean, I'm just looking through this

15    individual pled guilty in front of me, I don't have time go

16    back through my notes I guess we can, but I think I'd remember

17    that -- I don't see it explicitly stated here in the plea

18    agreement, is my problem.

19         I see there's a condition upon the government not

20    seeking the death penalty.  And I see it says the government

21    can seek the maximum penalty, which in my mind is the reason I

22    asked you to come up here, is life in prison.  I don't know

23    that --

24         MR. PURCELL:  You're right.  Paragraph 9, I'm sorry,

25    page 9, paragraph 13 last sentence.  Would it be correct

1    initially he was facing the death penalty, also correct

2    pursuant to his plea agreement --

3          THE COURT: Hold on one second.  Page 9?

4          MR. PURCELL:  I'm sorry, Your Honor, page 9.

5    Paragraph 13.

6          THE COURT:  13, last sentence.

7          Yes.  There's no question that's what the agreement

8    was, because I'm not indicating that I remember all guilty

9    pleas but, as you know, I'm pretty thorough on my pleas.  In

10    fact, I'm teased out there on my guilty pleas.  I've got

11    several people say they tried to get a 2255 and they've given

12    up because I've covered everything in a guilty plea.  I

13    remember it, if I determine someone breached a plea, he doesn't

14    face the death penalty, he faces life imprisonment.

15          I'm glad we clarified for that the record.  Okay.

16    All right.  Thank you very much.

17          MR. PURCELL:  Thank you.

18          THE COURT:  All right.  Thank you.

19          (Open court)

20          THE COURT:  If you'll clarify that point Mr. Purcell?

21          MR. PURCELL:  I will do that right now.

22    BY MR. PURCELL:

23    Q.  Mr. Pearson, I just asked you a moment ago about your

24    understanding of your agreement with the government, not

25    binding on the court, but your agreement between yourself and

1    the United States government, if you abide by the terms of the

2    plea agreement, what is your understanding your sentence will

3    be?

4    A.   35 years.

5    Q.   And it's correct -- actually, I misspoke -- that the

6    maximum sentence you would -- if I may approach the witness?

7    I'm not sure he can see this, if I put this in front of you

8    page 9, can you read right there?

9              Now, having read that, Mr. Pearson what is the

10   understand of the sentence you would face if you did not abide

11   by the terms of your plea agreement?

12   A.   Life.

13   Q.   Life?  Thank you.

14             Now, have you been truthful here today in your

15   testimony?

16   A.   Yes.

17   Q.   Was this murder done for you?

18   A.   No.

19   Q.   Did you set Patrick Byers up?

20   A.   No.

21   Q.   You did you set Frank up?

22   A.   No.

23             MR. BALAREZO:  Objection, Your Honor.

24             THE COURT:  Overruled.

25   Q.   Is there some sort of scheme on your part to manipulate the

```
 1    judicial system, all of us included, to keep Patrick Byers in
 2    jail for the rest of his life?
 3    A.  No.
 4    Q.  Do you dislike him?
 5    A.  No.
 6    Q.  Do you like him?
 7    A.  I don't know him.
 8    Q.  You have nothing against him, do you?
 9    A.  No.
10    Q.  How about these things you told the police about a beef way
11    girl friend or --
12            MR. BALAREZO:  Objection, asked and added.
13            THE COURT:  Sustained.  It was asked and answered.
14    Q.  Thank you.
15            Was there anything else you told the police about
16    might be a reason why you didn't like Patrick that you
17    remember?
18    A.  He shot my man.
19    Q.  Yeah, what about that?
20            MR. PURPURA:  I'm sorry.  I didn't hear that.
21    A.  He shot my home boy.
22    Q.  Did you tell the police that?
23    A.  Yes.
24    Q.  What did you say about him shooting your home boy, is that
25    Marco?
```

1    A.   Yeah.

2    Q.   Is there in fact a person named Marco?

3    A.   Yes.

4    Q.   And what do you know about Marco's death?

5              MR. PURPURA:  Objection.  I'm sorry.  There's an

6    objection.  Can we approach the bench?

7              THE COURT:  Yes, certainly.

8              (At the bench)

9              THE COURT:  Mr. Purcell, where we are going with

10   this?

11             MR. PURCELL:  I'm just going to basically have him

12   say in one of the statements, I think the defense probably has

13   it highlighted, is that the statement by him that Byers, he

14   didn't like Byers because Pearson said he didn't like Byers

15   because he --

16             THE COURT:  Is that true, it was there?

17             MR. PURCELL:  I don't believe it to be true.

18             THE COURT:  The shooting that -- well, we're going to

19   get into the matter of prior acts?

20             MR. PURCELL:  I don't believe he has any, I don't

21   think he really has any belief that Byers did it.

22             THE COURT:  The point is we dealt with this in terms

23   of the context of how we dealt with this in other matters, his

24   testimony is the product of shooting someone else.

25             MR. PURCELL:  They're probably going to get into it.

1          MR. PURPURA:  I shouldn't object.  I apologize, it's

2     up to them if they read into it.

3          THE COURT:  This becomes my ruling.  To get into

4     another shooting Mr. Byers, how do you address the 404(b)?

5          MR. PURCELL:  I understand.  Now it's a generic

6     question.

7          THE COURT:  It occurs to me, while you're up here, I

8     never asked the question, but it does seem to me that the

9     purposes of public dissemination, you can say how you approach

10    this, it's important for people to understand, it's not the

11    government who summarily determines what the sentence is.  All

12    people who plead guilty, it is ultimately the court, the Court

13    conducts a hearing, the Court determines by a preponderance

14    evidence whether or not there's a plea agreement at the trial,

15    whether there's a been a breach.  I think that's important to

16    establish of for public dissemination.  If you want me to

17    explain it to the jury, I will.  How do you feel?

18         MR. PURCELL:  I'll just try and lead him on that

19    point.

20         THE COURT:  From the point of view from the defense,

21    how do you want it?  I don't think it's appropriate as a matter

22    of record, that's important to be understood totally how it

23    works.

24         MR. BALAREZO:  I don't have objection Mr. Purcell

25    inquiring.

1          THE COURT: If you'll just cover that, let's go.

2          MR. PURCELL:  I'll be happy to.

3          (Open court)

4    BY MR. PURCELL:

5    Q.  Mr. Pearson, we're almost finished, but in terms of your

6    meeting with the police, particularly the Baltimore County

7    Police Department up to the time you received the

8    federally-appointed counsel, is it correct that you told the

9    police certain things that were basis for you not liking

10   Patrick Byers?

11   A.  Yes.

12   Q.  Was any of that true?

13   A.  No.

14   Q.  You made it up?

15   A.  Yes.

16   Q.  Now, in terms of your plea agreement, your understanding

17   is, if you abide by the terms of your agreement, your agreement

18   with the government, that is, that your sentence would be what?

19   A. 35 years.

20   Q.  Do you understand that it's not the government that

21   determines your sentence, it's the Court, do you understand

22   that?

23   A.  Yes.

24   Q.  So it's the Court?

25          MR. BALAREZO:  Objection, Your Honor.

1          THE COURT:  This is a Rule 11(c)(1)(C)  plea,

2     correct, Mr. Purcell?

3          It's up to the Court to accept or reject that.

4     BY MR. PURCELL:

5     Q.  Do you understand that, Mr. Pearson?

6     A.  Yes.

7     Q.  It's up to the Judge ultimately on the case, not me, not

8     you, not your attorney, as to whether or not that sentence will

9     be imposed?

10    A.  Yes.

11    Q.  Do you accept that?

12    A.  Yes.

13          MR. PURCELL:  May I have one moment, Your Honor?

14          THE COURT:  Sure.

15    Q.  There's a couple of photographs I'd like to show the

16    witness.  I have to get them.

17          If you'll look at exhibit 234, please.  Now, if

18    you'll look at that photograph, Mr. Pearson, do you recognize

19    the individual in the photograph to your left?

20    A.  Yes.

21    Q.  Who is that?

22    A.  Brazy.

23    Q.  Now, do you remember the police when you met with them, I

24    think it was maybe on the seventh of July, that they showed you

25    that photograph and you made an identification of Brazy?

```
 1    A.   Yes.

 2    Q.   Is that your handwriting to the right of the photograph?

 3    A.   Yes.

 4    Q.   I'm sorry, to the left of the photograph?

 5    A.   Yes.

 6    Q.   So you're MP, Marcus Pearson?

 7    A.   Yes.

 8    Q.   Now, direct your attention to exhibit number 235, do you

 9    recognize that photograph?

10    A.   Yes.

11    Q.   And who is the person depicted in the photograph?

12    A.   Frank.

13    Q.   And are you the person who wrote the notes to the side of

14    that photograph?

15    A.   Yes.

16    Q.   So that's your name, you wrote this is Frank?

17    A.   Yes.

18    Q.   Mr. Pearson, I'm just curious, you told us you were how

19    old?

20    A.   28.

21    Q.   And how far did you go in school, sir?

22    A.   11th.

23    Q.   Where did you go to 11th grade?

24    A.   Lake Clifton.

25    Q.   Did you drop out at 11th?
```

1    A.   Yes.

2    Q.   Now, look at the exhibit, do you see below the photograph,

3    there's a question is this the person who received a text

4    message from Patrick Byers?  And could you look at the

5    photograph, please?

6              Did you write yes?

7    A.   Yes.

8    Q.   Are those your initials next to the word yes?

9    A.   Yes.

10   Q.   And if you look at the photograph, there's a question, what

11   did the text say?  Do you remember being shown this photograph

12   and responding to that question?

13   A.   Yes.

14   Q.   Is that your answer?

15   A.   Yes.

16   Q.   Now, is that answer truthful?

17   A.   Yes.

18   Q.   So when you told the police that was the answer to the

19   question, that was a truthful answer?

20   A.   Yes.

21   Q.   And what was the answer to the question as to what did the

22   text message from Patrick Byers to Mr. Goodman say?

23   A.   What --

24   Q.   Look at the picture, if you need to, the photograph if you

25   need to?

1   A.   What did he say?  The name, address, phone number and sold

2   cars.

3   Q.   And that he sold cars?

4   A.   Yes.

5   Q.   And is that the information you used to get Cornish and

6   Randall and Trigger and Williams yourself involved in a murder

7   for hire for Mr. Byers?

