IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PATRICK ALBERT BYERS, JR.,　　　　　*

　　　Petitioner,　　　　　　　　*　　　Civil Action No. RDB-12-2348

　　　v.　　　　　　　　　　*　　　Criminal Action No. RDB-08-56

UNITED STATES OF AMERICA,　　　　*

　　　Respondent.　　　　　　　*

*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*

**MEMORANDUM OPINION**

Petitioner Patrick Albert Byers, Jr. ("Petitioner" or "Byers") was convicted by a jury of numerous charges stemming from the murder of Carl Lackl ("Lackl"). Although he was in state prison at the time of Lackl's murder, the Government established at trial that Byers arranged the murder using a contraband cell phone in order to prevent Lackl from testifying against him in his state trial for the 2006 murder of Larry Haynes ("Haynes"). After the United States Court of Appeals for the Fourth Circuit affirmed Petitioner's conviction, Petitioner filed *pro se* for post-conviction relief pursuant to 28 U.S.C. § 2255. Petitioner claims that he received ineffective assistance of counsel in violation of his rights under the Sixth Amendment to the United States Constitution, asserting that his attorneys failed to investigate matters or raise issues as he had directed them. For the reasons stated below, Petitioner's Motion to Vacate, Set Aside, or Correct Sentence (ECF No. 412) IS DENIED. In addition, Petitioner's Motions for Extension of Time to File (ECF Nos. 436 & 437) are GRANTED *EX POST FACTO*. Petitioner's Motion to Appoint Counsel (ECF No. 437) is DENIED. Accordingly, Byers' Motions for Copy Work (ECF Nos. 442 & 447) are MOOT

with the exception that a copy of Petitioner's docket sheet shall be mailed to the Warden of his present place of confinement, so that access to the criminal docket sheet can be made available to him in accordance with prison policy and procedures.   Byers' Motion to Withdraw (ECF No. 458) his prior Motion to Amend/Correct (ECF No. 453) is GRANTED.   Byers' Motion to Amend/Correct (ECF No. 453) is WITHDRAWN. Consequently, the Government's Motion to Dismiss (ECF No. 455) the now withdrawn Motion to Amend/Correct (ECF No. 453) is MOOT.   Finally, Petitioner's Motion for Deficient Service (ECF No. 460) is DENIED, Byers' Motion Objecting to Trial Counsel's Disclosures (ECF No. 461) is also DENIED, and his Motion to Compel (ECF No. 462) is MOOT.

## BACKGROUND

Petitioner Patrick Albert Byers, Jr. ("Petitioner" or "Byers") was convicted in this Court on charges stemming from the murder of Carl Lackl ("Lackl").   *See United States v. Byers*, 649 F.3d 197, 200 (4th Cir. 2011).   At the time of Lackl's murder, Petitioner was charged in state court with murdering Larry Haynes ("Haynes").   *Id.* at 201.   Lackl was an important prosecution eyewitness in that case, expected to place Petitioner at the scene of the Haynes murder.   *Id.*   At trial, the Government contended that Petitioner arranged Lackl's murder in order to prevent Lackl from testifying against Petitioner in that state proceeding. *Id.*   In an effort to discredit this alleged motive, Byers attacked Lackl's credibility and the strength of the state prosecutor's case against him.   *Id.*   In response, the Government detailed the strong evidence against Petitioner, including evidence that he had previously

shot a man named Carlile Coleman ("Coleman") in the same neighborhood where Haynes was murdered. *Id.* The facts established at trial are as follows:

I.  The Coleman Shooting

On May 24, 2004, Coleman and two assistants opened a temporary car wash in front of a house located at 506 North Montford Avenue in Baltimore. *Byers*, 649 F.3d at 201. That day, a man named "Pierre" accused Coleman or one of his assistants of taking drugs out of Pierre's car. *Id.* Coleman denied stealing the drugs and refused to pay for them. *Id.* A scuffle ensued between the two men, and Pierre broke a broom over Coleman's back. *Id.*

Pierre left the scene, but returned later with another man. *Id.* They entered the house at 506 North Montford Avenue, and the man accompanying Pierre shot Coleman in the buttocks as he attempted to flee. *Id.* The same man then stood over Coleman saying "I'm going to kill you." *Id.* He proceeded to shoot Coleman in the stomach. *Id.* The two men left the house, and Coleman was taken to a hospital, where he recovered. *Id.* When police asked Coleman to identify his attacker from a photo array, Coleman selected Byers. *Id.*

II.  The Haynes Murder

On March 4, 2006, Larry Haynes was shot and killed near the intersection of North Montford Avenue and Jefferson Street in Baltimore City, Maryland, within one block of the house where Coleman was shot. *Id.* Police recovered .40 caliber shell casings and a .40 caliber bullet nearby. *Id.* In addition, they recovered a .40 caliber semiautomatic handgun in an adjacent alley on the 500 block of North Montford Avenue. *Id.*

Detective Thomas Martin ("Detective Martin"), a Baltimore City Police officer investigating the Haynes murder, interviewed Lackl shortly after the murder. *Id.* Lackl acknowledged that he was in the area to purchase drugs. He explained that he and Connie Mays ("Mays") were driving along North Montford Avenue on the day of the shooting when they stopped at the 500 block for Lackl to urinate. *Id.* As Lackl stepped into the alley, he heard several gunshots. *Id.* at 202. He then saw a man running toward him in a northernly direction along North Montford Avenue. *Id.* The man threw a gun onto the roof of a garage in the alley across the street and made eye contact with Lackl as he continued running north.[1] *Id.* Lackl then looked up the street and saw Haynes, who had been shot eight times, lying on the ground. *Id.* Although Lackl began to approach Haynes, Mays insisted that they leave the scene because Mays had just purchased crack cocaine and did not want Police attention. *Id.* Upon returning home, Lackl told his girlfriend, Malinda Humes ("Humes"), that he wanted to report the shooting to police. *Id.* Humes advised Lackl not to get involved, but Lackl proceeded to contact police headquarters. *Id.*

Joseph Parham ("Parham") was arrested on drug possession charges on the same day as the Haynes murder. *Id.* According to Detective Martin, Parham claimed to have seen Haynes on North Montford Avenue, arguing with a man he knew as "Pat." *Id.* Parham heard gunshots and then saw Pat shoot Haynes. *Id.* Parham lived in the neighborhood and knew both men. *Id.* He told Detective Martin that Haynes dealt drugs and that Pat had previously been involved in the shooting of a car wash guy on North Montford Avenue. *Id.*

---

[1] A gun was recovered on the ground in the alley adjacent to North Montford Avenue, and Detective Martin surmised that the gun had bounced off of the roof and landed on the ground. *Byers*, 649 F.3d at 202 n.1.

After obtaining this information from Parham, Detective Martin retrieved the police file on the 2004 Coleman shooting. *Id.* He learned that Byers had been arrested for shooting Coleman, and placed his photo in a photo array. *Id.* When shown the photo array, Parham identified Byers as the shooter and Lackl identified him as the man who had thrown the gun on the garage roof. *Id.* Subsequently, Detective Martin arrested Byers for the murder of Haynes, and he was charged with first degree murder. *Id.* at 203. Petitioner admitted that he and his associates were involved in the sale of heroin in the North Montford area and that he had been in the area around the time of the shooting. *Id.* Petitioner also acknowledged that he knew Haynes and that Haynes was believed to have recently killed Petitioner's cousins. *Id.* However, he denied that there were any problems between him and Haynes. *Id.* Petitioner also stated that he had hidden a gun near a garage on North Montford Avenue, but that he planned to turn it over to an "Officer Kevin" in exchange for having drug charges against him dropped. *Id.*

As Petitioner's trial for the Haynes murder neared, Parham refused to cooperate with prosecutors and recanted his identification of Petitioner. *Id.* By April of 2007, Lackl remained the only cooperating eyewitness to the Haynes murder. *Id.*

III.  <u>The Lackl Murder</u>

On July 2, 2007, with the Haynes murder trial scheduled in the Circuit Court for Baltimore City to begin in just a matter of days, Lackl was murdered in front of his Baltimore County home. *Id.* Although Petitioner was in state custody at the time, police traced phone calls made to Lackl's residence just minutes before the murder to a cell phone owned by Marcus Pearson ("Pearson"), a member of the "Bloods" street gang. *Id.* After

agreeing to cooperate with investigators, Pearson revealed that a man named Frank Goodman ("Goodman") had offered Pearson $2,500 to kill Lackl for Petitioner. *Id.* Pearson agreed to "take care of it," and called a contraband cell phone that Byers had in jail ("jail cell phone") to verify the $2,500 offer. *Id.* According to Pearson, Goodman then gave him Lackl's home address and phone number. *Id.* Documents seized in Byers' jail cell contained the same address. *Id.* Goodman told Pearson that Lackl was selling a used Cadillac. *Id.*

After speaking with Byers and Goodman, Pearson recruited Jonathan Cornish ("Cornish") to be his triggerman. *Id.* As a "baby gangsta," or young member of the Bloods, Cornish was ordered to perform the murder for free for Pearson. *Id.* Pearson supplied Cornish with a handgun, and directed Cornish to follow him in a car with Michael Randle ("Randle"), another member of the Bloods. *Id.* Pearson rode in the lead car with his girlfriend Tammy Graham ("Graham"), who was unaware of the scheme to kill Lackl. *Id.* Pearson told Graham that he wanted to look at a car for sale on Philadelphia Road. *Id.* On the way, Pearson called Lackl to tell him that he was interested in looking at the Cadillac and that Lackl should wait for him outside. *Id.* at 204. Although he had intened to use a prepaid "burner" phone, Pearson accidentally used his personal phone to make this call. *Id.*

Pearson and Graham drove by Lackl's house. *Id.* Cornish and Randle drove past the house once, then returned and came to a stop where Lackl was waiting. *Id.* Lackl approached the car's front passenger window, at which time Cornish shot him three times. *Id.* Moments later, Cornish called Pearson to report that the job was complete. *Id.* Pearson called Petitioner to report that Lackl was dead and then disposed of the burner phone. *Id.*