8   A.   Yes.

9   Q.   For which you were paid $2200?

10  A.   Yes.

11       MR. PURCELL:  Thank you.  I have no further

12  questions.

13       THE COURT: Counsel, if you'll approach the bench one

14  second, please?

15       (At the bench)

16       THE COURT:  Mr. Purcell, I still want to address the

17  matter whether there's a breach.  I'm not satisfied as to --

18       MR. PURCELL:  Okay.

19       THE COURT:  I mean I don't think it's clear for the

20  record that, secondarily in that, 11(c)(1)(C) plea, I think

21  it's important, given, given that, you can introduce the plea

22  agreement in evidence.  I don't think the jury's going to look

23  at it.  It's important for the jury to understand what the plea

24  agreement means.  And given the response of this witness, which

25  are two things that trouble the Court, number one, it has to

1    make clear to the jury, about the breach of the plea agreement.

2    It is not within the province of the government, it is up to

3    the Court, I'm pretty sure in my notes that's not made clear.

4         And the second point is that, with respect to the

5    35-year sentence, his plea is under Rule 11 (c)(1)(C) pursuant

6    to which the government and defense counsel for Mr. Pearson had

7    agreed that a 35-year sentence is appropriate under 11(c)(1)(C)

8    and 11(c)(4) and Rule 11(c)(5), if the Court determines that 35

9    years is not the appropriate sentence, either the government or

10   the defendant will be given an opportunity to withdraw from the

11   guilty plea.

12        That's my point.  I don't think that, I'm not asking

13   you to say that.  Nor is the witness capable of explaining, but

14   I think it's important in this case, unless counsel's going to

15   --

16        MR. PURPURA:  I object.

17        THE COURT:  I'm going to explain it, because I think

18   it's important in terms of public record what the plea

19   agreement means.  I think the jury's going to have to read to

20   see if --

21        MR. PURCELL:  Your Honor, perhaps I would suggest

22   that what you do is, if you wish to, I mean, it's up to you,

23   maybe an instruction at the end of the C plea instructing you

24   that this is the --

25        MR. PURPURA:  Judge, here's why in this case, in any

1      other case we have, that's fine.  But this, I

2                THE COURT:  I don't think I understand.

3                MR. BALAREZO:  It appears you can appear above us.

4                MR. PURPURA:  The reason I question that procedure,

5      on any plea, although they are C pleas, unless the Court's

6      going to postpone the sentencing of this case, until after the

7      Court decide on the C pleas, what information is very important

8      starts to mitigate, which is relative culpability, and that's

9      where the question is going to.

10               The Court is not going to postpone the sentencing

11     until after they sentence these people.  It's really important

12     that the jury believes that these people will receive the

13     sentence which they will be offered.

14               THE COURT:  I understand.  I understand that.  My

15     point is, is that that I understand your point.  My point is

16     that, if there is a finding of guilty, there's a statutory

17     marker that you can use with respect to the 35-year sentence,

18     that's the point.

19               Okay.  That's fine.  If you're satisfied the record's

20     clear, and you can cross-examine.

21               MR. PURCELL:  I think the record is clear in terms of

22     the Court record.  I think your concern is public perception.

23               THE COURT:  My concern is that, as you all know, I

24     mean no disrespect for the U.S. Attorney's, past or present.

25     I'm always concerned there's an image that the government

1    determines whether had the person is of assistance.  They're
2    not the one who sentence the person.  It's the Court that
3    determines.

4         And that's my point in terms of making sure the jury
5    understands the process.

6         MR. PURCELL:  Just for the record, I did say I felt
7    this agreement's between us and not the Court and the Court
8    ultimately determines the sentence.  I thought I was fairly
9    clear on that.  I'm not doing a Rule 11 with the --

10        THE COURT:  I'm not going to object to what you're
11   going to, that's the fine, we're ready for cross-examination.

12        MR. PURCELL:  Thank you, Your Honor.

13        MR. BALAREZO:  Thank you.

14        THE COURT:  We'll now proceed with cross-examination.

15        Mr. Balarezo?

16        MR. BALAREZO:  Thank you, Your Honor.

17        If I could have one second --

18        THE COURT:  Take your time.

19        MR. BALAREZO:  -- to get myself organized?

20                    CROSS-EXAMINATION

21   BY MR. BALAREZO:

22   Q.  Good afternoon, Mr. Pearson.

23   A.  Good afternoon.

24   Q.  Mr. Pearson, you are testifying here today under what's

25   called in fact a cooperation agreement; is that right?

1   A.   Yes.

2   Q.   Which means that you agree to cooperate with the government

3   in exchange for a lighter sentence; is that right?

4   A.   What you say?

5   Q.   You agreed to cooperate with the government in exchange for

6   a lighter sentence; is that correct?

7   A.   I just agree to tell the truth.

8   Q.   We'll get to that part.

9           You're not here because you're doing your civic duty,

10  right?

11  A.   No.

12  Q.   You're not here because your conscience got the best of

13  you, correct?

14  A.   No.

15  Q.   You're here because at some point when you got charged in

16  Federal Court with using a telephone to further the murder of

17  Carl Lackl, you were even -- you might eventually face the

18  death penalty; is that correct?

19  A.   Correct.

20  Q.   And you're not here testifying because you're remorseful in

21  any way; is that correct?

22  A.   Kind of sort of.

23  Q.   Kind of sort of?

24          THE COURT:  Keep your voice up, please.  Speak into

25  the microphone.

```
 1    Q.   Kind of sort of?

 2    A.   Yeah.

 3    Q.   You orchestrated the murder of Carl Lackl and when the

 4    prosecutor asked you how you felt about that, you said it

 5    didn't really bother you, did it?

 6    A.   No.

 7    Q.   You're not testifying here because you're remorseful,

 8    right?

 9    A.   No.

10    Q.   You're testifying because you made a deal with them to

11    reduce your sentence as much as possible; is that correct?

12    A.   No.  I didn't know what my sentence was.

13    Q.   I'm not asking you what your sentence was, that's the

14    purpose of your testifying here today, correct?

15    A.   No.  It could have been life.

16    Q.   Sir, you do understand what an oath is; is that right?

17    A.   Yes.

18    Q.   An oath to tell the truth?

19    A.   Yes.

20    Q.   And that's an oath that you took when you came and sat in

21    that chair, you raised your hand?

22    A.   No.

23    Q.   Let me finish my question.  You raised your hand and said

24    I'm going to tell the truth?

25    A.   Yes.
```

1    Q.  And you know what the truth is?

2    A.  Yes.

3    Q.  You're 28 years old?

4    A.  Yes.

5    Q.  You understand what it is, you're a truthful person,

6    correct?

7    A.  Yes.

8    Q.  You're here telling this jury what the truth is?

9    A.  Yes.

10   Q.  You're telling them the truth because you have an agreement

11   with these people to tell the truth, right?

12   A.  You keep -- yes.

13   Q.  Now, you testified before a Grand Jury previously; did you

14   not?

15   A.  Yes.

16   Q.  Do you know what that is, a Grand Jury?

17   A.  Yes.

18   Q.  The prosecutor took you in a room with 23 other people,

19   without your lawyer, and asked you questions about your

20   involvement in the murder of Carl Lackl, right?

21   A.  Yes.

22   Q.  That was held on October 30, 2007, do you remember that?

23   A.  Yes.

24   Q.  The person who was asking you questions that particular day

25   was also Mr. Purcell, the one who asked you questions here

1    today?

2    A.   Yes.

3    Q.   And in that particular session, page 8, line 16, Mr.

4    Purcell asked you question, "And is it also correct, though,

5    that with advice of counsel, you decided to talk or present

6    testimony to the grand jury in hopes that perhaps later if

7    you're charged by the Federal Court or if you remain in the

8    state court, that your cooperation will be of assistance in

9    reducing your ultimate sentence?"

10           And your answer was "Yes."

11           Do you remember that question and answer?

12   A.   Yes.

13   Q.   And just we'll mark this as defense exhibit number 10.

14           THE COURT:  For identification.

15   Q.   For identification.  I'll point you to the highlighted

16   sections page 8, line 16 through 22.

17           Do you see that?

18   A.   Yes.

19   Q.   Was that not your response in October of 2007?

20   A.   Yes.

21   Q.   All you want out of this is a reduction of your sentence,

22   correct?

23   A.   No.

24   Q.   Have you written a letter of apology to the Lackl family?

25   A.   No.

1    Q.   Have you placed flowers on the grave of Mr. Lackl?

2    A.   How, when I'm locked up?

3    Q.   You haven't, right?

4         MR. PURCELL:  Objection.

5         THE COURT:  Overruled.

6    A.   I say how?  I'm locked up.

7    Q.   Now, in this particular case, you were initially charged by

8    the State of Maryland, correct?

9    A.   Yes.

10   Q.   With murder, right?

11   A.   Yes.

12   Q.   And you were possibly facing the death penalty in that

13   case, in Baltimore County, correct?

14   A.   Yes.

15   Q.   And you also had a pending carjacking charge; is that

16   correct?

17   A.   Yes.

18   Q.   Was that in relation to the murder of Mr. Lackl?

19   A.   Yes.

20   Q.   What was the carjacking?  What was the car that you jacked?

21   A.   The Camero.

22   Q.   The Camero?

23         Okay.  So you had various charges pending in relation

24   to this, right?

25   A.   Yes.

1    Q.  And then after, at some point after you were arrested by

2    the county, by the state, or charged by the state, the federal

3    government took over your case?

4    A.  Yes.

5    Q.  You do understand the difference, correct?

6    A.  Yes.

7    Q.  And the charge that you have agreed to plead to is the use

8    of a interstate commerce facility to commit a murder for hire,

9    basically using the telephones?

10   A.  Yes.

11   Q.  That's what brought you here to Federal Court, right?

12            Now, as I said, the cooperation agreement you made

13   with the government basically requires you to come here and

14   tell the truth?

15   A.  Yes.

16   Q.  And what you're telling this jury here is the truth?

17   A.  Yes.

18   Q.  You consider yourself a truthful person?

19   A.  Yes.

20   Q.  And you hope this jury believes what you have to say,

21   right?

22   A.  Yes.

23   Q.  So that you can get away from that very high penalty that

24   you were facing, possibly the death penalty, right?