Soon thereafter, Pearson contacted Goodman's cell phone in order to set up a time and place to collect the Lackl bounty. *Id.* Pearson met with Goodman, collected $2,200 ($300 less than was promised), and paid Cornish and Randle $100 each. *Id.*

Pearson's account was corroborated by the testimony of both Graham and Cornish at trial.[2] *Id.* The phone that Petitioner used to communicate with Pearson was not recovered, but Pearson identified the number of the jail cell phone. *Id.* Phone records revealed frequent calls from that number to members of Petitioner's family and his girlfriends as well as calls beween the cell phones of Pearson, Goodman, Cornish, and the jail cell phone on the day of the murder.[3] *Id.* These July 2, 2007 calls included twelve direct connect calls between Goodman and Petitioner, calls between Pearson and Petitioner, and calls between Pearson and Goodman moments before and after the shooting. *Id.*

IV. Petitioner's Trial

Byers was originally charged with multiple counts related to the murder of Carl Lackl. *Id.* at 205. On August 5, 2008, a federal grand jury returned a superseding indictment pursuant to which the Government sought the death penalty against Byers. Superseding Indictment, ECF No. 95. In Count I of the Superseding Indictment, Petitioner was charged with conspiring to use communication facilities in interstate commerce with the intent to commit the murder-for-hire of Lackl in violation of 18 U.S.C. § 1958 (a). *Id.* Count II charged him with a substantive count of murder-for-hire, in violation of 18 U.S.C. § 1958

---

[2] Graham testified that Cornish and another individual followed her and Pearson to Philadelphia Road, that Pearson called Lackl on the way, that they did not stop, and that the other car made a U-turn back to Lackl's house. *Byers*, 649 F.3d at 204. She further testified that Pearson met with Goodman on the way home from Philadelphia Road. *Id.* Cornish confirmed this timeline and admitted to pulling the trigger, killing Lackl. *Id.*

[3] Officers recovered the jail cell phone that Goodman used to communicate with Petitioner after he was arrested on September 5, 2007. *Byers*, 649 F.3d at 204-05. Goodman was questioned about the murder by police, but he maintained his innocence. *Id.* at 205.

(a). *Id.* In Count III, Petitioner was charged with conspiracy to obstruct justice by the murder of Lackl, in violation of 18 U.S.C. § 1512 (a)(1)(C). *Id.* In Count IV, Petitioner was charged with a substantive count of obstruction of justice. *Id.* Counts V and VI charged Petitioner with violations of 18 U.S.C.§ 924(c) and (j) (use of a firearm during and in relation to the crimes of violence charged in Counts I-IV). *Id.* In Count VII, Petitioner was charged with conspiracy to violate Section 924(c). *Id.* In Count VIII, Petitioner was charged with being a felon in possession of a firearm on March 4, 2006, the day of the Haynes murder. *Id.*

At trial, the government presented evidence showing that Byers arranged to have Lackl murdered and that he did so in order to prevent Lackl from testifying against him at the Haynes murder trial. *Byers*, 649 F.3d at 205. Petitioner challenged this alleged motive by attacking the reliability of Lackl's identification and the strength of the prosecution's case. *Id.* Petitioner highlighted Lackl's habitual drug use at the time of the shooting. *Id.* Petitioner also established that the DNA of Quinten Hogan ("Hogan"), another gang member who lived in the area of the Haynes murder, was found inside the gun recovered in the alley. *Id.* Additionally, Petitioner questioned Detective Martin about his alleged failure to interview witnesses who were in a corner store near the site of the Haynes murder. *Id.*

To counter the Petitioner's defense, the Government introduced evidence of the 2004 shooting of Carlile Coleman under Rule 404(b) of the Federal Rules of Evidence. *Id.* The Government established that Coleman survived the shooting and identified Byers from a photo array as the person who shot him. *Id.* Additionally, the Government established that Petitioner was a drug dealer in the area where Coleman and Haynes were shot and suggested that the shootings were motivated by Petitioner's desire to protect his "turf." *Id.*

During trial, Baltimore City Police Detective Wayne Jenkins ("Detective Jenkins") testified that he believed Petitioner ran a drug shop in the area where Haynes was murdered and that he had routinely seen Petitioner hanging around talking to drug dealers "all day long." *Id.*

Petitioner was convicted of seven counts pertaining to the Lackl murder (Counts I-VII) and one firearm charge pertaining to the 2006 Haynes murder (Count VIII). *Id.* at 206. Petitioner was acquitted of the charge of possession of a firearm in furtherance of a drug trafficking crime during the 2006 Haynes shooting. *Id.* at 206 n.4.

V. Petitioner's Sentencing and Post-Trial Developments

Ultimately, this Court sentenced Byers to concurrent life sentences for Counts I and II. *See* Order J., ECF No. 340. With respect to Counts III and IV, Petitioner received concurrent life sentences that would run *consecutively* to the life sentences imposed under Counts I and II. *Id.* Additionally, Petitioner received a life sentence *consecutive* to Counts I-IV with respect to Count VI, and another life sentence for Count V that was *consecutive* to Counts I, II, III, IV, and VI. *Id.* For Count VII, Petitioner received a twenty-year sentence to run concurrent with Count V. *Id.* Finally, Petitioner received a ten-year sentence for Count VIII that was concurrent to Counts V and VII. *Id.*

The United States Court of Appeals for the Fourth Circuit affirmed Petitioner's convictions on May 6, 2011.[4] *See Byers*, 649 F.3d at 217. Following the Fourth Circuit's ruling, Petitioner filed the currently pending Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 (ECF No. 412). Subsequently, by motion, Petitioner sought the opportunity to file "the most comprehensive" § 2255. Mot. for Extension to

---

[4] Petitioner's appeal was consolidated with that of his co-Defendant, Goodman. The Fourth Circuit affirmed Goodman's conviction as well.

File Comprehensive 2255, ECF No. 413.  This Court granted that Motion (ECF No. 414).

Petitioner then filed a supplement to his Motion to Vacate (ECF No. 424).  In those papers,

Petitioner asserted various arguments concerning alleged ineffective assistance of counsel,

mostly relating to his attorneys' investigation of his case and their decisions to interview

and/or call various witnesses.  The Government responded (ECF No. 432). [5]

Additionally, Petitioner filed a Motion to Appoint Counsel (ECF No. 437) and a

reply  brief (ECF No. 451). Petitioner then filed a Motion for Leave to Amend/Correct his

Motion to Vacate (ECF No. 453), which he promtply withdrew.[6]  *See* Pet'r's Mot. Withdraw

Pleading, ECF No. 458.  Next, the Government requested an Order allowing Petitioner's

attorneys to disclose privileged information in response to Petitioner's allegations of

ineffective assistance of counsel.  *See* Govt.'s Mot. Allow Disclosure, ECF No. 456.  This

Court granted the Government's Motion, and required a responsive affidavit from one of

Petitioner's trial counsel.  *See* Order, ECF No. 457.

---

[5] In separate motions (ECF Nos. 436 & 437), Petitioner sought extensions of time to file his reply.  To the extent those motions sought extensions (the Court notes that ECF No. 437 also constituted Petitioner's Motion to Appoint Counsel), those motions are GRANTED *EX POST FACTO* as they were considered in disposing of the instant Motion.  Before filing his reply, Petitioner also filed two motions for copy work. Those Motions (ECF Nos. 442 & 447) will be DENIED as MOOT, but this Court will instruct the Clerk to include an updated copy of the docket sheet along with the copy of this opinion.

[6] As Petitioner's Motion to Withdraw (ECF No. 458) remains pending on the docket, this Court notes that Petitioner's Motion is GRANTED and his Motion for Leave to Amend/Correct (ECF No. 453) will be deemed to have been WITHDRAWN.  Therefore, the Government's Motion to Dismiss Second or Successive Petition (ECF No. 455) is MOOT.

In response, Petitioner filed a Motion for Deficient Service (ECF No. 460)[7] and a Motion Objecting to Trial Counsel's Disclosures (ECF No. 461).[8]  Subsequently, Petitioner filed a "Motion to Compel the Government to Produce Any Document, or Affidavits from Either of the Trial Attorneys that It Is Seeking Such From" (ECF No. 462).   The Government then filed a Supplemental Response, along with the affidavit of Petitioner's trial counsel (ECF No. 463).[9]

## STANDARD OF REVIEW

Documents filed *pro se* are "liberally construed" and are "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)(citation omitted). In order to establish a claim for ineffective assistance of counsel, Petitioner must prove both elements of the test set forth by the Supreme Court in *Strickland v. Washinton*, 466 U.S. 668, 671 (1984). First, Petitioner must show that his counsel's performance was so deficient as to fall below an "objective standard of reasonableness." *Id.*

---

[7] In his Motion for Deficient Service (ECF No. 460), Petitioner alleges that the Government did not serve him with a copy of its Motion to Allow Disclosures from Petitioner's trial counsel.  However, page 5 of that Motion to Allow Disclosures includes a Certificate of Service indicating that a copy of the Motion was mailed to Petitioner's prison address, in accordance with Local Rule 102.1.(c).  Additionally, because this Court's two-page Order granting the Government's Motion to Allow Disclosures is numbered pages 6-7, Petitioner alleges that the court failed to serve him with all pages of that Order.  However, this was a typographical mistake, and Petitioner did in fact receive all (two) pages of the order.  For these reasons, Petitioner's Motion for Deficient Service (ECF No. 460) is DENIED.

[8] In his Motion Objecting to his Trial Counsel's Disclosures to the Government (ECF No. 461), Petitioner alleges that this Court has not exercised sufficient supervision over the disclosures ordered by this Court.  However, this Court's Order, dated December 23, 2014, allows disclosures by Petitioner's trial counsel only as necessary "to prove or disprove the claims and allegations of ineffective assistance of counsel."  The Order also states that it is "no broader than needed to ensure the fairness of the proceedings before this Court."  This court finds that these restrictions are sufficient to protect Petitioner's interests.  Additionally, this Court finds that the affidavit submitted by Petitioner's trial counsel William B. Purpura in response to the Order is no broader than necessary and does not unduly prejudice Petitioner's interests.  Therefore, Petitioner's Motion Objecting to Disclosures (ECF No. 461) is DENIED.