25   A.  Yes.

1    Q.   Or possibly a life sentence without parole, right?

2    A.   Yes.

3    Q.   And in this particular case, do you have the plea

4    agreement?

5         Do you understand I'm looking at page 9 of your plea

6    agreement, sir.  This is an agreement that you signed with the

7    government along with your attorney; is that right?

8    A.   Yes.

9    Q.   And it's your signature at the bottom here, correct, Marcus

10   Pearson --

11   A.   Yes.

12   Q.   -- signed December fifth, 2007?

13   A.   Yes.

14   Q.   And in this particular agreement, it indicates that the

15   parties stipulate and agree that a sentence of 35 years without

16   parole is the appropriate disposition of this case, right?

17   A.   Yes.

18   Q.   So where you and the government, or when you and your

19   attorney negotiated this plea agreement, the government agreed

20   that 35 years was appropriate for the murder of Carl Lackl,

21   right?

22   A.   Yes.

23   Q.   And 35 years from where you sit is a heck of a lot better

24   than the death penalty, correct?

25   A.   Yes.

```
 1    Q.  And it's a heck of a lot better than life without parole,
 2    right?
 3    A.  Yes.
 4    Q.  You've been locked up now for how long, two years?
 5    A.  Yes.
 6    Q.  And don't tell me what prison you've been in, but you're in
 7    jail?
 8    A.  Yes.
 9    Q.  You're in prison, you're in a little cell, right?
10    A.  Yeah.
11    Q.  10 by 10, maybe, maybe smaller?
12    A.  I don't know what size.
13    Q.  It's a small place, where you spend your time, correct?
14    A.  Yeah.
15    Q.  And for two years, you've been there sleeping on a metal
16    bunk bed, correct?
17    A.  Yeah.
18    Q.  You have a cellie?
19    A.  Yeah.
20    Q.  You have a cellie?  When you have to go to the bathroom,
21    your cellie's right there, right?
22    A.  Yes.
23    Q.  When you pass gas, your cellie's right there?
24    A.  Yeah.
25    Q.  You get no privacy?
```

```
 1    A.   No.

 2    Q.   Your every movement is dictated?

 3    A.   Yes.

 4    Q.   They tell you when you can go to the rec if you get rec?

 5    A.   Yes.

 6    Q.   They tell you when you can eat?

 7    A.   Yes.

 8    Q.   When you can eat breakfast?

 9    A.   Yes.

10    Q.   When you can have lunch?

11    A.   Yes.

12    Q.  Dinner?

13    A.   Yes.

14    Q.   Even when you take a shower?

15    A.   No.

16    Q.   You can take one any time you want?

17    A.   Yes.

18    Q.   You get one freedom at least.  You don't want to spend the

19    rest of your natural life under those conditions, do you?

20    A.   No.

21    Q.   Under this particular plea, where 35 years is the

22    appropriate disposition for the murder of Carl Lackl, you do

23    understand that you will be get able to get on the street some

24    day, correct?

25    A.   Yes.
```

1    Q.  Now, Mr. Pearson, you indicated that you are a Blood?

2    A.  Yes.

3    Q.  And Bloods is basically a nationwide organization, correct?

4    A.  Yes.

5    Q.  It's a gang?

6    A.  Yes.

7    Q.  And it's not a gang or it's not -- it's not a -- strike

8    that.

9           It's not a nationwide organization like the Boy

10    Scouts, right?

11    A.  No.

12    Q.  You don't help little old ladies walk across the street?

13    A.  No.

14    Q.  Right.  You don't go to old folks homes and bring them

15    blankets, right?

16    A.  No.

17    Q.  The whole purpose of the Bloods is rob, kill, and drugs,

18    correct?

19    A.  No.

20    Q.  And business, too, right?

21    A.  No.

22    Q.  What's the purpose of the Bloods, do you do civic services?

23    A.  No.

24    Q.  What did you do as a Blood, sir, you sold drugs, correct?

25    A.  Right.

1    Q.  And you robbed, right?

2    A.  No.

3    Q.  You didn't rob?

4    A.  No.

5    Q.  You didn't beat people?

6    A.  Yeah.

7    Q.  And you shot people?

8    A.  I shot at people.  I don't know if I shot them.

9    Q.  When you shoot at somebody, it's with intent to kill them,

10   right?

11   A.  Yeah.

12   Q.  So you have no problem as a Blood, boom, go and take a shot

13   at somebody, right?

14   A.  Correct.

15   Q.  Because that's what's required of you, correct?

16   A.  Right.

17   Q.  Now, you belong to what, this Westside Denver Lane project

18   gang, I think that's the complete name of your clique?

19   A.  Yes.

20   Q.  And you've been a Blood for three years?

21   A.  Yes.

22   Q.  That's three years back in July of '07, you were Blood for

23   three years?

24   A.  Yes.

25   Q.  Are you still a Blood today?

```
 1    A.   No.

 2    Q.   You're not a Blood for life?

 3    A.   No.

 4    Q.   But you are proud of that, what is it the Blood life tattoo

 5    that's on your stomach?

 6    A.   No, I ain't proud of it.

 7    Q.   You still have it, right?

 8    A.   Yes.

 9    Q.   When you got it, you got it because you were a Blood,

10    right?

11    A.   Yes.

12    Q.   And also that cobra, you got a cobra tattoo, don't you?

13    A.   Yeah.

14    Q.   You got a dog pound inside your left for arm; do you not?

15    A.   Yeah.

16    Q.   Do you have outlaw, out here, correct?

17    A.   Yes.

18    Q.   You also have a rifle somewhere you tattooed, right?

19    A.   Yes.

20    Q.   Because that's kind of the tool of your trade, right?

21    A.   No.

22    Q.   A weapon?

23         And for good measure, you also have -- do you know

24    what the Grim Reaper is?

25    A.   Yes.
```

1   Q.  What's the Grim Reaper?

2   A.  A person that like death.

3   Q.  Death, right?

4   A.  Yes.

5   Q.  Someone that causes death.  It's that guy with the big

6   black hood and sickle when he arrives knocking on your door,

7   your number's up, that's what it is, right?

8   A.  Correct.

9   Q.  That's what you considered yourself to be, that's why you

10   you have that tattoo on your body?

11   A.  No.

12   Q.  Now, as a Blood, you had obtained a relatively high

13   position; is that right?

14   A.  Correct.

15   Q.  I mean, you weren't one of these little, little guys like

16   Brazy?

17   A.  No.

18   Q.  You were above Brazy, right?

19   A.  Correct.

20   Q.  You were an OYG, right?

21   A.  Correct.

22   Q.  And OYG means what?

23   A.  A Original Young Gangster.

24   Q.  Orignal Young Gangster.

25          And in the three years that you had been a Blood, you

1    didn't start off as an Original Young Gangster, did you?

2    A.  No.

3    Q.  You worked your way up, correct?

4    A.  Correct.

5    Q.  You worked your way up by through thugging basically,

6    right?

7    A.  Correct.

8    Q.  Shooting people, right?

9    A.  Correct.

10   Q.  Robbing people, if you had to?

11   A.  I ain't never rob nobody, so --

12   Q.  Selling drugs?

13   A.  Yeah.

14   Q.  Bunch of other bad stuff you did to work your way up, make

15   your mark in the organization; is that correct?

16   A.  What you say?

17   Q.  You did a lot of bad stuff to get to the point of being an

18   OYG?

19   A.  No.

20   Q.  No?  Just a couple little bad things?

21   A.  No.  I came in because I was already a Blood three years

22   ago, and when the guy hooked up that's OG of the Blood he just

23   made me OYG.

24   Q.  Oh.  So you came into the organization as an OYG you're

25   saying now?

1    A.  No.

2    Q.  I thought this is what happened when were you at the camp,

3    this is what happened when you in the camp prison, right?

4    A.  Right.

5    Q.  That's what you said a little earlier?

6    A.  Right.

7    Q.  And you didn't have to be beaten in?

8    A.  No.

9    Q.  You didn't have to kill anybody?

10   A.  No.

11   Q.  You kind of just hooked up with at Blood made you an OYG?

12   A.  No.

13   Q.  How did you become a Blood OYG?

14   A.  Because the gang I hooked up with in jail was fake, but it

15   was the same type of gang.  So on the streets, the guy that was

16   under the real gang, he knew I was in it for a little minute,

17   so he made me OYG.

18           THE COURT:  Counsel, can you all approach the bench

19   for a second?

20           (At the bench)

21           THE COURT:  I'm going have the clerk take that off,

22   what you have on the screen.

23           MR. BALAREZO:  I thought we were off.

24           THE COURT:  Can you take them off, unless you are

25   requiring that something's in evidence.

```
 1              MR. BALAREZO:  It is the videos.

 2              THE COURT:  I meant to do it myself.

 3              (Open court)

 4              THE COURT:  Thank you.

 5    BY MR. BALAREZO:

 6    Q.  So during your -- excuse me -- three years as a Blood, you

 7    became very familiar with the organization, right?

 8    A.  Yes.

 9    Q.  You became very familiar with the rules --

10    A.  Yes.

11    Q.  -- and the requirements --

12    A.  Yes.

13    Q.  -- that kind of stuff, correct?

14              And one of the ways -- excluding the way you became a

15    Blood one of the other ways you can become a Blood is by

16    getting beaten in, correct?

17    A.  Correct.

18    Q.  And Bloods are tough guys, aren't they?

19    A.  Some of them.

20    Q.  I mean, come on, you don't join this organization because

21    you're a pansy, right?

22    A.  No.

23    Q.  You're a tough guy?

24    A.  Some join for protection.

25    Q.  For protection.
```

```
 1              All right.  And what you're telling us is that when

 2     you -- the beating, and let's talk about the beating, to become

 3     a Blood that's not a brutal beating of the person that's trying

 4     to join?

 5     A.  Yeah, you can fight back, though.

 6     Q.  It's a bunch of guys, big dudes standing around beating the

 7     crap out of a guy trying to become a Blood?

 8     A.  Correct.

 9     Q.  You're trying to make sure that guy is tough enough like

10     you to become one of you, correct?

11     A.  Correct.

12     Q.  Because if the guy can't take it, he's not going to become

13     a Blood; is that right?

14     A.  Correct.

15     Q.  And you punch him, right?

16     A.  Right.

17     Q.  Bunch of guys standing around punching?  Yes or no?

18     A.  Right.

19     Q.  But if the guy that you're beating up falls down, you give

20     him a hand back up?

21     A.  Right.

22     Q.  What did you do when you give him hand back up, what

23     happened?

24     A.  Start fight.

25     Q.  You continue fighting, right?
```

1    A.  Right.

2    Q.  And, in fact, these particular beatings are so bad that --

3    excuse me just a second.