[9] Given that the Government has now served Petitioner with a copy of his trial attorney's affidavit in its Supplemental Response on May 29, 2015 (ECF No. 463), the Petitioner's Motion to Compel (ECF No. 462) will be DENIED as MOOT.

at 688.  In assessing whether counsel's performance was unconstitutionally deficient, courts adopt a "strong presumption" that counsel's actions fall within the "wide range of reasonable professional assistance." *Id.* at 689.  Second, Petitioner must show that his counsel's performance was so prejudicial as to "deprive the defendant of a fair trial." *Id.* at 687.  In order to establish this level of prejudice, Petitioner must demonstrate that there is a "reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  Satisfying either of the two parts of the test alone is not sufficient.  Rather, the Petitioner must meet both prongs of the Strickland test in order to be entitled to relief.  *See id.* at 687.

## ANALYSIS

In his Motion to Vacate pursuant to 28 U.S.C. § 2255, the Petitioner alleges that he received ineffective assistance of counsel in violation of his Sixth Amendment rights in eight specific ways.  *See* Mot. To Vacate, ECF Nos. 412 & 424.  First, Petitioner claims that his trial counsel failed to call any of five witnesses, identified by Petitioner, who would have testified that Petitioner did not own the phone allegedly used to order Lackl's murder, that many inmates had access to the phone, and that Pearson, a key Government witness, had a motive to falsely incriminate Petitioner.  *Id.*  Second, Petitioner claims that counsel failed to obtain television news footage that would have "word for word" matched Pearson's testimony, suggesting that Pearson did not testify from personal experience.  *Id.*  Third, Petitioner alleges that counsel failed to obtain phone records that would have shown Petitioner did not illicitly circumvent the prison's secure telephone system.  *Id.*  Fourth, Petitioner claims that his counsel failed to obtain phone records or call any of eleven

witnesses, identified by Petitioner, to impeach the testimony of Detective Jenkins, a key Government witness, and purportedly show that Petitioner did not murder Haynes. *Id.* Fifth, Petitioner claims that counsel failed to call any of five witnesses, identified by Petitioner, who would have testified that Petitioner did not shoot Coleman. *Id.* Sixth, Petitioner claims that counsel failed to communicate with him during the appellate process, failed to raise an inneffective assistance of counsel argument on appeal, and failed to challenge the legality of a police search of Petitioner's jail cell. *Id.* Seventh, Petitioner claims that counsel failed to contact any of six witnesses, identified by Petitioner, who admitted to falsely testifying against Petitioner in court due to police coercion. *Id.* Eighth, Petitioner alleges that counsel failed to raise the issue of racial bias either at trial or on appeal, despite Petitioner's instructions to do so. *Id.*

I.  *Strickland* as Applied to Claims of Failure to Investigate or Follow Instructions

Byers' allegations primarily relate to his counsel's thoroughness in investigating his case and adherence to his instructions.  With respect to pretrial investigations, a criminal defense attorney has a duty to conduct an investigation that is reasonable under prevailing norms.  *United States v. Roane*, 378 F.3d 382, 410 (4th Cir. 2004).  As explained by the United States Supreme Court in *Strickland*:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly

> assessed for reasonableness in all the circumstances, applying a
> heavy measure of deference to counsel's judgments.

*Strickland*, 475 U.S. at 690–91.

With respect to following a client's instructions, there is also applicable authority. Under current law, criminal defendants have the right to make certain "personal" or "fundamental" decisions; "[a]s to those limited issues—pleading guilty, waiving a jury, taking the stand, and appealing a conviction or sentence—'an attorney must both consult with the defendant and obtain consent to the recommended course of action.'" *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010) (quoting *Florida v. Nixon*, 543 U.S. 175, 187 (2004)). With respect to tactical decisions, however, there is no such absolute requirement. The decision regarding which witnesses to call falls squarely into this category because it "is a classic tactical decision left to counsel . . . even when the client disagrees." *Chapman*, 593 F.3d at 369 (internal citations omitted); *see also Sexton v. French*, 163 F.3d 874, 885 (4th Cir. 1998) ("Decisions that may be made without the defendant's consent primarily involve trial strategy and tactics, such as what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed." (internal quotation marks omitted)). When a criminal defendant seeks post-conviction relief based upon an alleged error with respect to such a tactical decision, "[t]he reasonableness of [that] decision actually made by counsel is of course subject to challenge, but the decision is not unreasonable simply because the client expressed a contrary view." *Chapman*, 593 F.3d at 369; *see also Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy").

As a preliminary matter, this Court points out that Petitioner addressed the issue of calling of witnesses and his counsel's performance on the record at trial.  Petitioner indicated that his lawyers had done all that he asked of them and had called all of the witnesses that he wanted to have testify on his behalf.[10]  *See* Apr. 14, 2009 Tr. at 305:2-19.  In light of these statements, Petitioner's claims certainly appear circumspect at best.

## II.  Assessing Prejudice in the Context of Petitioner's Case

Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," meaning "a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.   In assessing the prejudice arising from evidence or testimony that was not offered at trial, that evidence must be compared to the overall strength of the government's case and to the defense that was actually presented to the jury.  *Cf. United States v. Roane*, 378 F.3d 382, 405 (4th Cir. 2004) (noting that evidence alleged to have been available through a more extensive investigation would not have "undermined the overwhelming evidence before the jury" of the defendants' guilt, meaning that defendants had not been prejudiced by their counsel's alleged error).

"In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."  *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).   Accordingly, before addressing Petitioner's specific claims, this Court will now provide a brief summary of the evidence presented by the Government as to Petitioner's guilt as well as the case presented by Petitioner's counsel.

---

[10] Petitioner did note that Mr. Robert Little had not been called, but he acknowledged that his counsel had attempted to locate Mr. Little and had been unable to do so.  The issue with respect to Mr. Little is addressed more fully *infra*.

III. The Government's Case

    A.  Pearson, Cornish, Graham, and the Phone Records

Lackl was murdered on July 2, 2007 in front of his house. As established by detectives' testimony at trial, the police investigators quickly learned that Lackl was scheduled to be a witness in a murder trial and discovered that the Lackl home had received calls from two unknown numbers on the day of the murder. Using telephone records, the police were able to trace one of those numbers to Pearson.[11] After locating Pearson, detectives conducted several recorded interviews with him. He initially denied any involvement with the shooting, and deflected attention to Cornish, the triggerman. Eventually, Pearson agreed to cooperate, and he admitted that he had been hired by Goodman to kill Lackl on Byers' behalf in exchange for $2,500. Pearson's cell phone directory included the cell phone numbers for Cornish, Goodman, and the jail cell phone used by Byers, and the documentary evidence submitted at trial showed a number of calls to those individuals. Specifically, the records reveal that phone contacts between Pearson and Goodman began on June 28, 2007 and ended just after the murder. Calls between Pearson and Byers' jail cell phone occurred only on the day of the murder (both before and after). Additionally, Pearson contacted Goodman throughout the day on July 2.

Cornish also cooperated, and his testimony at trial corroborated Pearson's accounts. Cornish testified at trial that he had been asked to kill a witness and that he had been told the man was white and selling a car. Mar. 24, 2009 Tr. 97-131. Cornish testified that he called Pearson shortly after the murder to report that the job was complete, and his testimony was corroborated by the phone records.

---

[11] Pearson had mistakenly used his personal cell phone to make one of the calls to Lackl's home.

The accounts of Pearson and Cornish were corroborated by the testimony of Tammy Graham, Pearson's girlfriend.  Graham testified that she drove Pearson to a meeting with Goodman soon after the murder and that, after that meeting, Pearson had noticeably more money.  Mar. 25, 2009 Tr. at 244-46.

### B.   Detective Ruby's Interview of Goodman

After Goodman was arrested, he made several statements to Detective Ruby. Goodman denied even knowing Byers and denied that he had any contact with Pearson on the day of the murder.  Goodman also stated that he had been at work on July 2. These statements were ultimately proven false.  Evidence indicated that Goodman visited Byers at the jail, and phone records reveal multiple contacts between Goodman and Pearson on the day of the murder.

### C.   The Investigation into Petitioner's Involvement in the Lackl Murder

Byers' jail cell was searched pursuant to a state search warrant on July 12, 2007—just a few days after the murder of Carl Lackl.  The search uncovered documents that had Lackl's name and address written on them as well as Goodman's cell phone number.   When Petitioner was interviewed by Detective Ruby in early September, he denied ever seeing the materials recovered from his cell.  Byers also denied using a cell phone in jail and denied knowing either Goodman or Pearson.  Petitioner attributed Goodman's phone number to a Frank Robinson.

### D.   Evidence Linking Petitioner to the Haynes Murder

After being arrested for an unrelated drug charge on the evening of the murder of Larry Haynes, Joseph Parham identified Byers (whom Parham knew and identified as "Pat")

as the man who shot Haynes during a tape-recorded photo array identification. Apr. 2, 2009 Tr. at 225-26, 233-36, 256-67. This identification matched the identification made by Lackl, who was also shown a photo array on March 4, 2007 (the day of the Haynes murder). Apr. 2, 2009 Tr. at 16-24, 29-36. Parham also noted that the same individual had been involved in an earlier 2004 shooting involving Coleman. Apr. 2, 2009 Tr. at 225-26, 233-36, 256-67. When interviewed regarding the Haynes murder, Byers stated that he had left the area before the murder and claimed to be at a car wash at the time of the murder. Apr. 2, 2009 Tr. at 46. He claimed to have learned of the murder shortly after it happened when "Greg" called him. However, Byers did not identifiy Greg's last name or phone number. Apr. 2, 2009 Tr. at 46-48. Detective Martin testified that he learned Byers' two cousins were killed just four days before the Haynes murder, and Byers told Detective Martin that he believed Haynes had killed his cousins. Apr. 2, 2009 Tr. at 51, 68. Petitioner also told Detective Martin that he had hidden a gun near the garage on Montford for an "Officer Kevin," but that it had been gone when he went back to check for it. Apr. 2, 2009 Tr. at 52.