4            If I could just --

5            (Pause.)

6    Q.  Apologize, Your Honor.  This wasn't not a clip, so I had to

7    go to the --

8            (Pause.)

9    Q.  The beatings that you get are so brutal sometimes there's

10   an alternative to that beating, right?

11   A.  Right.

12   Q.  Basically you can kill somebody to take the easy way out?

13   A.  Right.

14   Q.  So it would be better for somebody to kill somebody than to

15   get a beating, right?

16   A.  Right.

17   Q.  That's how bad those beatings are.  In fact, do you know

18   who Detective Ruby is, right?

19   A.  Correct.

20   Q.  Let me play this.

21           THE COURT:  What exhibit is this, Mr. Balarezo?

22           MR. BALAREZO:  Your Honor, so he'll explain all the

23   individual videos will be defense 3 point something.  I will

24   give a list to the Court once I play them.

25           (Pause.)

```
 1   Q.   My assistant's not helping me.
 2              (Recording played)
 3   Q.   Did you hear that, sir?
 4   A.   Yes.
 5   Q.   That's you, right?
 6   A.   Yes.
 7   Q.   And that's you talking to Detective Ruby on July the 31st,
 8   during one of your many sessions with him at the Baltimore
 9   Police Headquarters, right?
10   A.   Yes.
11   Q.   And the person you're talking about in that particular case
12   is Ronny, yes?
13   A.   Ronny what?
14   Q.   Ronny, your boy Ronny Williams, the driver of the car that
15   went out there when Mr. Lackl was killed?
16   A.   He wasn't gang.
17   Q.   You're talking about Ronny, right?
18   A.   I ain't hear all that much.
19   Q.   Let me play it back for you and try to pay attention this
20   time if you might.
21              (Pause.)
22              (Recording played)
23   Q.   Did you hear this?  Did you pay attention?
24   A.   Yes.
25   Q.   You're talking about Ronny Williams, right?
```

1    A.  Yes.

2    Q.  Ronny Williams is the driver, the person who drove Brazy

3    and Killa out to Philadelphia Road to kill Mr. Lackl, right?

4    A.  Yes.

5    Q.  And although he was a BGF member, at that point, correct,

6    that's what just said, he's a BGF?

7    A.  No.

8    Q.  What's BGF, do you know what?

9    A.  Black Guerilla Family.

10   Q.  Black Guerilla Family, that's another gang, right?

11   A.  Yes.

12   Q.  What you were telling Detective Ruby Ronny, was ready to

13   come home?

14   A.  That was a lie.

15   Q.  All right.  Well, that's what you told him.  I'm not asking

16   whether it's true or not, that's what you said?

17   A.  He wasn't -- he wasn't.

18   Q.  Let me finish.  That's what you were telling Detective Ruby

19   on the 31st, right?

20   A.  Right.

21   Q.  He was ready to come home and be a Blood.  Let's listen to

22   the rest.

23          (Recording played)

24   Q.  Did you pay attention to that part?  How do you become a

25   Blood?

```
 1    A.   By murdering somebody.

 2    Q.   You got to murder a motherfucker I think is what you said?

 3    A.   Right.

 4    Q.   One of the things you've got to do, right?

 5    A.   Right.

 6    Q.   Keep listening.

 7             (Recording played)

 8    Q.   Did you hear that?

 9    A.   Yeah.

10    Q.   Those niggas don't pick the beating, because who's going to

11    get beat for ten minutes, right?

12    A.   Yes.

13    Q.   By a whole bunch of them because it's really brutal,

14    correct?

15    A.   Correct.

16    Q.   And it is ten minutes, not five like you testified a few

17    minutes ago?

18    A.   It's five minutes.

19    Q.   But you told Detective Ruby ten?

20    A.   I told him lots of things.

21    Q.   Right.  Right.

22             (Recording played)

23    Q.   And you heard yourself say some people take the cheap way

24    out, right?

25    A.   Correct.
```

```
 1   Q.  And that's to take the cheap way out, killing somebody,
 2   right?
 3   A.  Yes.
 4   Q.  And you'd agree that little, just that little clip that we
 5   saw just now, your demeanor when you're talking to -- excuse me
 6   -- Detective Ruby is a little different than your demeanor here
 7   today, right?
 8   A.  Yes.
 9   Q.  Right now you're sitting here, you're very calm, right?
10   A.  Right.
11   Q.  You're in front of this jury, right?
12   A.  Right.
13   Q.  You're dressed up, shirt buttoned up, you saw how you were
14   contacting with Detective Ruby, kind of spinning a tale with
15   him, is that what you're telling us?
16   A.  Right.
17            (Recording played)
18   Q.  Now, as part of being a Blood, kind of what you guys do you
19   get is nicknames; is that correct?
20   A.  Right.
21   Q.  Now, is Pound a nickname that you got when you became a
22   Blood?
23   A.  No.
24   Q.  When did you get that nickname?
25   A.  Long, long time ago.
```

1    Q.  Long time ago.  What does Pound mean?

2    A.  Dog pound.

3    Q.  What does dog pound mean?

4    A.  I used to fight dogs.

5    Q.  Fight dogs, kind of what the drug dealers do with their Pit

6  Bulls, that kind of thing?

7    A.  Yeah.

8    Q.  Now, as a member of the Bloods, you also know other

9  individuals, for example, Trigger, right?

10    A.  Right.

11    Q.  Steven Thompson?

12    A.  Right.

13    Q.  And you knew him as was he the top OYG?

14    A.  Yes.

15    Q.  He was the dude, excuse me, the Blood gang member that was

16  above you?

17    A.  Right.

18    Q.  From whom you had to get permission for, to get someone

19  else to commit this mission that you don't do yourself, right?

20    A.  Right.

21    Q.  In the Blood all these nicknames mean something, don't

22  they?

23    A.  Right.

24    Q.  Trigger, what's a Trigger?

25    A.  A gun.

1  Q.  All right.  It's the little thing that you put your finger

2  on in a gun to pull when you shoot, right?

3  A.  Right.

4  Q.  In fact, Trigger got that nickname because he didn't have a

5  problem pulling that Trigger, right?

6  A.  I guess.

7  Q.  You guess.  Well, you knew him for a while, right?

8  A.  Yeah, since about like two years.

9  Q.  And you learned that during that time that you've known

10  him, Trigger has pulled the Trigger more than a few times,

11  right?

12  A.  I never seen him do it, but I guess he did it if he got the

13  name Trigger.

14  Q.  And that's Steven Thompson, just so we're clear?

15  A.  Right.

16  Q.  There's also an individual by the name of Michael Randle

17  that we've heard about, Killa?

18  A.  Right.

19  Q.  What's a Killa?

20  A.  A killer.

21  Q.  What's a killa, somebody who kills, right?

22  A.  Right.

23  Q.  And Randle got that name because he's got no problem

24  killing, correct?

25  A.  I don't know.  That's -- when I met him, that was his name.

1    Q.  You don't know that?  Okay.

2            And then there's this guy named Brazy?

3    A.  Correct.

4    Q.  And I mean Brazy doesn't really mean anything, right?

5    A.  It just mean crazy.

6    Q.  It means crazy, but it's spelled a different way, because

7    if you're a Blood you can't use the letter C, is that right, in

8    your names?

9    A.  Right.

10   Q.  So it's actually crazy but you take the C out and put in

11   the B for Bloods and make it Brazy, right?

12   A.  Right.

13   Q.  Because a C is basically stands for Crips?

14   A.  Right.

15   Q.  Who's your mortal enemy gang, correct?

16   A.  Right.

17   Q.  They're the ones that wear blue?

18   A.  Right.

19   Q.  You're not wearing blue today, by any chance, are you?

20   A.  No.

21   Q.  Now, do you know how Brazy got to to become a Blood, yes or

22   no?

23   A.  No.

24   Q.  You never saw him beaten in or anything like?

25   A.  No.

1  Q.  You didn't participate in it?

2  A.  No.

3  Q.  Do you know if he killed somebody before you joined, since

4  some people take the easy way out?

5  A.  I don't know.

6  Q.  Now, you said something on direct examination that Brazy

7  was about that mess, do you remember that --

8  A.  Right.

9  Q.  -- which means that Brazy is about what, violence, right?

10  A.  Right.

11  Q.  Your experience, your knowledge of Brazy is that he was a

12  violent individual?

13  A.  Right.

14  Q.  He might have been 15 years old, but he would do anything,

15  correct?

16  A.  Right.

17  Q.  In fact.

18        (Recording played)

19  Q.  Did you hear that?

20  A.  Yeah.

21  Q.  He's a live wire, right, is that what you said?

22  A.  Yes.

23  Q.  He's the type of person who would do any type of shit I

24  think you said?

25  A.  Right.

```
 1    Q.  And you're talking about Brazy during that particular

 2    conversation, correct?

 3    A.  Correct.

 4              (Recording played)

 5    Q.  You heard that, sir?

 6    A.  Right.

 7    Q.  You talk about Brazy, right?

 8    A.  Correct.

 9    Q.  Rob people I think you said?

10    A.  Correct.

11    Q.  Do all kinds of crazy stuff, right?

12    A.  Correct.

13    Q.  And he's so crazy that you're telling Detective Ruby that

14    you don't surround yourself with that kind of thing?

15    A.  Right.

16    Q.  That wasn't exactly true, was it?

17    A.  No.

18    Q.  Because you're right in the middle of that kind of thing,

19    right?

20    A.  Right.

21    Q.  Let's look at another one.

22              (Recording played)

23    Q.  Talking about Brazy again, right?

24    A.  Right.

25    Q.  Now, you were telling Detective Ruby that Brazy has killed
```

1    other people --

2    A.  Right.

3    Q.  -- right?

4         And that's not a lie, because that's true, he's

5    crazy, and that's what he does, right?