### E. Evidence Tying Petitioner to the Jail Cell Phone

The Government introduced a staggering number of phone records to demonstrate Petitioner's use of the jail cell phone. The phone records reflected thousands of calls, many directed to Petitioner's family or girlfriends. Several of these individuals, including Patrick Albert Byers, Sr., Petitioner's father, were subpoenaed by the Government and testified at trial as to their contacts with Petitioner while he was in jail. *See, e.g.,* April 2, 2009 Tr. at 1-8. The records reflected contacts between the jail cell phone and Edna Booze (Petitioner's grandmother) and Tiurra Pollard (a girlfriend) on the day of the Lackl murder. Apr. 1, 2009

Tr. at 71-95.  The records also revealed contacts between the jail cell phone and Dayna Wilkerson (a girlfriend) and Ivan Bates (Petitioner's counsel in his state murder case for the murder of Haynes).  Records also reflected contacts between both jail cell phones (the one used to contact Pearson that was never recovered and the second phone linked to calls to Parham) and Ebony Green, another girlfriend.  Apr. 1, 2009 Tr. at 10.  Records revealed that Petitioner changed the number of the jail cell phone on July 8 (just days after the Lackl murder) and again in September 2007.

F.  Evidence Relating to Parham's Recantation

After Parham's initial identification of Byers as the Haynes shooter, he affirmed his identification in November of 2008 and indicated that he would be willing to testify.  On March 5, 2009, however, Parham indicated that he was no longer willing to testify and recanted his identification.  On March 17, 2009, investigators discovered another contraband cell phone in Byers' bed at the Chesapeake Detention Facility.  Phone records reflected a number of calls from the second cell phone to Parham's home and cell phone between February 21 and March 13, 2009.  Parham testified at trial on behalf of the Government.  *See* Apr. 8, 2009 Tr. at 150-58.  He affirmed his recantation of his initial identification.  He also acknowledged that he had spoken to Byers on the phone.

IV. The Defense's Case

A.  Cross-Examination of Marcus Pearson

Due to the numerous statements and explanations provided by Pearson to investigators,[12] defense counsel undertook a lengthy cross-examination of Pearson at trial.  The full extent of the topics covered by Petitioner's counsel are too lengthy to fully recite

---

[12] Specifically, Pearson provided six recorded statements to investigators in the summer of 2007.

here, but they included a potential dispute between Pearson and Byers over a woman and a recorded statement by Pearson suggesting that he wanted Petitioner to remain in jail.

### B. Evidence that Lackl Was an Unreliable Witness

Petitioner's counsel also attempted to characterize Lackl's identification as unreliable. In particular, counsel repeatedly offered evidence that characterized Lackl as an unreliable drug addict. Detective Martin acknowledged that Lackl had a heroin problem. Apr. 6, 2009 Tr. at 170. Additionally, Lackl only made eye contact with the shooter for "a second" according to Detective Martin's recount of Lackl's statement. *Id.* at 151.

### C. Attacks on the Haynes Murder Investigation

Defense counsel also attacked the quality of the investigation into the Haynes murder. Primarily through the cross-examination of Detective Martin, counsel was able to illustrate that Lackl's account of the murder was inconsistent with those of other eyewitnesses in several respects. In particular, Ms. Cheryl Rookstool, who had seen the shooter, did not identify Byers as the shooter. Another witness suggested that the shooter had run in a different direction than Lackl claimed. Defense counsel also used video footage from the nearby corner store and the outdoor police camera to suggest that Byers was not the shooter.

The cross-examination of Detective Martin revealed several other facts. First, investigators discovered the DNA of Quinten Hogan on the magazine of the Haynes murder weapon in July 2008. Second, trial counsel demonstrated that Detective Martin was distracted throughout the investigation, due to a heavy case load. Apr. 6, 2009 Tr. at 96-97. Detective Martin failed to record the March 20, 2006 interview with Byers (meaning that

Detective Martin's memory served as the only record of that conversation), *id.* at 98, and also failed to follow up with several witnesses, *id.* at 203-09; Apr. 7, 2009 Tr. at 46-47.   Detective Martin also testified that Petitioner was eager to talk and cooperative, and that Petitioner lived nearby—thereby establishing an innocent reason for him to have been in the neighborhood.   Apr. 6, 2009 Tr. at 101-03.   Detective Martin testified that it was not uncommon for officers to trade guns for charges (as did Detective Jenkins).   Additionally, Detective Martin testified that Haynes had a long record and had many enemies.   Counsel also suggested that Haynes had a gang affiliation and demonstrated that Hogan, whose DNA was found on the gun, lived nearby and had possible gang affiliation.   Apr. 7, 2009 Tr. at 61.

### D.   Testimony of Cheryl Rookstool

Counsel also elicited the testimony of Cheryl Rookstool.   *See* Apr. 13, 2009 Tr. at 7. Rookstool was standing inside a nearby cornerstore at the time Haynes was murdered.   Soon after the murder she provided investigators with a description of the shooter, yet police investigators never showed her a photo array.   *See id.* at 16:20-22.   On cross-examination, Petitioner's counsel established that Ms. Rookstool was able to see the shooter's face clearly and that she knew Petitioner from being around the neighborhood.   *Id.* at 24:1-6, 26:23-24. Rookstool specifically testified that Byers was not the shooter.   *Id.* at 28:4-5.

### E.   Testimony of Darrell Briggs

Defense counsel called Darrell Briggs.   Briggs testified that Hogan was a drug dealer in the Montford and Jefferson neighborhoods.   Apr. 13, 2009 Tr. at 226-35.   Briggs also identified Hogan as "putting up" a "gang member sign."   *Id.* at 235:7-10.

F.  Alibi for the Coleman Shooting

Defense counsel called Vonda Cole, a relative of Petitioner, who testified that Petitioner was at the North Avenue Maryland District Courthouse just before the Coleman shooting.  This testimony was corroborated by court records.

V.  Assessment of Petitioner's Claims

A.  Issue One – Records Relating to the Jail Cell Phone

Byers alleges that his trial counsel provided ineffective assistance by failing to follow his instruction to investigate and acquire text messages and other records relating to the jail cell phone.  Specifically, Petitioner contends that  his trial counsel failed to secure text message records from June 2007 to July 2007 for the jail cell phone that "would have proven Pearson lied against the Defendant." Pet'r's Am. Mot. Vacate at 5, ECF No. 424.  According to Petitioner, his attorney informed him that the records were not available and could not be obtained.  Petitioner attaches several pages of phone records as exhibits to his motion.  In his Memorandum in Support of his Motion to Vacate, Petitioner further argues that the phone records "prove the jail [cell] phone expert lied in the trial testimony against Petitioner" and would have allowed for impeachment of the expert.[13]  Pet'r's Mem. Supp. Am. Mot. Vacate at 2, ECF No. 424-2.

Petitioner's assertions with respect to the first issue are rather jumbled, but this Court will attempt to address each in turn.  Petitioner has failed to establish any basis for relief with respect to text message content.  Detective Charles Gruss (the Government's witness with

---

[13] Petitioner also suggests that the records prove "that the phone evidence in this case was not showing [sic] Petitioner circumventing the phone security as the prosecution led the jury to believe." Pet'r's Mem. Supp. Am. Mot. Vacate at 2, ECF No. 424-2.  As Petitioner's third issue deals directly with this issue, the Court defers discussion of this point until that section of this opinon.

respect to the phone records in this case) testified that there was no indication that the jail cell phone had a text feature and that, even if the phone had such a feature, that the content of any such messages would not have been available in light of the several month gap between the Lackl murder and Petitioner's arrest.[14]  Despite Petitioner's bald assertions, this testimony remains unrefuted.   Therefore, as trial counsel began his representation of Petitioner well after that time had elapsed,[15] there is no basis for a claim of error on his failure to obtain such records.

Furthermore, the records that Petitioner has submitted with his memorandum appear to have little relevance to his claims regarding the jail cell phone.  The records do not appear to be cell phone records and do not make any reference to text messages.  Moreover, the vast majority of the records appear to be from periods outside the timeframe stated in Petitioner's motion.  Petitioner never explains how these records "prove the jail [cell] phone expert lied in the trial testimony against Petitioner" or would have allowed for impeachment of the expert, and this Court cannot fathom how they could possibly do so.  Accordingly, Byers has failed to demonstrate any deficient performance with respect to the jail cell phone.

Additionally, Petitioner contends that several witnesses, if called, would have established that the jail cell phone was not his.  Petitioner asserts that his trial counsel provided ineffective assistance by not contacting these individuals to call them as witnesses. This Court now addresses each of these individuals in turn:

---

[14] Specifically, Lackl was murdered on July 2, 2007, while Petitioner was not arrested until September of 2007.
[15] Specifically, Petitioner was not arrested for the July 2, 2007 murder of Lackl until early September of 2007. His court-appointed federal trial counsel was not appointed until February 15, 2008.

a. Jason Torbit

Petitioner contends that Torbit would testify that a number of inmates in the Baltimore City Detention Center had access to the jail cell phone. Petitioner further asserts that Torbit would testify that federal agents attempted "to coerce false testimony out of potential witnesses in exchange for Torbit's state gun charge being 'ignored' by the Feds." Mem. Supp. Am. Mot. Vacate at 3. According to Petitioner, Torbit attempted to contact Petitioner's trial counsel repeatedly but his calls were ignored. *Id.*

Petitioner's bald assertions regarding Torbit's supposed testimony are unavailing. Even if trial counsel erred in not calling Torbit, there was no prejudice to Petitioner's defense. Torbit's testimony would not have negated strong evidence contained in the jail cell phone records, which reflected hundreds of calls made on the jail cell phone to Petitioner's family and close associates. Indeed, several individuals admitted to talking to Petitioner on the jail cell phone during their testimony at trial. Accordingly, there was no prejudice to Petitioner resulting from Torbit not being called to testify.[16]

b. Malcolm Stewart

Petitioner asserts that Malcolm Stewart would "corroborate the testimony of Torbit" and testify that the jail cell phone "was not Petitioner's, but was his." Mem. Supp. Am. Mot. Vacate at 3. Petitioner provides no factual details to support Mr. Stewart's alleged ownership of the jail cell phone. Additionally, regardless of the precise ownership of the jail cell phone, the issue of import was Petitioner's use of the cell phone. The mere fact that another individual might have "owned" the jail cell phone does not negate the overwhelming

---

[16] In fact, the jail cell phone records showed over one hundred calls to Torbit's phone. Thus, had trial counsel called Torbit, he would have likely provided yet another link between Petitioner and the jail cell phone.

evidence that Petitioner used the jail cell phone to order the murder of Lackl.  The proffered "testimony" of Stewart does nothing to refute or explain the hundreds of calls to Petitioner's friends and family, nor does it serve to explain the numerous calls to Pearson or Goodman. Accordingly, regardless of whether trial counsel's failure to call Mr. Stewart constituted deficient performanece, Petitioner was not prejudiced .

     c.  <u>Davinya Winchester</u>

According to Petitioner, Davinya Winchester would testify that there was "a love triangle between Petitioner, Pearson, and a woman Pearson was in love with, which is the real/true motivation behind Pearson's lying against Petitioner."  Mem. Supp. Am. Mot. Vacate at 3.  According to Petitioner, Ms. Winchester would testify that Peason told Ms. Winchester that Pearson was going "to do his best to make sure Petitioner never gets around 'his girl' again."  Mem. Supp. Am. Mot. Vacate at 3.