6    A.  Right.

7    Q.  Now, what you also did tell Detective Ruby was that --

8         (Recording played)

9    Q.  Did you hear that, sir?

10   A.  Yeah.

11   Q.  Frank Goodman is not a Blood, is he?

12   A.  No.

13   Q.  Patrick Byers is not a Blood, is he?

14   A.  No.

15   Q.  But you're a Blood, right?

16   A.  Yes.

17   Q.  Brazy is a Blood?

18   A.  Yes.

19   Q.  Trigger is a Blood?

20   A.  Yes.

21   Q.  And Ronny is about to come home to be a Blood, right?

22   A.  He was.

23   Q.  He was.  All right.

24        Now, you do agree that part of your resume as a Blood

25   includes drug dealing, correct?

    1    A.  Correct.

    2    Q.  And you dealt a lot of drugs out on Normal Avenue; is that

    3    right?

    4    A.  Correct.

    5    Q.  And you sold I think you said you made up to $1600 a day,

    6    is that the right number?

    7    A.  Correct.

    8    Q.  And you pretty much sold every day, right?  You maybe took

    9    Sunday off go to church, I don't know?

   10    A.  I might have.

   11    Q.  You might have, right?

   12            So did you sell five days a week, Monday to Friday?

   13    A.  It was slow out there when I was out there.

   14            THE COURT:  Lean forward and speak into the

   15    microphone, Mr. Pearson.

   16    A.  Not every day, but most of the day like I might chill some

   17    days.

   18    Q.  $1600 a day is what you think you averaged, that's what you

   19    told this jury under oath today?

   20    A.  Right.

   21    Q.  So even if you were worked let's say four days a week,

   22    that's, what's the math, $6400 a week, just four days, right?

   23    A.  Right.

   24    Q.  Cash, right?

   25    A.  Right.

1    Q.  You weren't calling the IRS say hey I made 6400 bucks a

2    week, that's all cash money that you got to spend however you

3    wanted, right?

4    A.  Right.

5    Q.  And then you say that this little side job to kill somebody

6    comes along for 2,500 and you jump on it, because you needed

7    the money, that's what you said to this jury right before

8    lunch, I believe?

9    A.  Yeah.

10   Q.  And along with your drug dealing, there was also a Ronny

11   selling crack, right?

12   A.  Correct.

13   Q.  And also Terry and Lump were selling crack out there?

14   A.  Right.

15   Q.  As far as you knew, your other Blood buddy Trigger and

16   Brazy, they were all hustling, too, on their end of town?

17   A.  Correct.

18   Q.  Out on the west side?

19   A.  Correct.

20   Q.  Now, the story -- strike that.

21          What you're telling this jury here today, from that

22   stand, after you took the oath to tell the truth, is different,

23   you'll agree, from what you've told Detective Ruby previously,

24   right?

25   A.  I wasn't under oath when I told him.

1  Q.  I'm sorry?

2  A.  I wasn't under no oath when I told Detective Ruby what I

3  told him right there.

4  Q.  I can't hear what you're saying.

5  A.  I wasn't under oath when I told Detective Ruby when I told

6  him that.

7  Q.  I see.  You were not under oath when you talked to

8  Detective Ruby; is that what you just said?

9  A.  Yes.

10  Q.  All right.  So you can pretty much lie, it doesn't matter,

11  is that what you're saying?

12  A.  No.  I lied when I first got locked up.

13  Q.  You just sat --

14  A.  Trying to get myself out of the situation.

15  Q.  Sir, step back.

16        When you talked to Detective Ruby all those times,

17  you said you were not under oath, right?

18  A.  Right.

19  Q.  So it's all right to tell a lie at that point, correct?

20  A.  Correct.

21  Q.  And one of the first questions I asked you was to tell the

22  jury was that you consider yourself a truthful person, right?

23  A.  Correct.

24  Q.  And the fact that you're sitting here under oath, you're

25  telling us that's what's making a difference today, that's why

1   you're telling the truth, right?

2   A.  Right.

3   Q.  Do you know if you're found to be guilty of lying, for

4   example, perjury, that's what could happen if you tell a lie,

5   right?

6   A.  Correct.

7   Q.  And who would charge you with perjury if you tell a lie?

8   A.  Purcell.

9   Q.  The prosecutor, right?

10  A.  Right.

11  Q.  And right now you're facing, well, under this agreement,

12  you're only facing 35 years, right?

13  A.  Correct.

14  Q.  So a little perjury charge really is not on the top of your

15  worries, is it?

16  A.  Yeah.  If I lie, I get life.

17  Q.  And if you lie, what happens?

18  A.  I can get life.

19  Q.  So you have to sit here and basically --

20          MR. PURCELL:  Your Honor, advise counsel to stay out

21  of my space over here.

22          THE COURT: I think that's appropriate.  The objection

23  is sustained.

24          MR. PURCELL:  Or there's going to be a problem.

25          MR. BALAREZO:  I didn't mean to invade Mr. Purcell's

1   space.  I apologize.  I'll stay here.

2          THE COURT:  I think your finger was pretty close to

3   his right ear.

4          MR. PURCELL:  And --

5          MR. BALAREZO:  This might be a good time to take a

6   break.

7          THE COURT: Probably a good time to take a break.

8   We'll take a break for ten minutes.

9          (Recess.)

10         THE COURT:  Bring the jury back in.

11         (Jury present)

12         THE COURT:  Thank you, ladies and gentlemen.  You all

13  may be seated.

14         Mr. Balarezo?

15         MR. BALAREZO:  Thank you, Your Honor.

16  BY MR. BALAREZO:

17  Q.  Mr. Pearson, I'm going take a just a little step back for a

18  second.  July second, 2007, when you basically organized the

19  murder of Mr. Lackl, you were on probation; were you not?

20  A.  Correct.

21  Q.  And that probation that you were on was for a prior drug

22  distribution offense that the State of Maryland had charged

23  with you, right?

24  A.  Correct.

25  Q.  And what was that drug?

```
 1    A.  Crack cocaine.

 2    Q.  All right.  So you had been found guilty of distributing

 3    crack cocaine, right?

 4    A.  Right.

 5    Q.  And you were given, and you appeared before a judge in

 6    what, Circuit Court?

 7    A.  Yeah.

 8    Q.  Circuit Court?

 9    A.  Yes.

10    Q.  All right.  And when that judge sentenced you, he cut you a

11    break; did he not?

12    A.  Yes.

13    Q.  Because he in fact sentenced to you 12 years in prison,

14    right?

15    A.  Three years probation, 12 years suspended.

16    Q.  12 years of prison, suspended it all, right?

17    A.  Correct.

18    Q.  And put you on probation?

19         THE COURT:  Keep your voice up and lean forward into

20    the microphone, please.

21    A.  Right.

22    Q.  12 years in prison, suspend the sentence, give you

23    probation, give you another chance, right?

24    A.  Right.

25    Q.  And when he gave you that, part of what you told the Judge
```

1  was that were you going to follow his rules, right?

2  A.  Right.

3  Q.  You were not going to go out and commit any other crimes,

4  right?

5  A.  Right.

6  Q.  You were not going to do anything to make yourself come

7  back into a courthouse, right?

8          THE COURT:  Mr. Balarezo, would you please clarify

9  which court this was?  That was not in this court?

10  Q.  Sure.  Do you understand today you're sitting in United

11  States Federal District Court?

12  A.  Correct.

13  Q.  And the courthouse in which you were sentenced by another

14  judge was a Maryland state court?

15  A.  Correct.

16  Q.  Baltimore City Circuit Court?

17  A.  Right.

18  Q.  All right.  That judge, based your promises, do as he said,

19  stay out of trouble, not commit any more crimes, cut you a

20  break of probation, right?

21  A.  Right.

22  Q.  And then on July -- well, strike that.

23          Prior to July second, you're out there hustling

24  drugs, right?

25  A.  Correct.

1    Q.  So you didn't keep your promise to that judge, right?

2    A.  No.

3    Q.  And also on July second, you get involved in this

4    orchestrating this murder, and you didn't keep your promise to

5    that judge, then, too, right?

6    A.  No.

7    Q.  Now, the first time that you met with Detective Ruby here,

8    excuse me Detective Ruby --

9    A.  Right.

10    Q.  -- was some time around July the fifth, 2007; is that

11    correct?

12    A.  Yes.

13    Q.  And that is the day that you were arrested at some

14    establishment called the America's Best Inn, right?

15    A.  Yes.

16    Q.  And that's one of those flea bag motels that you used to

17    frequent --

18    A.  Yes.

19    Q.  -- right?

20           Not really a nice hotel, right?

21    A.  No.

22    Q.  You just go there and take your girls, do your business,

23    and leave, right?