Pearson himself originally made a statement to investigators regarding a disagreement he and Byers had over a girlfriend.  However, during his trial testimony, Pearson stated that he had fabricated that claim in order to deflect attention from himself.  *See* Apr. 26, 2009 Tr. at 192: 8-24.  Petitioner's trial counsel questioned Pearson about his relationship with Davinya Winchester and played recordings of Pearson suggesting that Pearson wanted Petitioner to remain locked up.[17]  *See* Mar. 30, 2009 Tr. at 33:4 – 36:10.

Petitioner's bald assertions regarding the purported testimony of Ms. Winchester are insufficient for Petitioner to obtain relief.  Petitioner had the benefit of this information at trial, and his counsel exploited it on cross-examination.  Petitioner has not explained how

---

[17] Although Petitioner never so expressly states, Davinya Winchester appears to be the third member of Petitioner's alleged love triangle.

Ms. Winchester's testimony would have allowed for further impeachment of Pearson.  As such, Petitioner has failed to show that he was prejudiced by counsel's purported failure.

   d.   <u>Steven Thompson & Michael Randle</u>[18]

Petitioner asserts that Steven Thompson and Michael Randle would testify that Pearson had wanted to "get rid of" Petitioner "by killing him, planting a gun on him, getting him 'locked up,' etc." Mem. Supp. Am. Mot. Vacate at 4.  Petitioner's assertions aside, there was no prejudice to Petitioner's defense with respect to these witnesses.  Trial counsel cross-examined Pearson at length regarding his prior inconsistent statements to investigators.  In particular, trial counsel pointed out that Pearson's plea agreement was premised upon his cooperation, and trial counsel further established that Pearson had attempted to stick the blame for the murder on others in order to clear himself.  *See, e.g.,* Mar. 30, 2009 Tr. at 14:21-23.  Trial counsel also established that Pearson had named Byers in another murder.  Mar. 30, 2009 Tr. at 28:18 – 31:7.  Finally, as noted above, trial counsel played recordings in which Pearson had suggested that he wanted Petitioner to remain incarcerated.  *See* Mar. 30, 2009 Tr. at 33:4 – 36:10.  Petitioner has not explained how the testimony of Thompson and Randle might have furthered his efforts to impeach and discredit Pearson's testimony.  Even if their testimony would have contributed to his defense in that respect, it would have done nothing to undermine the Government's presentation of the corroborating testimony of Cornish and Graham.  Accordingly, there is no conceivable way that this evidence could undermine confidence in the outcome of Petitioner's trial.  Petitioner has failed to demonstrate prejudice.

---

[18] Thompson and Randle were co-Defendants in the case against Petitioner and pled guilty to the charge of Aiding and Abetting the Use and Discharge of a Firearm during and in relation to a Crime of Violence, Causing Death by Murder pursuant to 18 U.S.C. § 924(c).

e. <u>Jamar Saunders</u>

According to Petitioner, Jamar Saunders would testify that the second jail cell phone that was recovered in "Supermax" was actually his and that federal investigators pressured him to "to lie and say the phone was Petitioner's." Mem. Supp. Am. Mot. Vacate at 4. Even if the phone was not Petitioner's—a claim that is dubious considering the fact that the phone was recovered in Petitioner's bed—the fact of Saunders' alleged ownership would have had little effect at Petitioner's trial.[19] The phone records from the second jail cell phone showed repeated contacts with Petitioner's family and associates. For example, Ebony Green testified at trial that she had contact with Petitioner on the second jail cell phone. *See* Apr. 1, 2009 Tr. at 110:17-19. More importantly, the evidence at trial established that Petitioner used the phone to contact Joseph Parham, who had originally identified Byers as the Haynes shooter but subsequently recanted. *See* Apr. 8, 2009 Tr. at 172:23 – 176:4. Thus, even if Saunders testified as Petitioner claims he would, that testimony would not negate the operative fact that Petitioner used a contraband cell phone to contact Parham.

B. <u>Issue Two – News Broadcast Footage</u>

Petitioner alleges that his trial counsel failed to secure local television news broadcasts as Petitioner had instructed. Petitioner asserts that those recordings would have shown that Pearson's testimony "was 'word for word' what he saw/heard on the news broadcasts." Mem. Supp. Am. Mot. Vacate at 5. Petitioner goes on to note that he "has private investigators retrieving this news footage for any future hearing." *Id.*

---

[19] In fact, the testimony of Ms. Ebony Green established that the phone sometimes changed hands among the inmates. Apr. 1, 2009 Tr. at 111:5-13.

While Petitioner baldly asserts that Pearson's testimony mirrored the news broadcasts "word for word," he has failed to present any facts to support this contention. Pearson's testimony spanned two days of trial and he testified extensively about the Lackl murder and his conversations with investigators during the ensuing investigation. As was made clear by Pearson's testimony on direct and through a lengthy cross-examination, Pearson's statements to investigators changed over time and were sometimes contradictory. Petitioner never specifically identifies the testimony that he asserts was repeated based upon news broadcasts, nor does he identify those broadcasts that Pearson allegedly relied upon.[20] This failure is basis enough for denying Petitioner's motion on this issue, as it is Petitioner's burden to present evidence supporting his claim.

Even if Petitioner had included those specifics, his claim would still fail because he has failed to demonstrate prejudice to his case. As was made clear by his testimony, Mr. Pearson's account of what occurred on the day of the Lackl murder changed significantly over time as investigators gathered more information and focused in on his involvement. Petitioner's counsel undertook a lengthy cross-examination of Pearson at trial and used these prior inconsistent statements to impeach his testimony. The clear purpose of much of Petitioner's counsel's cross-examination was to create the perception that Pearson's statements to investigators were fabricated and that Pearson had simply gone along with the story that investigators believed was true. In support of this theory, Petitioner's counsel did establish that some of the information Pearson initially disclosed to investigators before he

---

[20] Over two and a half years have passed since Petitioner originally filed his Amended Motion to Vacate, and Petitioner has also made numerous other filings in that period. Nevertheless, despite Petitioner's assertion that he had private investigators collecting news footage, Petitioner still has not submitted any materials (video clips, recordings, transcripts, or otherwise) to support his contentions about the similarity of Pearson's testimony to news broadcasts.

was arrested had been recounted from news broadcasts about the murder.  *See* Mar. 30, 2009 Tr. at 12:14-24.   Thus, the basis of Pearson's knowledge—and his reliance on news broadcasts—was an issue that was presented to the jury.   However, the jury's verdict suggests that jurors found Pearson's trial testimony, corroborated by additional evidence linking Petitioner to the Lack murder, to be credible.   Indeed, the facts to which Pearson testified at trial, which Petitioner alleges were derived from a news broadcast, were corroborated by the testimony of Cornish and Graham and supported by the phone records.

C. <u>Issue Three – Records Showing Petitioner's Use of the Jail's T-Netix Phone System</u>

Petitioner next argues that his trial counsel failed to investigate his usage of the T-Netix jail phone system.   In Petitioner's Amended Motion to Vacate, he specifically references Counsel's failure to obtain the telephone records of his grandmother, Ms. Edna Booze.   In Petitioner's view, this alleged failure prevented Petitioner from rebutting Lisa Hunter, the Government's T-Netix witness, who testified that the records of the company operating the jail's phone system did not reflect any calls on Petitioner's account between April 10, 2006 and April 16, 2008.  *See* Mar. 31, 2009 Tr. at 48:9 – 49:8, ECF No. 376.

Even if this Court were to rule that Ms. Booze's telephone records established that Petitioner had used his T-Netix account during the period from April 10, 2006 to April 16, 2008,[21] Petitioner has failed to establish that he was prejudiced by counsel's failure to establish this fact at trial.   The fact that Petitioner did not use the jail's phone system was a relatively minor point at trial, supporting the Government's case that he had used a

---

[21] Although the phone records appear to reflect collect calls to Ms. Booze from the T-Netix system, they do not identify Petitioner as the caller.   Even if the calls originated from Petitioner (which both this Court and the Government recognize as likely), the records do not include Petitioner's IPIN number.   Accordingly, the records do not directly refute Ms. Hunter's testimony.

contraband cell phone. The records attached to Petitioner's motion, however, do nothing to counter Petitioner's clear connection to the jail cell phone as proven by the jail cell phone's call records and the testimony of Petitioner's friends and family. As such, there is no way that those records would have changed the outcome of Petitioner's trial, and Petitioner therefore suffered no prejudice from counsel's supposed failure to obtain the records and introduce them into evidence.