24    A.  Right.

25    Q.  I'm sorry?

```
 1    A.  Correct.

 2    Q.  All right.  On July the second of 2007, after the murder of

 3    Mr. Lackl, you didn't go to a flea bag motel, did you?

 4    A.  No.

 5    Q.  You went to the Marriott Downtown Hotel, right?

 6    A.  Correct.

 7    Q.  And paid $4 dollars for a hotel room on that night, after

 8    the murder?

 9    A.  Correct.

10    Q.  And you also bought some drugs to get high after the

11    murder, right?

12    A.  Correct.

13    Q.  And I'm sure you ordered some room service, right?

14    A.  No.

15    Q.  You bought some food in, some drinks?

16    A.  No.

17    Q.  You went there to celebrate what you had done, correct?

18    A.  No.

19    Q.  And you were there with your girl Tammy Graham, do you

20    remember her?

21    A.  Right.

22    Q.  Was that the girl you were with that night?

23    A.  Yes.

24    Q.  Okay.  Now, July the fifth, 2007, three days after the

25    murder, when you get pulled out of -- excuse me, you get -- you
```

```
 1    were at the America's Best Inn, were you with Tammy Graham?

 2    A.   No.

 3    Q.   Who were you with that night?

 4    A.   Another girl.

 5    Q.   What was her name?

 6    A.   I don't know her real name.

 7    Q.   Don't remember her real name?  Let me see if this video of

 8    July fifth, 2007 refreshes your recollection.

 9            (Recording played)

10    Q.   Did you hear it?  Did you hear it?

11    A.   Right.

12    Q.   What did you ask Detective Ruby?

13    A.   What, about a bitch?

14    Q.   Yeah.  What were you asking him?

15    A.   Play it.  I didn't ask him nothing.

16    Q.   I'm sorry.

17    A.   I don't get what you said.

18            THE COURT:  Keep your voice up.

19    Q.   You didn't --

20    A.   No, play it again.

21    Q.   Let me play it again for you.

22            (Recording played)

23    Q.   Did you hear this time?

24    A.   Right.

25    Q.   What were you asking him?
```

```
1    A.  I said is she still out there?

2    Q.  What did you ask him?

3    A.  Was my bitch still out there, was my girl still out there?

4    Q.  Who were you referring to?

5    A.  The girl that came to the hotel with me that night, the one

6    got locked up with me that morning.

7    Q.  The one whose name you don't remember right now?

8    A.  Right.

9              (Recording played)

10   Q.  You almost didn't remember her name the next morning,

11   right?

12   A.  Right.

13   Q.  And it is not Shawnice, it's Eunice, right?  Do you

14   remember that, Eunice Gray?

15   A.  I guess.  I ain't know, I don't know her name.

16   Q.  Doesn't really matter, does it?

17   A.  No.

18   Q.  Now, July the fifth of '07, this was the first interview

19   that you had with this detective over here, Detective Ruby,

20   right?

21   A.  Right.

22   Q.  And during this particular situation, you're aware why he

23   wants to talk to you, right?

24   A.  Right.

25   Q.  It's something related to Mr. Lackl, right?
```

```
 1    A.  Right.
 2    Q.  And you know, you know, Mr. Pearson, that you were deep in
 3    it, right?
 4    A.  Right.
 5    Q.  And you know that when the police come to talk to you about
 6    something you did, you know you got to watch out, right?
 7    A.  Right.
 8    Q.  Because you're trying to stay out of trouble?
 9    A.  Right.
10    Q.  Back then, three days after the homicide, you know enough
11    that you want to try to distance yourself from what happened,
12    correct?
13    A.  Correct.
14    Q.  And Mr. Purcell asked you several questions about you
15    didn't have a lawyer then, right?
16    A.  Correct.
17    Q.  Well, you had a lawyer previously when you were convicted
18    for that drug trafficking charge, right?
19    A.  Right.
20    Q.  In state court?
21    A.  Right.
22    Q.  And you'd had another conviction, too, for drugs, also?
23    A.  Right.
24    Q.  So this was not your first contact with the police, right?
25    A.  No.
```

1  Q.  In fact, you know that you didn't have to say anything, you

2  could have remained quiet, right?

3  A.  Right.

4  Q.  But you chose to try to talk your way out of your trouble,

5  correct?

6  A.  Correct.

7          (Recording played)

8  Q.  Did you hear that?

9  A.  Correct.

10  Q.  So as you're sitting there in that room with Detective

11  Ruby, I'm going to keep it real with you, right?

12  A.  Right.

13  Q.  You're telling Detective Ruby I'm going to tell you the

14  truth, that's what you're telling him, right?

15  A.  Right.

16  Q.  Because you don't go through all that stuff because you

17  don't want to get tripped up?

18  A.  Right.

19  Q.  And then what did you proceed to do right after you tell

20  Detective Ruby you're going to keep it real?

21  A.  Lied to him.

22  Q.  Lied to him, right?

23  A.  Right.

24  Q.  Because you knew you were in trouble, correct?

25  A.  Correct.

1    Q.  And you know that having been on probation, or being on

2    probation at the time, facing 12 years of backup time, right?

3    A.  Right.

4    Q.  And 12 years of backup time means that if you violate your

5    probation, that judge can give you 12 years in prison for that

6    drug offense, right?

7    A.  Right.

8    Q.  The one that he cut you a break on?

9    A.  Right.

10   Q.  So you're like yo, I got to keep it real, right?

11   A.  Right.

12   Q.  Now, July the fifth, first version of events that you give

13   to Detective Ruby is you were out on Normal Avenue, you ran

14   into Brazy, Mr. Cornish, correct?

15   A.  Right.

16   Q.  And he told you what had happened, right?

17   A.  Right.

18   Q.  It wasn't -- you didn't tell him that you saw him out, and

19   then you drove out with Tammy, you didn't tell him any of that

20   stuff, correct?

21   A.  Correct.

22   Q.  Now, let me play another clip for you.

23              (Recording played)

24   Q.  Are you telling Detective Ruby -- you're telling him you're

25   going to keep it real, that Brazy is always talking about Pat,

1  right?

2  A.  Correct.

3  Q.  And that, in fact, you subsequently told him that Brazy was

4  Pat's man, correct?

5  A.  Right.

6  Q.  Brazy doesn't even know Patrick; is that right?

7  A.  Correct.

8  Q.  But you had no problem telling that lie to Detective Ruby

9  two feet from his face that day, correct?

10  A.  Correct.

11  Q.  Because you're trying to get out of trouble, right?

12  A.  Right.

13          (Recording played)

14  Q.  Stop that for a second.

15          You tell Detective Ruby Patrick called Brazy directly

16  on the phone, right?

17  A.  Right.

18  Q.  And told him he wanted him to handle something?

19  A.  Right.

20  Q.  And then you get into this bit about some conversation they

21  had, you're kind of telling him he said this, he said that,

22  that kind of thing, right?

23  A.  Right.

24  Q.  You're making it up as you go along, correct?

25  A.  Correct.

1   Q.  You're just sitting there in front of Detective Ruby trying

2   to make sure you stay out of trouble, making it up as you go

3   along, correct?

4   A.  Correct.

5   Q.  And you have no problem throwing people's names in there as

6   long as it is not you, correct?

7   A.  Correct.

8   Q.  Now, you're familiar with the City Jail, right?

9   A.  Correct.

10   Q.  And you talk about Patrick making a call.

11        (Recording played)

12   Q.  Did you hear those clips, sir?

13   A.  Yes.

14   Q.  Was what you had told Detective Ruby was that Patrick Byers

15   had made a call, because that was the point, you didn't know

16   Pat, right?

17   A.  Huh?

18   Q.  At that point, you didn't know Pat, you just threw that

19   name out there, Pat, correct?

20   A.  I knew him from --

21   Q.  We'll get there.  But on direct you said you did not know

22   Patrick, correct?

23   A.  Right.

24   Q.  You threw out Patrick's name and said Patrick had made a

25   call to Brazy, right?

1    A.   Correct.

2    Q.   Patrick, in effect, had used the phone at the jail, right?

3    A.   Correct.

4    Q.   And you just told the detective or two detectives, because

5    it's two separate days, one was July 5 the other August 26,

6    over a month later, half the jail has phones, correct?

7    A.   Correct.

8    Q.   So what you're telling the Detective is it ain't that hard

9    to make a call from the jail, right?

10   A.   Right.

11   Q.   Because the CO's bring them in?

12   A.   Yes.

13   Q.   You told them they raided a prison very recently, they

14   seized over a hundred phones?

15   A.   Right.

16   Q.   It's not that big a deal there, is it?

17   A.   No.

18   Q.   You also told Detective whatever it was Patrick wanted

19   Brazy to handle, Brazy never told you, right?

20        Do you remember saying that?

21   A.   Right.

22   Q.   And you told him that the next time you saw Brazy Brazy was

23   trying to sell a gun, a Glock, 9 mm.

24        Do you remember that?

25   A.   Right.  I don't remember it was a Glock or not, though.

```
 1    Q.  Let me refresh your recollection.

 2              (Recording played)

 3    Q.  Did you hear that now, sir?

 4    A.  Right, correct.

 5    Q.  Listening to yourself on July fifth tell Detective Ruby

 6    that Brazy was trying to sell you a gun, does that video

 7    refresh your recollection about whether or not you told him

 8    that?

 9    A.  Yeah.

10    Q.  You told him that, right?

11    A.  Yeah.

12    Q.  And was that a lie, too?

13    A.  Was it a lie that what I said?

14    Q.  Brazy wasn't trying to sell you a gun, was he?

15    A.  No.

16    Q.  You were just making it up as you go along?

17    A.  Right.

18    Q.  Listen to this clip.

19              (Recording played)

20    Q.  Did you hear that, sir?

21    A.  Right.

22    Q.  Again, making it up as you go along, right?

23    A.  Right.

24    Q.  And do you know where Montford and Jefferson are?

25    A.  Yes.
```

1    Q.  That's not South Baltimore, is it?

2    A.  No.

3    Q.  That's East Baltimore, correct?

4    A.  Right.

5    Q.  Now, you'll agree, as you sit here under oath telling this

6    jury what you say happened, what you're telling the Detective

7    is just a story, right?

8    A.  Correct.

9    Q.  And you had no problem lying to the detective, correct?

10   A.  Correct.

11   Q.  And you had no problem saying that Brazy was trying to sell

12   you a gun, right?

13   A.  Correct.

14   Q.  You had no problem saying that Patrick called Brazy,

15   directly, although you know that wasn't true?

16   A.  Correct.

17   Q.  And at the end of that particular interview, where did

18   Detective Ruby take you?

19   A.  Where did he take me?

20   Q.  He took you to a hotel, right?

21   A.  Correct.

22   Q.  You didn't pay for it, did you?

23   A.  No.

24   Q.  He paid for it?

25   A.  Right.

1  Q.  And he put you there because it was late at night, right?

2  A.  Right.

3  Q.  And he wanted you to hang around, basically, right?

4  A.  Right.

5  Q.  So he could talk to you more?

6  A.  Right.

7  Q.  In fact, what did you do, you left?

8  A.  Right.

9  Q.  And you left because you don't want to talk to that man

10  anymore, right?

11  A.  Right.

12  Q.  You don't want to keep it real with him anymore, correct?

13  A.  I never kept it real with him.

14  Q.  That's why you were trying to get out and you went to Glen

15  Burnie, right?

16  A.  Correct.

17  Q.  You didn't live in Glen Burnie, did you?

18  A.  No.

19  Q.  You were hiding out with the girl Tammy this time, not

20  Shawnice or the B you referred to earlier, correct?

21  A.  Right.

22  Q.  Now, July the 7th, two days later, you get picked up by the

23  police in Glen Burnie, right?

24  A.  Right.

25              (Recording played)

1  Q.  And what you do this particular time, the detective wants

2  to ask you more questionS about what happened on July the

3  second; is that right?

4  A.  Correct.

5  Q.  And you've already told him that little bit that we heard

6  about the phone call and the guns, right?