D. Issues Four & Five – Failure to Call Witnesses

Petitioner's fourth and fifth claims pertain to witnesses that Petitioner's trial counsel allegedly failed to either call or interview who would have provided exculpatory information regarding the Haynes murder and Coleman shooting. Petitioner asserts that he was not the shooter in either incident and that his counsel's failure to interview these individuals deprived the jury of evidence that could have "created doubt, and greatly increased the probability of a different outcome." Mem. Supp. Am. Mot. Vacate at 7-8. Additionally, Petitioner identifies a number of witnesses whose testimony would have contradicted the testimony of Detective Jenkins. This Court now discusses each of those individuals in turn.

a. Witnesses Related to the Haynes Murder

As noted above, evidence that Petitioner murdered Haynes was offered by the Government to show Petitioner's motive in ordering the Lackl murder. However, Petitioner contends that he was "nowhere near the location of Mr. Haynes when he was murdered." Mem. Supp. Am. Mot. Vacate at 7.

i.   <u>Darrell Briggs</u>

Byers asserts that he was at a car wash with his girlfriend at the time of the Haynes murder, and that his phone records from the day of the murder would have supported that alibi.  Am. Mot. Vacate at 9, ECF No. 424. In his Amended Motion to Vacate, he states that he received a call from Darrell Briggs shortly after the Haynes murder.  *Id.*  In his supporting memorandum, Petitioner characterizes Darrell Briggs as "an actual witness to the Haynes murder" who would testify that Petitioner was not Haynes' killer.  Mem. Supp. Am. Mot. Vacate at 8.   According to Petitioner, Briggs would also testify that Haynes told him an individual by the name of Quinten Hogan wanted him dead and was going to try to kill him. Petitioner submitted a purported affidavit from Mr. Briggs stating that he has "information that would have proven Patrick Byers['] innocence" and that he attempted to contact Petitioner's trial counsel repeatedly before trial, but was rebuffed.  *See* Briggs Aff., ECF No. 431-1.

Despite Petitioner's representations in his motion, Mr. Briggs was in fact called during his trial as a defense witness.  *See* Apr. 13, 2009 Tr. at 226-48, ECF No. 387.  During trial counsel's direct examination, Mr. Briggs identified Mr. Hogan from a photograph and testified that Mr. Hogan had been killed in August of 2008.

In his motion, Petitioner neither recognizes the testimony that Mr. Briggs did provide at trial nor explains the inconsistencies between his current assertions and Mr. Briggs' trial testimony.   In particular, Mr. Briggs testified that he met with trial counsel at least once before he testified and had also met with trial counsel's investigator at an earlier time.  *See* Apr. 13, 2009 Tr. at 227:25-228:14.  Moreover, the purported affidavit of Mr. Briggs does

not establish any of the facts alleged by Petitioner in his Motion or Supporting Memorandum.   Accordingly, Petitioner has failed to establish the factual predicate for a finding that his counsel's performance was deficient with respect to calling Mr. Briggs.

ii.   Dorsey Ebbs[22]

According to Petitioner, Dorsey Ebbs will testify that he was "present at the Haynes murder," that Petitioner was not the shooter, and that Petitioner was not "anywhere near the location of the Haynes murder."   Mem. Supp. Am. Mot. Vacate at 9.   Mr. Ebbs did not testify at Petitioner's trial, but statements by Mr. Ebbs were discussed during the testimony of Detective Martin, the lead investigator on the case.   When he was initially interviewed by police, Mr. Ebbs' description of the shooter did not precisely match Petitioner's build.   Mr. Ebbs also stated that the shooter had run in a different direction than that reported by several other witnesses, including Lackl.   During trial counsel's cross-examination of Detective Martin, trial counsel questioned Detective Martin about his failure to individually interview Mr. Ebbs.   Mr. Ebbs originally provided a statement to police, but Detective Martin never individually interviewed him.   Apr. 6, 2009 Tr. at 203:5-19, ECF No. 379. When Detective Martin attempted to follow up, he was unable to locate Mr. Ebbs.   *Id.*

As presented here, Petitioner has failed to state a viable claim for relief with respect to Mr. Ebbs' testimony.   As a preliminary matter, the record suggests that Mr. Ebbs could not be located and, as such, trial counsel cannot be faulted for failing to interview or call Mr. Ebbs.   Moreover, even if trial counsel could have located and called Mr. Ebbs, Petitioner

---

[22] Petitioner's Motion spells Mr. Dorsey Ebbs' last name "Ebbs"; the trial transcript, however, spells his name "Epps."

was not prejudiced in this matter.  Petitioner's trial counsel effectively employed Mr. Ebbs' statement to impeach the testimony of Detective Martin and to discredit his investigation.

### iii.  Wilton Hunt

Petitioner asserts that Wilton Hunt would testify to standing "in a store five feet away from the actual murder" and that Petitioner was not the shooter.  Mem. Supp. Am. Mot. Vacate at 9. Like Mr. Ebbs, Mr. Hunt did not testify at trial.  Mr. Hunt, however, was with Ms. Cheryl Rookstool at the time of the Haynes murder, and Ms. Rookstool's testimony was relayed at trial.  At trial, Ms. Rookstool stated that she did not believe that Petitioner was the shooter.  Apr. 13, 2009 Tr. at 28:4-5.

Petitioner's motion does not identify any special reason why Mr. Hunt's testimony was necessary for his defense.  Based upon the representations in his motion, his testimony would have been very similar to that of Ms. Rookstool.  As such, Mr. Hunt's testimony would have been repetitive and duplicative, and there was no need to call Mr. Hunt directly. Moreover, as trial counsel explained in his affidavit, there was some concern that Hunt's testimony could contradict certain aspects of Rookstool's testimony.[23]  Trial Counsel's Aff. at 4.  Accordingly, Petitioner has failed to establish that trial counsel erred in his strategic decision not to call Mr. Hunt as a defense witness.

---

[23] Trial counsel's concern was all the more reasonable considering that he believed both witnesses were somewhat "intellectually impaired."  Trial Counsel's Aff. at 4.  Indeed, Ms. Rookstool admitted to being a user of crack cocaine at the time of the murder, but she testified that she had not taken any at the time of the murder.  Apr. 13, 2009 Tr. at 19:1-20, ECF No. 387.  Later, Rookstool testified that she had a history of epilepsy and had damage to a muscle behind her left eye and some brain damage due to a case of spinal meningitis when she was young.  *See* Apr. 13, 2009 Tr. at 16-23.

### iv.  Tiurra Pollard[24]

Byers asserts that Tiurra Pollard would testify to a conversation between Byers, Goodman, and other individuals.   He asserts that Ms. Pollard's testimony would demonstrate that he did not think Haynes had killed his cousin and that he suspected other individuals.  Mem. Supp. Am. Mot. Vacate at 9.   Accordingly, Petitioner asserts that Ms. Pollard's testimony could have "established the doubt necessary for the jury to come to a different verdict." *Id.*

Ms. Pollard was in fact called as a witness in this case by the Government, and she testified that she was in contact with Petitioner via the jail cell phone while he was detained in the Baltimore City Jail.  *See* Apr. 1, 2009 Tr. at 91-92.   She made no mention of the matters referenced in Petitioner's Motion.

### v.  Shanise James

Byers asserts that Ms. Shanise James was with him at a nearby carwash when Haynes was murdered and overheard the alleged telephone conversation between him and Mr. Briggs warning him that Haynes had been murdered.  Mem. Supp. Am. Mot. Vacate at 9. However, Petitioner has failed to establish that trial counsel was in any way deficient with respect to the purported failure to call Ms. James.

---

[24] The exact spelling of Ms. Pollard's first name is somewhat unclear.  The trial transcript spells her first name "Tiurra" based upon the Government's spelling before she was called.  *See* Apr. 1, 2009 Tr. 71:8-20, ECF No. 377.  In his papers, Petitioner spells her name "Tair," while the Government's opposition spells it "Tierra."

Petitioner has not asserted that trial counsel was aware of Ms. James nor that trial counsel was aware of any information regarding a potential alibi.[25]   Thus, Petitioner has failed to establish facts that would support a finding of ineffective assistance.  *See United States v. Roane*, 378 F.3d 382, 401 (4th Cir. 2004) (conclusory allegations regarding knowledge, without more, insufficient to warrant evidentiary hearing); *see also id.* at 407.

Moreover, even if Petitioner was able to establish deficient performance with respect to the failure to call Ms. James, Petitioner has not demonstrated any prejudice by such failure.  Detective Martin testified that Petitioner told him the same alibi with respect to the carwash after Petitioner was arrested.  Thus, Petitioner's asserted alibi was presented to, and rejected by, the jury.  Nor was any additional evidence regarding this alibi likely to have swayed the outcome of Petitioner's trial.  Despite trial counsel's efforts to present evidence calling into doubt Lackl's identification, the facts remained that two witnesses quickly identified Petitioner as the Haynes shooter.  Although Parham eventually recanted, the evidence regarding Petitioner's calls to Parham was incredibly damaging.  With respect to Petitioner's convictions for the Lackl murder, the likelihood of prejudice is even more minute.  Regardless of whether Petitioner killed Haynes, the motive for the killing remains.  Additional evidence that Petitioner was not the shooter would not have undermined the overwhelming evidence, including direct testimony and phone records, identifying Petitioner as the individual who ordered the Lackl murder.

---

[25] Indeed, trial counsel's affidavit confirms that trial counsel had no knowledge of Ms. James: "To the best of my recollection, if Ms. James was available, my investigator or I would have interviewed her.  If Ms. James was an alibi witness, I am also sure that Byers['] state court counsel, Ivan Bates, would have known of her existence and named her as an alibi in the state court case."  Trial Counsel's Aff. at 4.

### vi. Kevin Cade

Petitioner asserts that Mr. Kevin Cade is Haynes' younger brother and would testify that "it is well known that Petitioner did not kill Haynes, nor did he have any connection to the murder."  Mem. Supp. Am. Mot. Vacate at 10.  Petitioner has failed to establish the requisite facts to support a claim that trial counsel's performance was deficient by failing to call Mr. Cade. Petitioner's summary of Cade's purported testimony is conclusory and unsupported by an affidavit or other evidence.  Nor has Petitioner alleged that trial counsel knew about Cade or explained why counsel should have discovered that Cade had information about the Haynes murder.  Moreover, Petitioner has failed to establish that Mr. Cade has any admissible testimony to offer.  Indeed, the basis of his testimony appears to be rumor rather than personal knowledge.  Accordingly, there is no evidence that trial counsel erred in not calling Mr. Cade as a witness.