7  A.  Right.

8  Q.  But he's not really buying it, is he?

9  A.  No.

10 Q.  And he asked you more questions, right?

11 A.  Right.

12 Q.  And you tell him more things, right?

13 A.  Right.

14 Q.  You keep making it up as you go along, right?

15 A.  Right.

16 Q.  Now, do you know a guy named Dino, I think you testified

17 about Dino, right?

18 A.  Right.

19 Q.  Dino's not a Blood, is he?

20 A.  No.

21 Q.  He's in another organization, what is it, the BGF or

22 something like that?

23 A.  Yes.

24 Q.  And BGF is what?  Thank you.

25 A.  Black Guerilla Family.

1    Q.  Black Guerilla Family.

2    Q.  Is that a rifle organization?

3    A.  It's a gang from California.

4    Q.  Like the Bloods?

5    A.  Yeah.

6    Q.  Now, on this particular day, now we're talking about the

7    7th, your second meeting with the detective, you give him a

8    little more information, correct?

9              (Recording played)

10   Q.  Do you see that, sir?

11   A.  Yes.

12   Q.  The section there, were you still keeping it real?

13   A.  No.

14   Q.  You were still making it up?

15   A.  Yeah.

16   Q.  And what you tell the Detective is that now Dino is the

17   driver of that car, right?

18   A.  Right.

19   Q.  And you know that Dino had nothing to do with driving the

20   car, right?

21   A.  Right.

22   Q.  I mean it was his car, but he was not the driver, right?

23   A.  Right.

24   Q.  And you had absolutely no problem putting somebody else's

25   name right in the middle of that, correct?

1    A.   Correct.

2    Q.   Because you were trying to do what, keep yourself out of

3    it, right?

4    A.   Right.

5    Q.   Now, what you basically did in telling Detective Ruby that

6    you falsely accused Dino of being the driver, do you agree with

7    that?

8    A.   Right.

9    Q.   Now, you also told Detective Ruby that same day, the

10   seventh, I won't play all these videos, but you'd told him

11   you'd been riding dirt bikes with Nellie on the second of July,

12   do you remember that?

13   A.   Yeah.

14   Q.   That's not something you had told him on the fifth, but you

15   told him this time around, right?

16   A.   Right.

17   Q.   You'd been riding dirt bikes with Nellie, you were hanging

18   around with Tammy getting high, do you remember that?

19   A.   Yes.

20   Q.   What you told him was you did not see Brazy until after the

21   murder happened and Brazy started telling you about it, do you

22   remember that?

23   A.   Correct.

24   Q.   Now, after this particular session, when you're still

25   making it up as you go along, does Detective Ruby arrest you on

1   the 7th of July?

2   A.  No.

3   Q.  He doesn't, right?

4   A.  No.

5   Q.  He lets you go, correct?

6   A.  Correct.

7   Q.  Did he put you up in a hotel room again?

8   A.  No.

9   Q.  Did you pay for your total room that night?

10  A.  Yeah.

11  Q.  And the next time you ran into Detective Ruby was July

12  31st; is that correct?

13  A.  Yes.

14  Q.  And now this was about three weeks later, and he's still

15  interested in what you have to say, right?

16  A.  Correct.

17  Q.  And you are still concerned that you're going to put

18  yourself right in the middle of this, right?

19  A.  Say it again?

20  Q.  You're still concerned that you're putting yourself or you

21  may be put in the middle of this murder, right?

22  A.  Right.

23  Q.  And you're still trying to make sure you stay out of it,

24  right?

25  A.  Right.

1    Q.  Now, on that particular date when you talk to Detective

2    Ruby, this would be on the 31st, now.

3            (Recording played)

4    Q.  Let me stop you for a second.  You don't have a problem

5    with helping them out as long as they help you out, right?

6    A.  Right.

7    Q.  That's what you're saying basically you're going to give

8    had them a little information in the hopes they leave you alone

9    and don't charge you or arrest you for the murder of Carl

10   Lackl, right?

11   A.  Right.

12           (Recording played)

13   Q.  So you're in effect telling him I will be straight up with

14   you.  You put me up in a hotel room the other night, correct?

15   A.  Yeah.

16   Q.  You spent your own money, so you've got to believe what I

17   am saying, that's what you're telling him?

18   A.  Right.

19   Q.  Because there's no reason for me to lie to the police,

20   right?

21   A.  Right.

22           (Recording played)

23   Q.  After you showed me that, I'm going to be honest with you,

24   right?

25   A.  Correct.

1    Q.   What he had shown you was the list of phone numbers pulled

2    from your cell phone?

3    A.   Right.

4    Q.   He showed you some of the contacts he found had taken

5    place, right?

6    A.   Right.

7    Q.   So at this point you have to change your story a little

8    bit, right?

9    A.   Right.

10   Q.   And, again, you're making it up as you go along, right?

11   A.   Right.

12   Q.   Because Marcus Pearson is trying to keep Marcus Pearson out

13   of trouble?

14   A.   Right.

15   Q.   And you have no problem telling that man in the face I'm

16   going to be honest with you, right?

17   A.   Right.

18   Q.   Now, in this particular scenario, although previously you

19   had told the detective that Pat called Brazy direct and told

20   him to handle something, but Brazy never told you what it was

21   that he handled, that's what you told him before, right?

22   A.   Right.

23   Q.   Now you're telling him, listen to this clip.

24            (Recording played)

25   Q.   So now on the 31st, all of a sudden the truth is that

1     Patrick calls Brazy directly from jail and Brazy now tells you

2     that Patrick wants him to kill the witness, right?

3     A.   Correct.

4     Q.   So now you're story's evolving, it is changing, right?

5     A.   Right.

6     Q.   You're changing so it will suit your own personal

7     situation?

8     A.   Right.

9     Q.   Because all you're worried about is Marcus Pearson, right?

10     A.   Right.

11     Q.   You're not worried about Brazy, you're not worried about

12     Dino, are you?

13     A.   No.

14     Q.   You're not worried about Pat, right?

15     A.   No.

16     Q.   And what you further go on to tell the Detective is that

17     there was a plan, right?

18     A.   Right.

19     Q.   Apologize, I put on the wrong one.

20            What you told him was that the plan was to kidnap Mr.

21     Lackl, right?

22     A.   Right.

23     Q.   And hold him somewhere, until after the trial, right?

24     A.   Right.

25     Q.   And you were making that up as you go along, too?

    1   A.   No.

    2   Q.   Well, that's what you told him, was there a little bit of a

    3   lie and a little bit of truth in what you were saying?

    4   A.   No.

    5   Q.   You made it up, right?

    6   A.   Right.   No.   I told him, that's what I did want to have.

    7   Q.   That's what you wanted to happen?

    8   A.   Right.

    9   Q.   So Marcus Pearson's involvement in this was that Marcus

   10   Pearson wanted Mr. Lackl to be kidnapped and taken somewhere

   11   else, correct --

   12   A.   Correct.

   13   Q.   -- until after the trial that Mr. Byers was supposedly

   14   going to have, right?

   15   A.   Right.

   16   Q.   And take him in the woods, right?

   17   A.   Right.

   18   Q.   And have him killed in the woods?

   19   A.   Right.

   20   Q.   That was your plan?

   21   A.   Right.

   22   Q.   Right?

   23   A.   Right.

   24   Q.   And that was the truth?

   25   A.   Yeah, that was the truth.

1    Q.  Yeah, that was the truth.  What happened is your boy Brazy,

2    your Blood brother decided to pull the trigger out on

3    Philadelphia Avenue instead, right?

4    A.  Right.

5    Q.  And Detective Ruby, based on information that you had given

6    him, based on his own investigation, started asking you about

7    whether or not you had gone out to Philadelphia Road, correct?

8         Do you remember that?

9    A.  Correct.

10   Q.  And what did you tell him?

11   A.  No.

12   Q.  You told him no, you were pretty adamant, weren't you?

13   A.  Right.

14   Q.  August first.

15        (Recording played)

16   Q.  Stop that for one second.

17        This particular situation, that clip, we'll see the

18   rest of it, you're spinning your lies, as you say, to Detective

19   Ruby, right?

20   A.  Right.

21   Q.  And he's telling you he doesn't believe it, right?

22   A.  Correct.

23   Q.  And then he starts telling you what he knows --

24   A.  Right.

25   Q.  -- is that right?

1    A.  Right.

2    Q.  We'll hear it.  Then what you do after is you start

3    changing your story to fit what he knows; is that correct?

4    A.  Correct.

5                    (Recording played)

6    Q.  I'm going to stop it.  That's what's going on.  You're

7    trying to talk your way out, trying to make it up as you go

8    along, and he's telling you that's not what I know because I

9    know your girl was out there, right?

10   A.  Correct.

11   Q.  This is a long clip.  I'm not going to play it all.

12                    (Recording played)

13   Q.  Did you hear that, sir?  He told you you could not afford

14   to have other people write your story for you, right?

15   A.  Right.

16   Q.  And that story you were writing for yourself he wasn't

17   buying, right?

18   A.  Right.

19   Q.  The more he told you what he found out from other people or

20   his investigation, the more he was writing your story, correct?

21   A.  Right.

22   Q.  Because you changed your version of events to fit what he

23   was telling you he knew, right?

24   A.  Right.

25   Q.  And then you were being asked even at that point, if you

1    had gone out to Philadelphia Road.

2              (Recording played)

3    Q.  See it, me and my girl, you were not out on Philadelphia

4    Road, you weren't out there, right?  I mean you're that upset

5    by that suggestion you're pounding the table.

6              (Recording played)

7    Q.  Another lie?

8    A.  Correct.

9    Q.  Right in front of his face, right?

10   A.  Right.

11             (Recording played)

12   Q.  You're a pretty good actor, aren't you?

13             MR. PURCELL:  Objection.

14             THE COURT:  Overruled.

15   Q.  You're sitting in that room, indignant, pissed off this man

16   is accusing you being at the scene of the murder.  You're

17   telling him I'm not at the scene of the murder, that's at least

18   three times you denied being out there, right?

19   A.  Correct.

20   Q.  Because, up until that point, you had nothing to do with

21   the murder, you had not been at the scene, you had not driven

22   anywhere, right?

23   A.  Right.

24   Q.  And after he starts questioning you and questioning you,

25   you finally tell him that you were at the scene of the murder,

1    right?