### b. Witnesses Related to the Coleman Shooting

Byers also contends that his trial counsel provided ineffective assistance by failing to call several witnesses who would have testified that he did not shoot Coleman.  Mem. Supp. Am. Mot. Vacate at 11.   While Petitioner's claims with respect to these witnesses are addressed more fully below, this Court first notes that it is effectively impossible for Petitioner to demonstrate any prejudice arising from evidence pertaining to the Coleman shooting.  Evidence of the Coleman shooting was offered under Rule 404(b).  Thus, the evidence as to the Coleman shooting is distinct from the substantive evidence supporting the charges against Petitioner for the Lackl and Haynes murders.

Moreover, the United States Court of Appeals for the Fourth Circuit has already addressed the limited effect that the Coleman evidence had on Petitioner's trial. In assessing whether the evidence related to the Coleman shooting was properly admitted under Rule 404(b), the Fourth Circuit found that the evidence was not unfairly prejudicial to Petitioner.[26]  *See Byers*, 649 F.3d at 210.  In particular, the court noted that this Court had issued two limiting instructions explaining that the Coleman evidence could not substitute for evidence of the conduct charged in the indictment.  *See id.*  Additionally, the Fourth Circuit found that, even if the Coleman shooting evidence had been admitted improperly, its admission constituted harmless error.[27]  *Id.* at 211.  As explained by the court:

> The government introduced overwhelming evidence of Byers' guilt in planning and executing the murder of Lackl. In addition to direct testimony from Pearson that Byers ordered and paid for the hit on Lackl and the confession of the actual killer, the government presented substantial evidence establishing telephonic communication between Cornish the triggerman, Pearson, Goodman, and Byers on the day of the murder. The evidence also established an obvious motive for Byers to kill Lackl—the elimination of the sole remaining witness against him on state murder charges. In view of the strong evidence suggesting that Byers planned the murder-for-hire against Lackl, we can say with "fair assurance" that the evidence of Coleman's non-fatal shooting was harmless.  *Id.*

While this Court recognizes that the Fourth Circuit's review of the issue arose in a different procedural context, the mountain of evidence against Petitioner remains

---

[26] Evidence admitted under Rule 404(b) must also satisfy the standard of Rule 403, which requires that the probative value of evidence not be substantially outweighed by the danger of unfair prejudice.  Thus, the Fourth Circuit's prejudice determination was within the context of a Rule 403 assessment.

[27] Under the harmless-error standard, a district court's evidentiary ruling will be upheld unless the appellate court determines, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."  *Byers*, 649 F.3d 197, at 211.

unchanged.   As such, Petitioner is unable to demonstrate any prejudice for purposes of *Strickland* with respect to the Coleman shooting.

### i.   Beverly Gibson

According to Petitioner, Beverly Gibson would testify that she was present at the Coleman shooting and "that Petitioner was not there and . . . was not the shooter." Mem. Supp. Am. Mot. Vacate at 11. Petitioner has not, however, established any facts to suggest that trial counsel knew about or should have known about Ms. Gibson or that she had information about the Coleman shooting. This Court further notes that Petitioner's conclusory allegations are all the more fanciful in light of the unrebutted evidence that Coleman was shot inside his house with only the shooter and one other individual present. *See Byers*, 649 F.3d at 201.

### ii.   Edna Booze

Petitioner asserts that Edna Booze, Petitioner's grandmother, would testify that she was with Petitioner in a Baltimore court "at the date and time of the Coleman shooting." Mem. Supp. Am. Mot. Vacate at 11. However, this same alibi was presented to the jury through the testimony of Vonda Cole and court records from the Baltimore City District Court. Accordingly, calling Ms. Booze to establish this point was unnecessary because the testimony she would have provided would have been duplicative.[28]

---

[28] In his affidavit, trial counsel stated that he was concerned about protecting Ms. Booze's credibility for the sentencing phase of Petitioner's trial.

### iii. <u>Robert Little</u>

Petitioner contends that Robert Little was a witness to the Coleman shooting and would testify that Petitioner was not the shooter.  According to Petitioner, Little would testify that Little's brother (Clinton Little) got into a physical altercation with Coleman and that a man named Terrence Whitworth found Coleman and beat him with a broomstick before Troy Wilson (who is now dead) shot Coleman.[29]   Mem. Supp. Am. Mot. Vacate at 11.  Additionally, Petitioner has submitted a purported affidavit of Little stating that he has "information that would have proven Patrick Byers['] innocence," but was rebuffed by Petitioner's trial counsel.  Little Aff., ECF No. 431-1.

At trial, Petitioner stated that Little was one witness that he wanted to subpoena to testify but whom his lawyers had not called.  Apr. 14, 2009 Tr. at 304:2-10.  However, when the Court asked counsel about Mr. Little, counsel explained that they had been unable to locate Mr. Little.  Apr. 14, 2009 Tr. at 304:16-25.  When asked by the Court, Petitioner indicated that he understood that his lawyers had attempted to find Mr. Little but had been unsuccessful.  *Id.* at 305:7-11.  As such, Petitioner's conclusory allegations regarding Little's testimony—coupled with the fact that Petitioner has once again failed to explain any personal knowledge basis for the purported testimony—cannot be taken to assert a potentially meritorious claim.

### c. <u>Witnesses to Impeach Detective Wayne Jenkins' Testimony</u>

In his Memorandum Supporting his Amended Motion to Vacate, Petitioner also identifies several witnesses that he claims would provide evidence to impeach Detective

---

[29] Petitioner suggests that Terrence Whitworth would also testify that Troy Wilson was the person who shot Coleman.  Petitioner does not identify any basis for Whitworth's proffered testimony.

Wayne Jenkins, a detective for the Baltimore City Police Department in the Violent Crime Impact Division of the Narcotics Unit.[30]   According to Petitioner, Mr. Renardo Robinson would have testified that Detective Wayne Jenkins' trial testimony was false and designed to cover up the working relationship between Petitioner and Detective Jenkins by which Petitioner would provide tips to Detective Jenkins in exchange for information on informants and influence that would "make charges or investigations 'go away.'"   Mem. Supp. Am. Mot. Vacate at 8.   Additionally, Petitioner later submitted a purported affidavit from Mr. Robinson which stated that Mr. Robinson had "information that would have proven Patrick Byers['] innocence."[31]   Robinson Aff., ECF No. 431-1.   Petitioner identifies several other witnesses—specifically, Terrence Whitworth, Reginald McNeil, Robert Little, Joey Fitzgerald, Toshiba Ross, and Nitra Conway—who he asserts would testify similarly.

At Byers' trial, Detective Jenkins testified that he knew Byers operated a drug shop near the location where Haynes was murdered.   Apr. 7, 2009 Tr. 115-16, ECF No. 380. Detective Jenkins also stated that he had met with Petitioner approximately ten to fifteen times so that Byers could provide information regarding other drugs dealers in the neighborhood.   *Id.* at 111.   Detective Jenkins testified that he met with Petitioner on the day of the Haynes murder after Petitioner had called him and told him that he had information about a shooting.   During that meeting, Detective Jenkins also noted several details that he deemed suspicious, including the fact that Petitioner appeared more nervous than normal and that this was the first time Petitioner had provided information regarding a violent

---

[30] In 2006, however, Detective Jenkins was still a plainclothes officer working in unmarked cars.  *See* Apr. 7, 2009 Tr. 111:2-4.

[31] The Court notes that Mr. Robinson's purported affidavit is substantively identical to that of Mr. Briggs; only the names differ.

crime.  *Id.* at 122, 137.  According to Detective Jenkins, Petitioner stated that a friend had seen a tall, thick black man shoot Haynes and subsequently throw a handgun on the roof of a nearby garage.  *Id.* at 123.

Regardless of whether Petitioner could state a cognizable ineffective assistance claim with respect to these purported impeachment witnesses, Petitioner's contention must be rejected because he has failed to show any prejudice as a result of trial counsel's alleged failure to call these witnesses.  Detective Jenkins expressly acknowledged that he had a relationship with Petitioner.[32]  Moreover, his testimony had only tangential value in the prosecution of Petitioner.  As noted above, Detective Jenkins' testimony related to the aftermath of the Haynes shooting and Petitioner's statements to him.  Even if Petitioner had succeeded in discrediting Detective Jenkins and the jury had wholly disregarded his testimony, the evidence linking Petitioner to the jail cell phone—and, therefore, the Lackl murder—would have been unaffected.  Evidence of the Haynes murder was introduced for the purpose of proving Petitioner's motive.  Since Lackl was one of the primary links between Byers and the Haynes shooter and was expected to be a crucial witness in Byers' state trial for the Haynes murder, Petitioner's motive existed regardless of whether he in fact committed the Haynes murder.  Moreover, Detective Jenkins' testimony was far from the only evidence offered to link Petitioner to the Haynes murder.  According to Detective Martin, to whom Petitioner had also given a statement, Petitioner said that he was near the

---

[32] According to Detective Jenkins, Petitioner refused to formalize the relationship or receive remuneration for his information.  *See* Apr. 7, 2009 Tr. at 119:5-14.  Petitioner baldly asserts, however, that he was compensated in other ways; specifically, he contends that Detective Jenkins would "make charges or investigations 'go away'" or provide information about "who informants were."  Mem. Supp. Am. Mot. Vacate at 8.  Of course, Petitioner has supplied no factual support for these contentions other than his characterization of the supposed testimony of uncalled witnesses.  Of course, testimony that Petitioner had exchanged for information about informants would have been damaging to his defense in a witness murder case

scene of the Haynes murder (close enough, in fact, to hear the shots).  Petitioner also stated, without any solicitation from Detective Martin, that he had hidden a gun near the spot where Lackl claimed to have seen a fleeing suspect throw a gun.  Apr. 6, 2009 Tr. at 52: 1-25.

E.  Issue Six – Appellate Counsel's Refusal to Raise Ineffective Assistance of Counsel on Appeal and Failure to Challenge This Court's Ruling Denying His Motion to Suppress

Although Petitioner's Amended Motion to Dismiss only identifies four grounds for relief, his Memorandum in Support identifies several additional issues.  The first of these— identified by Petitioner as the sixth issue to be addressed by this Court[33]—is based upon his appellate counsel's refusal to raise the issue of ineffective assistance of counsel during his appeal.  Mem. Supp. Am. Mot. Vacate at 11-12.  However, "[i]neffective assistance claims are generally not cognizable on direct appeal … 'unless [an attorney's ineffectiveness] conclusively appears from the record.'" *United States v. Benton,* 523 F.3d 424, 435 (4th Cir. 2008) (quoting *United States v. Richardson,* 195 F.3d 192, 198 (4th Cir. 1999)).