2    A.   Right.

3    Q.   Because he was writing your story, right?  Correct?

4    A.   Correct.

5             (Recording played)

6    Q.   What you told Detective Ruby before this day was that Brazy

7    had told you about the murder, right?

8    A.   Right.

9    Q.   And when Detective Ruby began questioning you, you changed

10   your story, what you're telling him now you and your boy Nellie

11   drove out behind Brazy, the Blood, behind Randle, the Blood,

12   and behind Ronny, the soon to be Blood, to see if they were

13   really going to do what they said they were going to do, right?

14   A.   Right.

15   Q.   Once again, Pearson is trying to make sure he is not

16   involved in this murder because you're just going to be a

17   spectator, right?

18   A.   Right.

19   Q.   Is that part of what you were just making up as you go

20   along?

21   A.   Yes.

22   Q.   And Detective Ruby then asks you some questions about

23   whether or not you called Mr. Lackl; do you remember those?

24   A.   Correct.

25             (Recording played)

 1  Q.  You talked to the dude, that would be plain dumb stupid,

 2  you're telling him man, I ain't playing.  I ain't dumb.  I'm

 3  not stupid?

 4  A.  Correct.

 5  Q.  Making it up still?

 6  A.  Right.

 7  Q.  At some point after this particular portion, Detective Ruby

 8  says, well, you know I have a gun, because you had gotten the

 9  gun for him, right?

10  A.  Right.

11  Q.  He says you've given me Brazy, the phone call that you made

12  told him to get him to incriminate himself, right?

13  A.  Right.

14  Q.  But I still don't have anyone putting the gun in Brazy's

15  hand at the time of the murder.

16          Do you remember that?

17  A.  Right.

18  Q.  And because you've told him up to that point that you

19  didn't see the murder, you can't put the gun in Brazy's hand,

20  right?

21  A.  Right.

22  Q.  And Detective Ruby is telling you these things, correct?

23  A.  Correct.

24          (Recording played)

25  Q.  Up until this time, you're spinning your story, telling him

1  I don't have anything.  You change the story to say you

2  followed him to see what was going on, and he still doesn't

3  believe you, right?

4  A.  Right.

5  Q.  He's telling you what I need is somebody to tell me they

6  saw the shooting, right?

7  A.  Right.

8  Q.  Up until that point, you're telling him I didn't see it, I

9  had nothing to do with it, right?

10  A.  Right.

11  Q.  Right.  After he tells you that, what did you tell him, do

12  you remember?  You told him you saw the shooting.

13              (Recording played)

14  Q.  Right?

15  A.  Correct.

16  Q.  Detective Ruby's writing your story, correct?

17  A.  Right.

18  Q.  "Marcus, I need to find who did the shooting.  Who put the

19  gun in somebody's hand.  I need that, that's important to me."

20              That's what he's telling you, right?

21  A.  Right.

22  Q.  And all along, "I haven't done it, I don't know who did

23  it," as soon as he says that, I saw it now, right?  I saw the

24  shooting?

25  A.  Right.

1    Q.   I witnessed him killed, because that's what he wanted from

2    you, correct?

3    A.   Correct.

4             (Recording played)

5    Q.   Basically, what he wanted you to say is I witnessed a

6    shooting, right?

7    A.   Right.

8    Q.   And that's what you're asking the detective?

9    A.   Right.

10   Q.   And that's what you tell him when he tells you, yeah,

11   that's what I want you to say, right?

12   A.   Right.

13   Q.   For good measure.

14            (Recording played)

15   Q.   Do you remember that?

16   A.   Yes.

17   Q.   Good measure.  You throw in something about a little girl

18   standing out there, right?

19   A.   Right.

20   Q.   You never saw the little girl because you never saw the

21   shooting, right?

22   A.   Right.

23   Q.   And that was a lie, right?

24   A.   Right.

25   Q.   In fact, it was a lie, that was something that you had

1  heard on the news, I believe, correct?

2  A.  Correct.

3  Q.  And because you knew that Detective Ruby was looking for

4  information, you heard stuff on the news, you figured, hey,

5  I'll give him that, right?

6  A.  Right.

7  Q.  Because Marcus Pearson is looking out for Marcus Pearson,

8  right?

9  A.  Right.

10  Q.  And you don't care who you implicate or who you named,

11  because you're the only one that you're worried about?  Right?

12  A.  Correct.

13  Q.  Now, at the end of that day, there was some further

14  questioning that you got from Detective Ruby, do you remember

15  that?  Do you remember that story about Nellie?

16  A.  Yeah.

17  Q.  Where you had told him that, on the day of the shooting,

18  you had been riding around with Nellie, and you and Nellie went

19  out to Philadelphia Road finally just to see what had happened?

20  A.  Yeah.

21  Q.  All right.

22         (Recording played)

23  Q.  Before you dig any deeper holes and more bullshit stories

24  he needs the truth, right?

25  A.  Right.

1   Q.  And keeps telling you stuff that he knows, right?

2   A.  Right.

3   Q.  And stuff that he needs, right?

4   A.  Right.

5   Q.  And you're giving it to him, right?

6   A.  Right.

7   Q.  He's writing your story still, correct?

8   A.  Right.

9   Q.  And once again Nellie is not a Blood, is he?

10  A.  Yeah.

11  Q.  Is he a Blood?  He had nothing do with this, did he?

12  A.  No.

13  Q.  You had no problem putting Nellie's name into this murder

14  case, correct?

15  A.  Correct.

16  Q.  Because it suited your purposes, did it not?

17  A.  Correct.

18  Q.  In fact, it continues.

19          (Recording played)

20  Q.  Did you hear that?

21          You're the only man out.  I don't want that in my

22  case.  I want everybody's story to be the same, is what he's

23  telling you, right?

24  A.  Correct.

25  Q.  And you start making your story the same, right?

```
 1    A.  Right.
 2             (Recording played)
 3    Q.  Once everybody's story's the same, that's when we got the
 4    truth, right?
 5    A.  Right.
 6    Q.  And, of course, that's what he wants?  He wants the truth?
 7    A.  Right.
 8    Q.  And you make your story what he wants it to be, right?
 9    A.  True.
10    Q.  In fact, you're so adamant that you're telling the man the
11    truth.
12             (Recording played)
13    Q.  Kids will die coming out of my baby mama stomach, I am
14    telling you the truth, right, to the man's face, right?
15    A.  Correct.
16    Q.  And he keeps writing your story, right?
17    A.  Correct.
18    Q.  You give him what he wants, right?
19    A.  Correct.
20    Q.  And you continue spinning your tale, correct?
21    A.  Correct.
22    Q.  Continue lying, right?
23    A.  Correct.
24    Q.  Until it fits the story he wants to write, right?
25    A.  Correct.
```

1          MR. BALAREZO:  Your Honor, will the Court go till

2     five?  This might be a good time to break.

3          THE COURT:  Counsel, approach the bench for one

4     second, please.

5          (At the bench)

6          THE COURT:  All right.  We're not going to be sitting

7     tomorrow, obviously.  And we'll start at 9:30 Monday.

8          How much longer are you going to be with Mr. Pearson,

9     Mr. Balarezo?

10          MR. BALAREZO:  Hour and a half maximum.  I'm trying

11     to pare a lot of the videos down.

12          THE COURT:  All right.  I would say, it's up to you,

13     we're not going to go through every single thing on the tape,

14     you're going to have move along a little bit, I didn't want to

15     interrupt.  If it's going to be an hour and a half of playing a

16     video clip, you have other things other than that.

17          MR. BALAREZO:  I do.

18          THE COURT:  That's fine.  We just got to do, all

19     right.  So we'll tell the jury we're finished until 9:30 Monday

20     morning.  And we have Mr. Pearson, you think an hour and a half

21     on your cross?

22          MR. DAVIS:  One hour.

23          THE COURT:  Two hours on cross.

24          And, Mr. Purcell, you have redirect?

25          MR. PURCELL:  I'm sorry?

1        THE COURT:  You have redirect on Pearson?

2        MR. PURCELL:  Oh.

3        THE COURT:  Pearson for the better part of Monday.

4   And who's the next witness?

5        MR. PURCELL:  Try to get my regular order.  It would

6   be Detective Martin briefly and then Detective Gary Childs.

7        THE COURT:  How are we doing in terms of the process

8   in terms of the pace of the trial?

9        MR. PURCELL:  We're doing pretty well.  This was

10  always going to be the thing that took the longest.

11       THE COURT:  I'm not trying to rush anybody.

12       MR. PURCELL:  I appreciate that.

13       THE COURT:  So we're doing pretty well for scheduling

14  purposes, so I'll tell the jury they're excused until 9:30

15  Monday.

16       MR. PURPURA:  Can we have a moment with the Court

17  afterwards off the record?

18       THE COURT:  Sure.  Off the record, sure.  Do you want

19  to come back into my chambers after we finish? That's fine.

20       (Open court)

21       THE COURT:  All right.  Ladies and gentlemen, it

22  doesn't finish our week, but it finishes yours here, kind of

23  get all your employers to tell them you'll be at work tomorrow.

24  I'm just kidding you on that.  But we're not going to be

25  sitting tomorrow, and we will sit again 9:30 starting at 9:30

1    Monday morning.

2              Lawyers have confirmed that we're pretty much right

3    on schedule, perhaps a tad ahead in terms of where we thought

4    we'd be at this point the trial is proceeding, going on pace.

5    I want to thank the lawyers for their hard efforts in that

6    regard.

7              Mr. Pearson, you'll be back on the witness stand

8    9:30.  You're not to discuss your testimony with anyone.

9              Do you understand that?

10             THE WITNESS:  Yes.

11             THE COURT:  Okay.  With that, this Court stands

12   adjourned for the day, and counsel wants to see me back in my

13   chambers, that's fine.

14             (Proceedings adjourned)

15

16             I, Jacqueline Sovich, RPR, CM, do hereby certify
     that the foregoing is a correct transcript from the
17   stenographic record of proceedings in the above-entitled
     matter.

18

19   _____

20   Jacqueline Sovich                          DATE
     Official Court Reporter

21

22

23

24

25

1

2

3                    I N D E X

4    WITNESS          DIRECT    CROSS    REDIRECT    RECROSS

5    Tammy Graham          6       10          75          80

6    Ryan Harger          81       90

7    Michael Thomas       97      105

8    Marcus Pearson      108      217

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25