Additionally, it appears that Petitioner seeks to raise a claim regarding the search of his jail cell.[34]  Before trial, trial counsel filed a motion to suppress the tangible evidence discovered in Petitioner's cell—which included a note with Lackl's name and address.  *See* Mot. Suppress, ECF No. 60.  This Court held a two-day hearing and ultimately denied the motion.  *See* Sept. 22, 2008 Order, ECF No. 124.  After Petitioner's conviction and

---

[33] The Court has combined the fourth issue, which was alluded to in the Amended Motion, and the fifth, dealing with the Coleman shooting and not expressly addressed in the Amended Motion although arguably related because it also deals with investigation of alibi witnesses.

[34] The Court notes that it is somewhat unclear whether Petitioner challenges the actions of his attorneys on appeal or the actions of his trial counsel.  While Petitioner states that "Petitioner's counsel failed/refused to communicate with Petitioner during the appellate process" at the beginning of this section of his memorandum, he later states that his trial counsel "said he was 'tired of Petitioner's complaints and ceased communication,' effectively forfeiting Petitioner's opportunity to 'challenge the search' of his jail cell, which would've eliminated the prosecution's angle that the phone . . . was Petitioner's when it WAS NOT."  Mem. Supp. Am. Mot. Vacate at 11-12.

sentencing, Petitioner noted an appeal to the United States Court of Appeals for the Fourth Circuit. Subsequently, he notified the court that he wished to terminate trial counsel and was seeking other representation. *See* Aug. 3, 2009 Letter, ECF No. 20, No. 09-4439 (4th Cir. Aug. 14, 2009). In response, the Fourth Circuit issued a notice stating that Petitioner would be required to file a formal motion requesting new counsel because trial counsel had been court-appointed. *See* ECF No. 21. The notice specifically stated that trial counsel "ha[d] been working [Petitioner's] appeal in a very professional manner" and that Petitioner's appeal was moving forward. *Id.* After new counsel was appointed and the briefing schedule had been set, Petitioner submitted his opening brief, by counsel, raising several issues.[35] *See* ECF No. 87. This Court's ruling as to the motion to suppress was not one of those. *Id.*

Regardless of whether Petitioner's claim is directed at his trial counsel or appellate counsel, it is clear that there is no basis to grant Petitioner relief based upon his attorneys' handling of the suppression issue. As noted above, trial counsel did, in fact, file a motion to suppress the evidence recovered from Petitioner's jail cell. That motion was properly denied because the search was conducted pursuant to a warrant issued by a state court. Petitioner fails to mention the warrant, let alone provide any reason why the warrant was defective. Alternatively, regardless of the status of the law in other circuits, the law of this circuit clearly indicates that a detainee has no "right of privacy from routine searches of [the detainee's] jail cell." *United States v. Jeffus*, 22 F.3d 554, 559 (4th Cir. 1994). Thus, while trial counsel appropriately filed the motion on behalf of Petitioner, the motion was properly denied. That

---

[35] As Petitioner's appeal was consolidated with Goodman's case, Petitioner and Goodman submitted a joint brief.

result would have been the same regardless of the quality of trial counsel's advocacy. Accordingly, there was no error by trial counsel and no prejudice to Petitioner.

With respect to appellate counsel, it is equally clear that Petitioner has failed to make a meritorious claim.  Appellate counsel was "entitled to a presumption that [they] decided which issues were more likely to afford relief on appeal." *Bell v. Jarvis*, 236 F. 3d 149, 175 (4th Cir. 2000) (citing *Strickland*, 466 U.S. at 688).  In order to overcome this presumption, Petitioner must demonstrate that his attorneys' decision not to pursue the issue fell below an objective standard of reasonableness in light of the prevailing norms.  *Id.*  As noted above, Petitioner's motion was properly disposed of under existing law.  Other than an alleged circuit split, Petitioner has not identified any reason why the refusal to appeal this Court's suppression ruling was objectively unreasonable.  Certainly, counsel were entitled to omit an issue which had a very limited likelihood of success in order to focus the Court of Appeals' attention on more pressing issues.  *Cf. Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) ("Effective assistance of appellate counsel does not require the presentation of all issues on appeal that may have merit, and we must accord counsel the presumption that he decided which issues were most likely to afford relief on appeal. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." (internal quotation marks and citations omitted)).  Petitioner has provided no plausible basis for challenging the search, nor is there one existing under the law.  Accordingly, Petitioner's claim must fail.

G. Issue Seven – Government Intimidation of Witnesses

In his seventh claim, Byers asserts that the government intimidated, threatened, or attempted to coerce false testimony from Joseph Parham, Tair Pollard, Jason Torbit, Jamar Saunders, Whitney Mears, Patrick A. Byers, Sr., and Kisha Newsom.  Mem. Supp. Am. Mot. Vacate at 12.   Several of these individuals—and Petitioner's assertions regarding the information as to which they would have testified—have been addressed above.   Beyond Petitioner's bald assertions, he has identified no evidence to support his claims.   Moreover, even if Petitioner were to succeed in demonstrating actual attempts at coercion, he has failed to show any prejudice caused by trial counsel's purported failure to investigate such activity. Jason Torbit, Jamar Saunders, and Whitney Mears did not testify at all at trial—let alone testify against Petitioner.  The only testimony provided by Tair Pollard, Patrick A. Byers, Sr., and Kisha Newsom was that they had had contact with Petitioner by means of the jail cell phone—a fact that was readily corroborated by the telephone records.

The only witness who provided any extensive testimony was Joseph Parham, who actually recanted his earlier identification of Byers as the Haynes murderer and testified that Byers was not the individual who shot Haynes. Parham's testimony was, at least superficially, exculpatory.   As such, assuming Parham was pressured by the Government, Petitioner is unable to demonstrate prejudice.  The truly damaging aspect of Parham's testimony was not the content of his testimony.  Instead, it was the Government's use of Parham's previous identifications, coupled with the evidence from a second cell phone (and the corresponding phone records) used by Petitioner to contact Parham and his family.  It was not Parham's

trial testimony that was prejudicial to Petitioner, but Petitioner's own clear—and apparently successful—intimidation of witnesses that was damaging to his defense.

    H.  Issue 8 – Racial Bias in Death Penalty Prosecution

Byers' final argument is that, contrary to his instructions, trial counsel "forfeited Petitioner's rights to 14th Amendment protection under the constitution, re racial discrimination . . . in relation to Death Penalty Prosecutions." Mem. Supp. Am. Mot. Vacate at 13. Petitioner attaches a report published by the American Civil Liberties Union stating that African American criminal defendants have received death sentences at a much higher rate than white defendants and alleges that his counsel failed to raise the issue. *See* ECF No. 424-10.

This final claim must fail for two reasons. First, Petitioner's counsel did in fact raise "racial discrimination and disproportionality" as grounds for eliminating the death penalty as an option in Petitioner's case. *See* Mem. Supp. Mot. Bar Death Penalty, ECF No. 138-1, at 2-9. Additionally, Petitioner has failed to make a showing of prejudice as to this claim. Although the Government sought the death penalty against Petitioner, the jury ultimately did not find that the death penalty was appropriate. *See* Judg., ECF No. 340. Accordingly, Petitioner's final grounds for relief must fail, and Petitioner's Motion to Vacate (ECF No. 412) is DENIED.[36]

---

[36] Petitioner requests court-appointed counsel. However, there exists no constitutional right to habeas counsel. *See United States v. Riley*, 21 F. App'x 139, 142 (4th Cir. 2001). When a court chooses not to conduct an evidentiary hearing in a habeas proceeding, it appoints counsel according to discretion when "the interests of justice so require." *See* 18 U.S.C.A. § 3006(A)(2)(a); *see also* Rule 8 of the Governing Rules of § 2255 Motions (requiring the court to appoint counsel for a § 2255 motion only if the court conducts an evidentiary hearing.). The Court has reviewed Petitioner's Motion and supporting Memorandum and the Government's opposition thereto and finds no hearing is necessary. *See* Local Rule 105.6 (D.Md.2011). Since there is no need for an evidentiary hearing in this case, the interests of justice do not require Petitioner to have counsel

## CONCLUSION

For the foregoing reasons, Petitioner's Motion to Vacate, Set Aside, or Correct Sentence (ECF No. 412) is DENIED.  Petitioner's Motions for Extension of Time to File (ECF Nos. 436 & 437) are GRANTED *EX POST FACTO.*  Petitioner's Motion to Appoint Counsel (ECF No. 437) is DENIED.  Additionally, Petitioner's Motions for Copy Work (ECF Nos. 442 & 447) are MOOT with the exception that a copy of Petitioner's docket sheet shall be mailed to the Warden of his present place of confinement, so that access to the criminal docket sheet can be made available to Petitioner in accordance with prison policy and procedures.  Petitioner's Motion to Withdraw (ECF No. 458) his prior Motion to Amend/Correct (ECF No. 453) is GRANTED.  Petitioner's Motion to Amend/Correct (ECF No. 453) is WITHDRAWN.  Consequently, the Government's Motion to Dismiss (ECF No. 455) the now withdrawn Motion to Amend/Correct (ECF No. 453) is MOOT. Finally, Petitioner's Motion for Deficient Service (ECF No. 460) is DENIED, Petitioner's Motion Objecting to Trial Counsel's Disclosures (ECF No. 461) is also DENIED, and Petitioner's Motion to Compel (ECF No. 462) is MOOT.

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the court is required to issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  A certificate of appealability is a "jurisdictional prerequisite" to an appeal from the court's earlier order.  *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Where the court

---

for ruling on this motion. As such, this Court will not appoint counsel to represent Petitioner in his § 2255 motion, and the Petitioner's Motion to Appoint Counsel (ECF No. 437) is DENIED.

denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong.  *See Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Because reasonable jurists would not find Petitioner's claims debatable, a certificate of appealability is DENIED.

A separate Order follows.

Dated:          September 16, 2015

                                                        /s/
                                            Richard D. Bennett
                                            United States District Judge